IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

MICHAEL A. MCGUIRE, JEB, and )
KLL, )
  )
     Plaintiffs, )
  )     CASE NO. 2:19-CV-174-WKW
   v. )         [WO]
  )
STEVEN T. MARSHALL, *et al.*, )
  )
     Defendants. )

## MEMORANDUM OPINION AND ORDER

For the third time in ten years, the constitutionality of the Alabama Sex Offender Registration and Community Notification Act ("ASORCNA")—the most comprehensive and debilitating sex-offender scheme in the nation—is before the court. ASORCNA applies to adult offenders no matter when or where they were convicted and affects virtually every aspect of registrants' lives. They may not live or work within 2,000 feet of a school or daycare, even if the offender never harmed a child. Between 10:30 p.m. and 6:00 a.m., no offender can be in the same house as a minor niece or nephew—not even for a minute. They may not travel outside of their county of residence for three or more days without notifying law enforcement of their exact plans. Even a minor violation of any of these provisions may result in years behind bars. And unless a narrow exception somehow applies, offenders must comply with ASORCNA for life. *See generally* Ala. Code §§ 15-20A-1 through 15-

20A-48.

The State of Alabama says that these restrictions protect the public, especially children, from recidivist sex offenders.  That is a compelling state interest.  But sex offenders are not second-class citizens.  The Constitution protects their interests too.

This case is about whether certain ASORCNA provisions violate the First and Fourteenth Amendments, are unconstitutionally vague, violate the Constitution's ex post facto clause, or are selectively enforced.  Plaintiffs are three registered sex offenders covered by ASORCNA.  Before the court are Defendants' motion to dismiss (Doc. # 35) and Plaintiffs' response (Docs. # 43, 52).  For the reasons below, Defendants' motion to dismiss is due to be granted in part and denied in part.

## I.     JURISDICTION AND VENUE

The court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1343.  The parties do not dispute personal jurisdiction or venue.

## II.     STANDARD OF REVIEW

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  This standard "is not akin to a

2

'probability requirement,' but it asks for more than a sheer possibility that [the] defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556). "For purposes of Rule 12(b)(6) review, . . . a court generally may not look beyond the pleadings." *United States ex rel. Osheroff v. Humana Inc.*, 776 F.3d 805, 811 (11th Cir. 2015).

The State challenges the court's subject matter jurisdiction by arguing that KLL lacks standing to challenge many of ASORCNA's provisions. The court also *sua sponte* questions JEB and McGuire's standing to challenge other ASORCNA provisions. An attack on subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) may be either a facial attack or a factual attack. *Lawrence v. Dunbar*, 919 F.2d 1525, 1528–29 (11th Cir. 1990) (per curiam). A facial attack simply challenges the sufficiency of the plaintiff's jurisdictional allegations, which are taken as true. *Id.* at 1529. Factual attacks challenge "the existence of subject matter jurisdiction in fact, irrespective of the pleadings, and matters outside the pleadings, such as testimony and affidavits, are considered." *Id.* (quoting *Menchaca v. Chrysler Credit Corp*., 613 F.2d 507, 511 (5th Cir. 1980)). All questions regarding Plaintiffs' standing can be resolved on the face of the complaint.

### III.   FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs Michael McGuire, JEB, and KLL bring facial and as-applied claims to ASORCNA in its entirety and to many of its specific provisions. They invoke the

protections of the First Amendment, void for vagueness doctrine, the Fourteenth Amendment's Equal Protection Clause, and the Ex Post Facto Clause. Defendants move to dismiss based on 1) standing, 2) res judicata (for JEB and McGuire's claims), 3) the statute of limitations, 4) the court's discretion to decline a declaratory judgment action, and 5) the merits.

### A. **Statutory Framework**

As described in *Doe 1 v. Marshall*, "the State of Alabama enacted its first sex-offender statute over five decades ago." 367 F. Supp. 3d 1310, 1319 (M.D. Ala. 2019) (citing Ala. Act No. 1967-507) [hereinafter *Doe 1*]. "That law required offenders to submit their name to their county sheriff, and only law enforcement could access that roster." *Id.* (citing Ala. Act No. 1967-507 §§ 1, 2). Since then, Alabama has repeatedly amended its sex-offender laws to make them broader and more restrictive. *See McGuire v. Strange*, 83 F. Supp. 3d 1231, 1236–40 (M.D. Ala. 2015) [hereinafter *McGuire 1*]; *Doe v. Pryor*, 61 F. Supp. 2d 1224, 1226–29 (M.D. Ala. 1999). The current statute, ASORCNA, comprises mostly legislation from 2011, 2015, and 2017. *See* Ala. Act No. 2011-640; Ala. Act No. 2015-463; Ala. Act. No. 2017-414.

ASORCNA applies to adults convicted of any of thirty-three "sex offenses." Ala. Code § 15-20A-5. It also applies to anyone convicted of a crime in another jurisdiction if that jurisdiction "requires that anyone convicted of that crime register

as a sex offender," *id.* § 15-20A-5(37), and to "[a]ny offender determined in any jurisdiction to be a sex offender," *id.* § 15-20A-5(38).  It applies retroactively, sweeping offenders under its control no matter when they were convicted or their duty to register arose.  *Id.* § 15-20A-3(a).  Unless relieved from its requirements because of medical need or through one of its other narrow exceptions, offenders are subject to ASORCNA's requirements for life.  *Id.* § 15-20A-3(b).

### 1. *Duty to Register and Reporting Requirements*

Offenders must register with law enforcement upon (1) release from incarceration (or at the time of conviction if not incarcerated), or (2) upon entering the state.  *Id.* § 15-20A-10.  ASORCNA requires an in-person appearance before local law enforcement of the county in which the sex offender resides, accepts employment or a volunteer position, or attends school.  *Id.*  When registering, they must provide law enforcement with their home address, the name and address of their employer, their vehicle information, their phone numbers, and more.  *Id.* § 15-20A-7(a)(4)–(8).

Offenders must "immediately" update their registration information whenever it changes.  *Id.* § 15-20A-10.  "Immediately" means within three business days.  *Id.* § 15-20A-4(9).  Most changes must be reported in-person.  *Id.* § 15-20A-10(e)(1).  Changes to phone numbers may be reported in-person, online, or over the phone, "as required by the local law enforcement agency."  *Id.*

Law enforcement uses this information to establish a registry, which it makes available to the public. *Id.* § 15-20A-8. ASORCNA also requires local law enforcement to notify the community of a sex offender's presence by distributing flyers to nearby residents. *Id.* § 15-20A-21.

### 2. *Residency, Travel, and Employment Restrictions*

ASORCNA strictly limits the areas in which sex offenders may live and work. The residency provision proscribes the establishment or maintenance of a residence within 2,000 feet of a school, childcare facility, or resident camp. *Id.* § 15-20A-11(a). ASORCNA also prohibits sex offenders from establishing or maintaining a residence within 2,000 feet of the property on which a victim's immediate family members reside. *Id.* § 15-20A-11(b). The 2,000-feet exclusion zone is measured in a straight line from nearest property line to nearest property line. *Id.* § 15-20A-11(h). Those sex offenders who were released or convicted and established a residence within an exclusion zone prior to ASORCNA's effective date were not required to relocate. *See, e.g.*, *id.* § 15-20A-11(a) ("No adult sex offender shall . . . maintain a residence *after release or conviction* . . . within 2,000 feet of the property . . . ." (emphasis added)).

In addition to imposing geographical limitations on living arrangements, ASORCNA prevents sex offenders from residing with certain minor children (the "minor-cohabitation rule"). No sex offender may "reside or conduct an overnight

visit with a minor." *Id.* § 15-20A-11(d).  The Act defines "overnight visit" as "[a]ny presence between the hours of 10:30 p.m. and 6:00 a.m."  *Id.* § 15-20A-4(14).  The minor-cohabitation rule generally does not apply if the sex offender is the parent, grandparent, sibling, stepparent, or stepsibling of the minor.  *Id.* § 15-20A-11(d).  Under certain circumstances in which the sex offender's victim was a child, however, even these familial exceptions do not apply.  *Id.* § 15-20A-11(d)(1)–(5).

Deciphering the statutory meaning of "residence" is no small feat—it takes four statutory cross-references to pin down the term's definition.[1]  "Residence" is defined as "[a] fixed residence . . . or other place where the person resides, regardless

---

[1] Set out in full, the four relevant provisions read as follows:

(6) FIXED RESIDENCE. A building or structure, having a physical address or street number, that provides shelter in which a person resides.
. . . .
(14) OVERNIGHT VISIT. Any presence between the hours of 10:30 p.m. and 6:00 a.m.
. . . .
(20) RESIDE. To be habitually or systematically present at a place.  Whether a person is residing at a place shall be determined by the totality of the circumstances, including the amount of time the person spends at the place and the nature of the person's conduct at the place.  The term reside includes, but is not limited to, spending more than four hours a day at the place on three or more consecutive days; spending more than four hours a day at the place on 10 or more aggregate days during a calendar month; or spending any amount of time at the place coupled with statements or actions that indicate an intent to live at the place or to remain at the place for the periods specified in this sentence.  A person does not have to conduct an overnight visit to reside at a place.
(21) RESIDENCE. A fixed residence as defined by Section 15-20A-4 or other place where the person resides, regardless of whether the person declares or characterizes such place as a residence.

Ala. Code § 15-20A-4.

of whether the person declares or characterizes such place as a residence." *Id.* § 15-20A-4(21). ASORCNA then defines the operative term "reside" as "be[ing] habitually or systematically present at a place," a matter which "shall be determined by the totality of the circumstances." *Id.* § 15-20A-4(20). In addition to this catch-all, the Act specifies three circumstances under which a person resides at a place: first, if the person spends four hours there on three consecutive days; second, if the person spends four hours there on ten days out of a month; and third, if the person spends any length of time there and has indicated an intent to remain for the named periods of time. *Id.* These three circumstances, as the Act makes clear, are illustrations rather than limitations of the definition. *Id.* Should a registrant fail to notify law enforcement or obtain a travel permit prior to "spend[ing] three or more consecutive days" away from his residence, he will be deemed to have changed residences and will be required to report the change to law enforcement. *Id.* §§ 15-20A-11(e)(2), 15-20A-10(e)(1).

The statute does allow for a limited reprieve from these restrictions. As of August 1, 2017, ASORCNA offers registrants a safe harbor in the form of residential preapproval. *Id.* § 15-20A-11(g). Should law enforcement preapprove an address as ASORCNA compliant before a registrant moves in, his residence there will not violate the residential-exclusion rules. *Id.* Registrants also may petition a state circuit court for relief based on terminal illness, permanent immobility, or other

debilitating medical condition.  *Id.* § 15-20A-23(a).  To grant this relief, the state court must find that the petitioner does not pose a substantial risk of engaging in future sexual misconduct.  *Id.* § 15-20A-23(g).

The employment provision, like the residency provision, imposes a geographical limitation on sex offender activity.  No sex offender may "accept or maintain employment or a volunteer position" within 2,000 feet of a school or childcare facility.  *Id.* § 15-20A-13(b).  Registrants also may not accept or maintain employment within 500 feet of a playground, park, or athletic facility with a principal purpose of serving children.  *Id.* § 15-20A-13(c).  The exclusion zone is measured from nearest property line to nearest property line.  *Id.* § 15-20A-13(f).

This provision further precludes sex offenders from working at any facility or organization that provides services primarily to children.  *Id.* § 15-20A-13(a).  These employment restrictions apply regardless of whether the sex offender's victim was a minor child.  "Employment" includes volunteer work and part-time work, but not "time spent traveling as a necessary incident to performing the work."  *Id.* § 15-20A-4(5).  There is no preapproval "safe harbor" for the 2,000-feet employment exclusion zone.  Offenders may, however, be relieved from that restriction if a state court finds they pose no substantial risk of any future sexual misconduct.  *Id.* § 15-20A-25(f).

If a registrant intends to leave his county of residence for a period of three or more consecutive days, he must complete a travel notification document and provide the details of his travel plans. *Id.* § 15-20A-15.

### 3. Branded Identification Requirement

To ensure easy identification of registrants, ASORCNA requires all sex offenders to carry branded identification cards. Specifically, the statute provides that a sex offender must "obtain . . . and always have in his or her possession, a valid driver license or identification card issued by the Alabama State Law Enforcement Agency." *Id.* § 15-20A-18(a). These registrant-specific driver's licenses must "bear[ ] a designation that enables law enforcement officers to identify the licensee as a sex offender." *Id.* § 15-20A-18(b), (c). The Alabama Legislature delegated to the Secretary of the Alabama Law Enforcement Agency ("ALEA") the exclusive power "to promulgate any rules as are necessary to implement and enforce" ASORCNA. *Id.* § 15-20A-44(c). ALEA, in turn, has required the face of the identification cards to bear the inscription "CRIMINAL SEX OFFENDER" in bold, red letters. (Compl. ¶ 59.) Registrants must also relinquish any other identification previously issued to them "by a state motor vehicle agency" that does not bear the sex offender inscription. *Id.* § 15-20A-18(d). They may not "mutilate, mar, reproduce, alter, deface, disfigure or otherwise change the form of any" state-issued identification. Ala. Code § 15-20A-18(e).

10

According to the operative Complaint, the State has initiated partial voluntarily cessation of this requirement in the wake of this court's final decision in *Doe 1*. (Compl. ¶ 62.)   In the final *Doe 1* opinion, this court found that the "CRIMINAL SEX OFFENDER" designations were unconstitutionally compelled speech as applied to the *Doe* plaintiffs. *Doe 1*, 367 F. Supp. 3d at 1324–27.  As alleged,  the State has changed its manner of enforcing the branded identification requirement, allowing the *Doe* plaintiffs and at least some other registrants, including McGuire, to exchange their old licenses for new ones that use a numbered code to signal to law enforcement that the license-holder is a sex offender. (Compl. ¶¶ 128–133.)

### 4. Loitering

ASORCNA prohibits any adult sex offender who has been convicted of a sex offense involving a minor from loitering "on or within 500 feet of the property line of any property on which there is a school, childcare facility, playground, park, athletic field or facility, school bus stop, college or university, or any other business or facility having a principal purpose of caring for, educating, or entertaining minors." Ala. Code § 15-20A-17(a)(1).  To loiter is defined as "to enter or remain on property while having no legitimate purpose or, if a legitimate purpose exists, remaining on that property beyond the time necessary to fulfill that purpose." *Id.* § 15-20A-17(a)(2).  The statute is not violated unless the registrant "has first been

asked to leave a prohibited location by a person authorized to exclude the adult sex offender from the premises." *Id.* "An authorized person includes, but is not limited to, any law enforcement officer, security officer, any owner or manager of the premises, a principal, teacher, or school bus driver if the premises is a school, childcare facility, or bus stop, a coach, if the premises is an athletic field or facility, or any person designated with that authority." *Id.*

### 5. *Penalties for ASORCNA Violations*

ASORCNA's provisions are enforced by threat of criminal prosecution. Even a minor violation may constitute a Class C felony. *See, e.g.*, Ala. Code § 15-20A-10(j). Offenders are liable only if they "knowingly" violate the law, however. *Id.*

The term of imprisonment for a Class C felony is "not more than 10 years or less than 1 year and 1 day." *Id.* § 13A-5-6(a)(3). But if the defendant was convicted before of a Class A, B, or C felony, he must be sentenced to "not more than 20 years or less than 2 years." *Id.* §§ 13A-5-6(a)(2), 13A-5-9(a). And if he was convicted before of two Class A, B, or C felonies, he must be sentenced to "life or not more than 99 years or less than 10 years." *Id.* §§ 13A-5-6(a)(1), 13A-5-9(b).

### B. <u>Parties</u>

#### 1. *Plaintiff Michael McGuire*

Once more unto the breach goes Michael McGuire, who is "well known by this Court as he was the Plaintiff in *McGuire I*." (Compl. ¶ 5.) McGuire was the

sole plaintiff in *McGuire I*, No. 2:11-cv-1027-WKW (M.D. Ala.), which proceeded to a bench trial and culminated in findings that ASORCNA's former requirements 1) that homeless registrants who live in municipalities report weekly in-person to two separate law-enforcement jurisdictions and 2) that all in-town registrants seek travel permits from two separate law-enforcement jurisdictions were unconstitutional under the Ex Post Facto Clause. *McGuire v. Strange*, 83 F. Supp. 3d 1231, 1271 (M.D. Ala. 2015). McGuire filed this suit as the sole plaintiff on March 11, 2019 (Doc. # 1), amended his complaint (Doc. # 9), and then was granted leave to file a second amended complaint with additional co-plaintiffs (Doc. # 30).

Mr. McGuire is a 64-year-old adult registrant of ASORCNA who lives in the Middle District of Alabama. In 1985, Mr. McGuire was convicted in Colorado of sexual assault of his 30-year-old girlfriend. After his release from prison four years later, McGuire paroled to the Washington D.C. area, where he worked as a musician and cosmetologist. (Compl. ¶¶ 70–73.) "He was not required to register as a sex offender after serving his prison sentence and parole. . . . Mr. McGuire returned to his hometown, Montgomery, Alabama to care for his ailing mother in 2010." (Compl. ¶¶ 74, 76.) He moved in with his mother and then voluntarily visited the Montgomery Police Department to confirm his belief that he was not subject to Alabama's sex offender law. The Montgomery Police Department required Mr.

McGuire to register as a sex offender and gave him five days, under felony threat, to move from his mother's "non-compliant" home.  (Compl. ¶¶ 77–78.)

His complaint alleges a wide variety of injuries under ASORCNA, some of which will be addressed or elaborated on in later sections.  He is currently homeless.  (Compl. ¶ 138.)  Because of ASORCNA's residency restrictions and prohibitions on overnight visits with minors, he has limited the time spent at his brother's home, at family gatherings, and with his wife.  (Compl. ¶¶ 88–94.)  Because of ASORCNA's employment restrictions and its alleged vagueness, Mr. McGuire has turned down opportunities to engage in musical performances on a paid and volunteer basis.  (Compl. ¶¶ 95–105.)   He alleges that ASORCNA's residency, travel, and employment restrictions interfere with his ability to participate in his church's ministries.  (Compl. ¶¶ 108–14.)  The travel provisions limit his ability to engage in spontaneous weekend trips because he cannot obtain law enforcement permission on Friday evenings or weekends, and ASORCNA's twenty-one-day notification requirement for international travel burdens his ability to visit his brother in Germany.  (Compl. ¶¶ 117–122.)  Additionally, he alleges that he encountered burdensome delays and administrative hurdles during the process of exchanging his word-branded driver's license for a code-branded license.  (Compl. ¶¶ 123–33.)

## 2. *Plaintiff JEB*

JEB is also familiar to this court as John Doe #7 in the *Doe 1* litigation. (Compl. ¶ 6.)  He is an adult ASORCNA registrant living in the Middle District of Alabama.  (Compl. ¶ 149.)  In 1987, JEB pleaded guilty to second-degree sodomy of an adult jail inmate and registered as a sex offender upon his release from prison in 2011.  Most of his allegations center on Chilton County Investigator Derrick Bone, who was not permitted to be joined as a defendant in this action.  (Doc. # 30.) He alleges that Bone harassed him and twice caused him to be arrested in mid-2018 for violating ASORCNA's residency and reporting provisions.  (Compl. ¶¶ 151–68.) He alleges that he was arrested again due to a legally deficient bond revocation warrant on October 15, 2018, and that he was eventually released on bond on June 13, 2019.  (Compl. ¶¶ 177–82.)

> Mr. JEB is afraid that he will be arrested again by law enforcement for any of the many ways he can be unjustly deemed by Bone to have violated ASORCNA's restrictions; for failing to report his daily choices in people or places he visits; places where he can obtain work; or, any combination of ASORCNA's residency, employment, travel and in person reporting restrictions and requirements.

(Compl. ¶ 183.)

In addition to these arrest-related allegations, JEB alleges that he has turned down construction work because he does not know where he may obtain employment.  (Compl. ¶¶ 184–87.)  "JEB currently carries an Alabama driver's license branded with CRIMINAL SEX OFFENDER on its face.  He is offended by

the label and wishes to have the brand removed from his license now."  (Compl. ¶ 188.)  JEB registers quarterly with his county sheriff's office and pays $10 during each registration event.  (Compl. ¶ 189.)

### 3.  *Plaintiff KLL*

Plaintiff KLL is the only plaintiff who, to this court's knowledge, has not previously challenged ASORCNA.  He is an adult ASORCNA registrant residing in the Northern District of Alabama.  (Compl. ¶ 191.)  KLL lived in Louisiana when he was charged with and convicted of contributing to the delinquency of a juvenile under La. Rev. Stat. Ann. § 14:92(A)(7)[2] for sexual conduct that occurred when he was 18 and his victim was 16.  (*Id.* ¶¶ 192–96.)  KLL pleaded guilty to this charge in 2012.  (*Id.* ¶ 198.)  He alleges that he was not required to register as a sex offender "after accepting the plea agreement."  (*Id.* ¶ 198.)   However, he later had his probation revoked for violations of his probation's residency terms, and upon his release from prison in 2014, KLL was required to register under Louisiana's sex offender law.  (*Id.* ¶¶ 198–99, 201.)

---

[2]  Throughout their Complaint and Response, Plaintiffs incorrectly refer to KLL's crime of conviction as a violation of "La. Rev. Stat. § 14:92(7)."  (Compl. ¶¶ 198, 201, 415; Doc. # 43, at 62, 108.)  The correct citation is La. Rev. Stat. § 14.92(A)(7).  *See* La. Rev. Stat. § 14:92(A)(7) (defining contributing to the delinquency of juveniles as "the intentional enticing, aiding, soliciting, or permitting, by anyone over the age of seventeen, of any child under the age of seventeen . . . to . . . perform any sexually immoral act").  This provision is the only subsection (7) in that code section and accords with KLL's description of his crime.

KLL was required to register under ASORCNA upon moving to the state in 2015. (*Id.* ¶¶ 203–04.) He alleges he was required to register under Alabama Code § 15-20A-5(38) (*id.* ¶ 204), which requires anyone determined to be a "sex offender" under another state's law to register under ASORCNA. KLL alleges that his offense conduct would not have been a crime in Alabama, which only criminalizes consensual sexual behavior with victims under the age of 16. (*Id.* ¶ 201.)

KLL alleges a variety of injuries under ASORCNA, some of which will be detailed or elaborated on in subsequent sections. He alleges that until July 2018, he was required to register both with a city police department and a county sheriff's office. (*Id.* ¶¶ 205–06); *see also* Ala. Code §§ 15-20A-10(f) (requiring quarterly, in-person registration with "local law enforcement"); 15-20A-4(12) (defining "local law enforcement" to include both the sheriff of the county and the chief of police of the municipality where the sex offender resides). However, KLL moved in July 2018 and now registers only with the sheriff of his county. (Compl. ¶¶ 205–07, 231.)

KLL alleges that his county's sheriff distributed sex offender community notification flyers in August 2018. (*Id.* ¶ 209.) "Members of his church received the flier and one elder in the church subsequently discovered KLL on the ALEA sex offender website." (*Id.* ¶ 210.) KLL alleges that he is injured by the branded identification requirement because "[t]h[ose] words and codes on my license is one [sic] the worst parts. I am not a sex offender and do not agree with anyone labeling

me that way." (*Id.* ¶ 211.)  When family members who have minor children visit KLL, he sleeps in his vehicle away from his home to avoid violating ASORCNA's prohibition on overnight visits with minors.  (*Id.* ¶¶ 213–14.)  KLL alleges he is unsure whether ASORCNA's employment restrictions permit collecting abandoned items on the side of the road in restricted areas for refurbishment and that "he avoids seeking employment when he does not know if the prospective employment locations are within ASORCNA's zones of exclusion."  (*Id.* ¶¶ 216–18.) ASORCNA's employment, travel notification, and general reporting requirements often prevent him from accepting out-of-town jobs on short notice.  (*Id.* ¶¶ 219–22.)

KLL alleges that his desires to attend and volunteer his skills to his church are chilled.  He fears that his activities might be construed as having established a "residence" at his church, which is located within 2,000 feet of a high school.  He cannot volunteer as a craftsman at his church due to ASORCNA's employment restrictions and travel notification requirements.  (*Id.* ¶¶ 223–26.)  Lastly, KLL refrains from taking his younger brother to ball fields and does not attend sporting events at local schools because he does not understand and fears violating ASORCNA's anti-loitering provisions. (*Id.* ¶¶ 227–30.)

### 4. Defendants

Defendants Steven Marshall, Alabama Attorney General, and Hal Taylor, Secretary of the Alabama Law Enforcement Agency, are sued in their official

capacities.  Plaintiffs allege that these are proper defendants "in a case challenging the constitutionality and enforcement of a state statute." (*Id.* ¶¶ 8–9.)  Additionally, Secretary Taylor's office is responsible for administering ASORCNA's branded identification provisions, including determining the nature of the "brand" and determining how and whether registrants may exchange licenses labeling them as "CRIMINAL SEX OFFENDER[S]" for a less offensively branded license.  (*See id.* ¶¶ 62–65.)  The complaint alleges that "Defendant Taylor currently requires that registrants shall only obtain non-branded identification at certain ALEA offices in the state, requiring potentially thousands of registrants to travel beyond the usual locations where they obtain identification often having to travel several additional miles to exchange their branded identification." (*Id.* ¶ 64.)  Plaintiffs also specifically allege in Count 5 that Defendant Marshall is responsible for selectively enforcing ASORCNA against KLL and for selectively enforcing the reporting and residency requirements against JEB and McGuire.  (*Id.* ¶¶ 413–17.)  Because Defendants are sued in their official capacities, however, the court refers to them collectively as "the State of Alabama" or "the State."

## C. Procedural History and Claims

McGuire filed this suit as the sole plaintiff on March 11, 2019.  (Doc. # 1.) He amended his complaint on March 19, 2019.  (Doc. # 9.)  He was granted leave to file a second amended complaint, the current operative complaint, with additional

co-plaintiffs on October 29, 2019.  (Docs. # 30, 31.)

Count 1 alleges that ASORCNA is facially overbroad and impermissibly infringes upon Plaintiffs' freedoms of speech and expressive conduct under the First Amendment.  It seeks to invalidate ASORCNA in its entirety except for its application to offenders deemed to be sexually violent predators.  (Compl. ¶¶ 398–99.)  Count 2 alleges that ASORCNA's anti-loitering and employment restrictions are facially void for vagueness because "they contain language that persons of ordinary intelligence cannot understand; and/or, leave determinations of violations to the complete discretion of law enforcement."  (*Id.* ¶¶ 401–06.)  Count 3 alleges that over a dozen ASORCNA provisions facially and as-applied violate the Equal Protection Clause because they "infringe upon fundamental rights and liberties or are not rational and apply regardless of whether registrants are no longer subject to formal punishment, have not harmed minors or pose no discernable threat to children . . . ."  (*Id.* ¶ 410.)  Plaintiffs imply by their allegations that the Equal Protection Clause requires treating sex offenders who are no longer subject to formal punishment, have not harmed minors, and do not pose a threat to children the same as non-sex offenders—or that the Constitution at least requires individualized risk assessments of the future risk of recidivism before treating such offenders differently from non-offenders.  (*Id.* ¶¶ 409–10.)

Court 4 alleges this statutory scheme imposes ex post facto punishment on

Plaintiffs.  (Compl. ¶¶ 411–12.)  While the Complaint does not label this claim as facial or as-applied, the Complaint seeks quintessentially facial relief:  an injunction of "the State's enforcement of [ASORCNA] upon registrants whose convictions predate August 1, 2017 or alternatively, July 1, 2011." *AFSCME Council 79 v. Scott*, 717 F.3d 851, 863 (11th Cir. 2013) ("A facial challenge, as distinguished from an as-applied challenge, seeks to invalidate a statute or regulation itself." (quoting *United States v. Frandsen*, 212 F.3d 1231, 1235 (11th Cir. 2000) (quotation marks omitted))); *id.* ("Where 'an injunction . . . reach[es] beyond the particular circumstances of these plaintiffs,' it 'must therefore satisfy [the Supreme Court's] standards for a facial challenge to the extent of that reach.'" (quoting *Doe v. Reed*, 561 U.S. 186, 194 (2010)) (alternations in original)).

Count 5 alleges that Defendant Marshall selectively enforces the statute against KLL by requiring him to register as a sex offender in Alabama for conduct that is not criminal in Alabama.  Count 5 also alleges that Defendant Marshall selectively enforces the reporting and residency requirements against JEB and McGuire (Compl. ¶¶ 414–17), seemingly through ASORCNA's provision requiring dual reporting for "in-town" registrants (Compl. ¶¶ 368, 369; Doc. # 43, at 103; Doc. # 52, at 5–6) and through its homeless reporting requirements (Compl. ¶¶ 358–67).

## IV.   DISCUSSION

### A. <u>Possible Attempt to Add Plaintiffs</u>

Plaintiffs' Second Amended Complaint includes allegations related to ASORCNA registrants "REL" and "ALC."  (Compl. ¶¶ 232–266.)  These registrants do not appear in the style of the Second Amended Complaint, nor are they listed as plaintiffs in the section denoting the parties to this suit.  (Compl. ¶¶ 5–7.)  Yet, REL and ALC submit verifications of the allegations they make in the Second Amended Complaint.  (Doc. # 31-1, at 5–6.)  Defendants move for dismissal of these parties to the extent that Plaintiffs may be attempting to add them.  Plaintiffs did not respond to this argument.

"If the plaintiff fails to prosecute or to comply with these rules *or a court order*, a defendant may move to dismiss the action or any claim against it."  Fed. R. Civ. P. 41(b) (emphasis added).  A district court also "has inherent authority to manage its own docket 'so as to achieve the orderly and expeditious disposition of cases.'"  *Equity Lifestyle Props. v. Fla. Mowing & Landscape Serv.*, *Inc.*, 556 F.3d 1232, 1240 (11th Cir. 2009) (quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991)); *see also id.* at 1241 ("A district court need not tolerate defiance of reasonable orders.").  The court granted McGuire leave to add only JEB and KLL as additional plaintiffs (Doc. # 30, at 1), not REL or ALC.  Thus, REL and ALC will not be added as additional plaintiffs to this lawsuit.

## B. Standing

Because standing is jurisdictional, the court must address it at the outset. Defendants have focused their arguments on KLL's standing because they believe that all of McGuire's and JEB's claims are barred by res judicata. However, jurisdictional issues must be assessed before procedural issues. Therefore, McGuire's and KLL's standing will be assessed *sua sponte*.

Because Article III confers federal court jurisdiction only on cases or controversies, a federal court lacks subject matter jurisdiction over a complaint that fails to make plausible allegations of standing. *Stalley ex rel. United States v. Orlando Reg'l Healthcare Sys., Inc.*, 524 F.3d 1229, 1232 (11th Cir. 2008). "The party invoking federal jurisdiction bears the burden of establishing these elements." *Lujan v. Defenders of Wildlife, Inc.*, 504 U.S. 555, 561 (1992). The burden of proof for establishing standing is the same as the general burden of proof at the pleading stage: plausibility. *See id.*

The "irreducible constitutional minimum of standing contains three elements." *Id.* at 560. "First, the plaintiff must have suffered an 'injury in fact'— an invasion of a legally protected interest which is (a) concrete and particularized, and (b) 'actual or imminent, not 'conjectural' or 'hypothetical.'" *Id.* (citations omitted). Second, "the injury has to be 'fairly . . . trace[able] to the challenged action of the defendant, and not . . . the result [of] the independent action of some third

23

party not before the court.'"  *Id.* at 560–61 (quoting *Simon v. Eastern Ky. Welfare Rights Organization*, 426 U.S. 26, 41–42 (1976)).  Third, "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'"  *Id.* at 561 (quoting *Simon v. Eastern Ky. Welfare  Rights Organization*, 426 U.S. 26, 38, 43 (1976)).  "For an injury to be 'particularized,' it must affect the plaintiff in a personal and individual way."  *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016) (quoting *Lujan*, 504 U.S. at 560 n.1).  "A 'concrete' injury must be 'de facto'; that is, it must actually exist."  *Id.*  (citation omitted)  "[A] plaintiff seeking prospective injunctive relief must 'allege facts from which it appears there is a substantial likelihood that he will suffer injury in the future.'"  *Stevens v. Osuna*, 877 F.3d 1293, 1311 (11th Cir. 2017) (quoting *Strickland v. Alexander*, 772 F.3d 876, 883 (11th Cir. 2014)).

Plaintiffs' Complaint and Response contain conclusory standing arguments asserting that all Plaintiffs have standing to challenge every provision of ASORCNA, including those that apply "to juveniles, youthful offenders and *defacto* [sic] registrants of the statute including parents, guardians and custodians of juveniles; organizations (*e.g.,* churches) who provide services to primarily to children; and, family members of ASORCNA registrants."  (Compl. ¶¶ 399(a) & n.11.)

Plaintiffs' Response asserts that each Plaintiff has

suffered injuries in fact since the enactment of Ala. Act No. 2017-414 (effective August 1, 2017).  The 2017 Act was a 'substantial re-write' of ASORCNA, significantly revising provisions and adding new definitions which changes the way the statute is enforced and, under which Plaintiffs have suffered harm.  Importantly, all Plaintiffs suffer new injuries each day under ASORCNA proscriptions and chilling of their First Amendment freedoms.

(Doc. # 43, at 101.)

Plaintiffs specifically allege that their injuries give them standing to challenge the residency, employment, travel, reporting provisions, and the State's new branded identification practices.  They assert that "even if the Court determines McGuire and/or JEB lack standing, the defendants have conceded to KLL's standing on facial challenges on overbreadth and vagueness grounds."  (Doc. # 43, at 102–03.)  (Defendants do not so concede.)  Plaintiffs allege that "under First Amendment, third-party standing doctrine, KLL may challenge the entire statute."  (Doc. # 43, at 102–103.)  Lastly, they allege that overbreadth and *jus tertii* doctrine grant them standing to represent parties not before the court, such as ASORCNA juveniles and youthful offenders; parents, guardians and custodians of juveniles; organizations; and close family members of ASORCNA registrants.  (*See* Compl. ¶¶ 399(a) n.11, 410 n.12.)  Allegations of standing should be made of sterner stuff.

Plaintiffs lack standing to challenge every provision of ASORCNA, even in their overbreadth claim.  Except as delineated below, Plaintiffs have not alleged injuries in fact under every provision of ASORCNA, nor could they likely ever assert

an injury under provisions related to juvenile offenders.  As Defendants correctly alluded to in their opening brief, the overbreadth doctrine "is an exception to the prudential standing prohibition against *jus tertii* claims" that allows a plaintiff to bring an overbreadth claim when provisions of a statute that constitutionally apply to the plaintiff "might be unconstitutionally applied to third parties not before the court."  *CAMP Legal Def. Fund, Inc. v. City of Atlanta*, 451 F.3d 1257, 1270–71 (11th Cir. 2006) (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973)). However, this doctrine does not relax the core requirements of constitutional standing:  A plaintiff must "establish injury in fact as to each provision, even under the overbreadth doctrine."  *Id.* at 1273; *see also id.* at 1271 ("A plaintiff who has established constitutional injury under a provision of a statute as applied to his set of facts may also bring a facial challenge, under the overbreadth doctrine, to vindicate the rights of others not before the court under that provision.").  Therefore, even in an overbreadth claim, Plaintiffs may only challenge provisions that injure them.

Even with respect to the specific ASORCNA provisions that Plaintiffs have standing to challenge, they may not assert the rights of third parties as part of their traditional equal protection claims (Count 3).  The Supreme Court has permitted litigants to bring actions on behalf of third parties "provided three important criteria are satisfied:  The litigant must have suffered an 'injury in fact,' . . . ; the litigant

must have a close relation to the third party; and there must exist some hindrance to the third party's ability to protect his or her own interests." *Powers v. Ohio*, 499 U.S. 400, 410–11 (1991) (quoting *Singleton v. Wulff*, 428 U.S. 106, 112 (1976)). For good reason, the Supreme Court has "not looked favorably upon third-party standing." *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004).

First, third-party standing does not broaden the number of provisions under which Plaintiffs can claim to have suffered an injury in fact. *See Singleton v. Wulff*, 428 U.S. 106, 112–13 (1976) (first finding that the physician plaintiffs suffered their own injury under the challenged statute before assessing whether they could assert the rights of their plaintiffs who suffered a different kind of injury under the statute).

Second, Plaintiffs' bare assertion that "all plaintiffs have a substantial relationship with other registrants of ASORCNA, including other adult registrants, youthful and juvenile offenders, and parents, guardians and custodians of juveniles not before the Court" strains comprehension. (Doc. # 43, at 103; *see also* Compl. ¶ 410 n.12.) Except for the two adult non-parties mentioned in the Complaint, whose relationship to Plaintiffs is unexplained, Plaintiffs do not allege that they know any other ASORCNA registrants, let alone plausibly allege any substantial relationships. Unlike lawyers who have asserted the rights of known clients or doctors who have asserted the rights of known patients, Plaintiffs "before us do not have a 'close relationship' with" other registrants; "indeed, they have no relationship at all."

*Kowalski*, 543 U.S. at 131 (holding that attorneys could not invoke the rights of hypothetical future clients); *see also Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 624 n.3 (1989) (permitting a law firm to challenge a drug forfeiture statute by invoking the rights of an existing client); *Singleton*, 428 U.S. at 117–18 (permitting abortion-providing physicians to invoke the rights of patients seeking abortions).   This court need not assess whether the other parties Plaintiffs seek to represent are hindered in their ability to sue.   Plaintiffs' equal protection claim (Count 3) may only assert their own rights to challenge the specific provisions of ASORCNA that they have plausibly alleged injured them.

### 1. *KLL's Standing*

As  Defendants  correctly  concede,  KLL  may  challenge  ASORCNA's community notification and internet dissemination (§§ 15-20A-8, 21), residency (§ 15-20A-11, 4(14), 4(20)), employment (§ 15-20A-13), travel (§ 15-20A-15 ), and loitering provisions (§ 15-20A-17).   (Doc. # 36, at 27–28.)   KLL may also challenge the  branded  identification  requirement  (§ 15-20A-18),  (s*ee id.* ¶ 211),  and  the registration/reporting and fee requirements (§§ 15-20A-10, 22(a)).   (*See* Compl. ¶ 231 ("KLL currently registers with the Sheriff of his county and pays $10 at each registration event.").)   KLL has alleged injuries in fact under these provisions that are traceable to the Defendants (as enforcers of ASORCNA) and redressable by enjoining the provisions.

KLL may challenge ASORCNA's retroactive application provision (§ 15-20A-3(a)), (*see* Compl. ¶ 388), even though he may not have been injured by it. Plaintiffs primarily allege that ASORCNA was applied retroactively to registrants whose convictions pre-date the 2017 amendments. (*Id.* ¶ 412.)  Defendants argue that ASORCNA was applied retroactively to registrants whose convictions pre-date ASORCNA's 2011 enactment and attacks KLL's ex post facto claim (based on his 2012 guilty plea) on those grounds. (Doc. # 36, at 50–51.)  Because the question of standing is intertwined with the merits of KLL's claims, the court must "find that jurisdiction exists and deal with the objection as a direct attack on the merits of the plaintiff's case." *Garcia v. Copenhaver, Bell & Assocs., M.D.'s, P.A.*, 104 F.3d 1256, 1261 (11th Cir. 1997) (quotation marks omitted) (quoting *Williamson v. Tucker*, 645 F.2d 404, 415–16 (5th Cir. 1981)).  This question will be addressed in the context of KLL's ex post facto claim.

KLL has standing to challenge the lifetime registration requirement (§ 15-20A-3(b)) even though the Complaint lacks a particularized allegation that it applies to him.  The Complaint repeatedly alleges that ASORCNA applies for life. (Compl. ¶¶ 321, 397, 412, 17.)  At this stage, KLL has plausibly alleged standing to challenge ASORCNA's lifetime registration because "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we 'presum[e] that general allegations embrace those specific

facts that are necessary to support the claim.'" *Lujan*, 504 U.S. 555, 561 (quoting

*Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990)).

Finally, KLL does not allege any particularized injuries that would allow him

to challenge the relief provisions, but this is ultimately immaterial to the merits of

any challenge to this provision.[3] KLL does not have standing to challenge the

provisions of ASORCNA relating to homeless registrants because he is not

homeless, nor does he allege an imminent fear of homelessness.  He also does not

have standing to challenge the dual reporting requirement for "in-town" registrants.

While he was subject to this requirement until 2018, he now lives out of town, and

he has not alleged that he is likely to be injured by this provision in the future.

(Compl. ¶¶ 206, 231.)

---

[3] The closest the Complaint comes to explaining how the relief provisions might injure KLL is the following statement:  "Relief provisions are only available to certain registrants of ASORCNA.  ASORCNA provides minimal provisions for relief for some registrants, while failing to provide even the possibility for relief for others."  (Compl. ¶ 379.)  Plaintiffs' Response adds allegations that

> [t]he State does not provide sex offender treatment for offenders who are considered adults.  Yet registrants who may not be able to afford expensive treatment, but are among the very few eligible for relief, will be at the mercy of a judge who may decide of [sic] her level of risk for future sexual offenses.  Here is an additional problem for the few relief-eligible offenders. The "considerations" the judge may base granting relief upon are standardless.

(Doc. # 43, at 78.)  But these allegations are not connected to any particular Plaintiff, nor does the Complaint allege that any Plaintiff has sought relief and encountered any of these potential roadblocks.  Plaintiffs clearly know how to specifically allege an injury: the Complaint states that McGuire is ineligible for relief (Compl. ¶¶ 17 n.2, 147, 379).  KLL's exclusion from these specific references undercuts his claim for standing.

## 2. *JEB's Standing*

JEB may challenge ASORCNA's reporting/registration, reporting fee, travel, residency, employment, retroactive[4] and lifetime registration, community notification, and internet dissemination requirements. (*See* Compl. ¶¶ 183, 185–87, 189, 380, 391.) He does not have standing to challenge the relief provisions, in-town versus out-of-town reporting discrepancy, loitering provisions, or homelessness provisions because he alleges no injuries under those provisions. A few of these findings merit elaboration.

JEB narrowly alleges standing to challenge the residency, travel, and some or most of the reporting requirements. His complaint alleges that Investigator Bone, who Plaintiffs were not allowed to add as a Defendant, investigated and arrested him for alleged violations of the reporting and residency provisions. (Compl. ¶¶ 155–68.) Therefore, it is not readily apparent how his injuries are fairly traceable to these Defendants. However, given JEB's history with law enforcement, he states a plausible fear of future enforcement. (Compl. ¶ 183.) Declaring the law unconstitutional would remove any threat of enforcement. JEB has plausibly alleged standing to challenge these provisions because Defendants continue to enforce and

---

[4] JEB does not state his conviction date in this Complaint. However, the Complaint generally alleges that all Plaintiffs, including JEB, have been "retroactively captured under the punitive strictures of ASORCNA." (Compl. ¶ 88; *see also* Compl. ¶¶ 389, 390, 393.) This general allegation suffices at this stage of the litigation. *See Lujan*, 504 U.S. at 561.

legally defend the law and eliminating the law would eliminate his fears of enforcement.

JEB may not challenge the relief provisions for the same reason as KLL. *See supra*, at n.3. The Complaint specifically alleges that McGuire is ineligible to seek relief, but it does not make the same claim for JEB.

JEB has standing to challenge the branded identification requirements. He alleges that he "currently carries an Alabama driver's license branded with CRIMINAL SEX OFFENDER on its face. He is offended by the label and wishes to have the brand removed from his license now." (Compl. ¶ 188.) The practice that injured him was declared unconstitutional as-applied to him in *Doe # 1*. Defendants claim in their opening brief that he has received a new ID, (Doc. # 36, at 17), however they have not submitted any public records that could be judicially noticed so as to corroborate this assertion. Discovery will easily resolve this factual dispute; thus, JEB is not barred at this time from challenging the branded identification requirements.

JEB does not have standing to challenge the in-town/out-of-town or homeless reporting discrepancies, because he lives out of town, does not allege homelessness, and is therefore not injured by the discrepancies. (Compl. ¶ 189.) His claim in Count 5 appears to rest on this provision. Count 5 alleges that Defendant Marshall selectively enforces "the reporting requirements and residential zones of exclusion,

Ala. Code §§ 15-20A-10; -11 facially or, in the alternative, as applied to Mr. JEB."
(*Id.* ¶ 417.)  This claim cannot be based on JEB's selective enforcement allegations
against Bone because Defendant Marshall was not involved in those transactions.
Plaintiffs' Response states that, within Count 5, Plaintiffs "validly claim that, even
within the state-created class of ASORCNA registrants, registrants are treated
disparately for no articulable reason at all (*e.g.* dual registration, reporting and fees
for 'in town' registrants)."  (Doc. # 43, at 103.)  Consequently, the "in-town" and
homeless discrepancies are the only provisions that can be logically connected with
JEB (and McGuire's) selective enforcement claim.  Because these "discrepancies"
do not injure JEB, JEB's claim in Count 5 is due to be dismissed for lack of standing.

### 3. *McGuire's Standing*

McGuire has standing to challenge ASORCNA's retroactivity and lifetime
adherence; community notification and internet dissemination; quarterly registration
requirements; fee provisions; residency restrictions; homeless reporting
requirements; employment restrictions; travel notification; branded identification;
and relief provisions.  (*See* Compl. ¶¶ 88, 103, 106, 115, 116, 119, 125, 379, 380,
391, 393.)  McGuire is also the only Plaintiff who has standing to challenge the dual
reporting provisions for "in-town" registrants (§§ 15-20A-10, 4(12)).  (*See* Compl.
¶ 115.)  He has not alleged any injuries under ASORCNA's loitering provision.  He

does not have standing to challenge § 15-20A-28, a relief provision that only applies to juvenile offenders.

McGuire's claim that law enforcement officers have "charged a $10 weekly fee when he was homeless in the past, and nothing in the statute prevents his local law enforcement office from charging him a fee in the future, should they so decide" (Compl. ¶ 116) alleges an injury in fact, but it is not fairly traceable to Defendants. McGuire alleges that "ASORCNA provides that as a homeless registrant Mr. McGuire is required to pay a weekly fee of $10 at his homeless registration events." (*Id.* ¶ 116; *see also id.* ¶ 26 (citing Ala. Code § 15-20A-22(a) as the source of this requirement); *id.* ¶¶ 371–76 (alleging that homeless registrants must pay a minimum of $520 per year).) But this is legally incorrect. Alabama Code § 15-20A-22(a) only requires a fee at "the first quarterly registration on or after July 1, 2011, and at each quarterly registration thereafter." § 15-20A-22(a). The court interpreted this statute in the same manner during the *McGuire 1* litigation. *McGuire 1*, 83 F. Supp. 3d at 1256. Therefore, McGuire's allegation suggests that local law enforcement officers have misinterpreted the law since the litigation of *McGuire 1*, which would give rise to a claim against local officers, not these Defendants. A misinterpretation is not redressable by a declaration of unconstitutionality. Therefore, McGuire lacks standing to challenge a non-statutory weekly homelessness fee.

### C. **Res Judicata**

"The purpose behind the doctrine of res judicata is that the 'full and fair opportunity to litigate protects [a party's] adversaries from the expense and vexation attending multiple lawsuits, conserves judicial resources, and fosters reliance on judicial action by minimizing the possibility of inconsistent decisions.'" *Ragsdale v. Rubbermaid, Inc.*, 193 F.3d 1235, 1238 (11th Cir. 1999) (alteration in original) (quoting *Montana v. United States*, 440 U.S. 147, 153–54 (1979)). "Res judicata bars the filing of claims which were raised or could have been raised in an earlier proceeding." *Id.* (emphasis added). "Under res judicata the effect of a judgment extends to the litigation of all issues relevant to the same claim between the same parties, whether or not raised at trial." *Olmstead v. Amoco Oil Co.*, 725 F.2d 627, 632 (11th Cir. 1984) (internal quotation and citation omitted) (emphasis added).

"[A] party may raise a res judicata defense by motion rather than by answer where the defense's existence can be judged on the face of the complaint." *Concordia v. Bendekovic*, 693 F.2d 1073, 1075 (11th Cir. 1982). The court may also take judicial notice of the pleadings, orders, and judgment entered in *McGuire I* and *Doe 1* for purposes of Defendants' res judicata defense without converting their motion to dismiss into a motion for summary judgment. *See Lobo v. Celebrity Cruises, Inc.*, 704 F.3d 882, 892 (11th Cir. 2013); *see also Lozman v. City of Riviera Beach*, 713 F.3d 1066, 1075 n.9 (11th Cir. 2013) (holding that the Circuit could

properly consider court documents from a prior state court action when analyzing a motion to dismiss on res judicata grounds); *Ladd v. City of W. Palm Beach*, 681 F. App'x 814, 816 (11th Cir. 2017) (rejecting the "plaintiff's argument that, because of the Fed. R. Civ. P. 12(b)(6) posture of th[at] case, the district court improperly took judicial notice of the prior state court proceedings" when analyzing a res judicata argument) (alterations added)).   Plaintiffs' Response did not object to the court's taking such notice, and it would be hard to see how they could, as Plaintiffs' Complaint cites the final opinions in both cases, as well as several other *Doe 1* filings.

"A subsequent suit is barred under the doctrine of claim preclusion when the following four elements are present: (1) there is a final judgment on the merits, (2) the decision was rendered by a court of competent jurisdiction; (3) the same cause of action is involved in both cases; and (4) the parties, or those in privity with them, are identical in both suits." *Baloco v. Drummond Co.*, 767 F.3d 1229, 1246 (11th Cir. 2014).   The burden of establishing a claim of res judicata rests on the party raising it.   *In re Piper Aircraft Corp.*, 244 F.3d 1289, 1295, 1296 (11th Cir. 2001).

The parties do not dispute that the first, second, and fourth requirements of this doctrine are met.   The third requirement is hotly contested.   "Res judicata is no defense where, between the first and second suits, there has been a[ ] . . . modification of significant facts creating new legal conditions." *Manning v. Auburn*, 953 F.2d

1355, 1359 (11th Cir. 1992) (alteration in original) (quoting *Jaffree v. Wallace*, 837

F.2d 1461, 1468 (11th Cir. 1988)).  Res judicata "turns primarily on the commonality

of the *facts* of the prior and subsequent actions," and those facts must be compared

with precision.  *In re Piper*, 244 F.3d at 1295, 1298.  It "does not turn on the nature

of a party's alternative legal theories."  *Id.*

> When determining whether the causes of action are the same for
> purposes of res judicata, we consider "whether the primary right and
> duty are the same in each case." *Ragsdale*, 193 F.3d at 1239.  Although
> we have described the "rights and duties" test as the "principal" res
> judicata test, *id.*, we have stressed that courts must also consider the
> factual context of each case along with the "rights and duties" at
> issue.  *See Manning v. City of Auburn*, 953 F.2d 1355, 1359 (11th Cir.
> 1992) (explaining that it is an "oversimplification" to focus on rights
> and duties alone and that we must also compare the factual issues in
> each case).  In general, even if the rights and duties at issue are distinct,
> where a case "arises out of the same nucleus of operative fact, or is
> based upon the same factual predicate," as a former action, the two
> cases constitute the same "claim" or "cause of action" for purposes
> of res judicata. *Ragsdale*, 193 F.3d at 1239.  When applying the "same
> nucleus of operative fact" test, we "look to the factual issues to be
> resolved [in the second lawsuit between the parties] and compare them
> with the issues explored in [the first lawsuit]." *Id.*  We apply a
> pragmatic approach to this analysis by comparing the substance of the
> actions, not their form.  *See id.* at 1239 & 1239 n.8.

*Batchelor-Robjohns v. United States*, 788 F.3d 1280, 1285–1286 (11th Cir. 2015)

(alterations in original).  If the critical facts underlying Plaintiffs' present claims

were never discussed in previous opinions or litigated by the parties, that is powerful

evidence that the cases did not involve the same cause of action.  *In re Piper*, 244

F.3d at 1297.

Essentially, JEB and McGuire can defeat Defendants' res judicata argument by showing that 1) new material facts arose after their earlier litigation that give rise to a claim they could not have brought at that time and/or that 2) an amendment to the law inflicted a new injury upon them.  Plaintiffs cannot avoid res judicata by merely arguing that the provision Plaintiffs are challenging has changed, even if the change is significant, nor can they rest on the court's broad statement in *Doe 1* that the 2017 amendments were a "far-reaching rewrite of the challenged ASORCNA provisions."  *Doe 1 v. Marshall*, No. 2:15-cv-606, 2018 WL 1321034, at *2 (M.D. Ala. Mar. 14, 2018).

Defendants bear the burden of establishing this argument, and to the extent that Defendants' arguments fail at this time, those arguments may be renewed in a later dispositive motion with the assistance of additional facts.  While it may appear inequitable that ASORCNA registrants may change their own circumstances and then bring new claims to "old" provisions (such as McGuire's new desires to serve his church), that risk originated when the State enacted a law that regulates virtually every aspect of registrants' lives.  ASORCNA has nearly boundless potential to injure old plaintiffs in new ways.

### 1. McGuire

### a. Prior Judgment

McGuire's previous suit, *McGuire I*, began on December 2, 2011.  *McGuire I*, No. 2:11-cv-1027-WKW, ECF Doc. 1.  The allegations in *McGuire I* arise from McGuire's 1986 sexual assault conviction in Colorado and his relocation to Alabama in 2010, where he was required to register as a sex offender under ASORCNA's predecessor statute, the Alabama Community Notification Act (ACNA).  *Id.* ¶¶ 17–30.  The first complaint alleged that ACNA negatively impacted his ability to find housing and employment (*id.* ¶¶ 38–41, 44–46), his ability to live with his wife (*id.* ¶ 51), the requirement that he carry a "sex offender identification card" (*id.* ¶¶ 48, 66), and the publication of his information as a registered sex offender (*id.* ¶¶ 53–54).  McGuire asserted four constitutional claims and sought to be relieved of his obligations to comply with ACNA.  *Id.* ¶¶ 79–105.  As relevant to the present action, McGuire made similar allegations and constitutional challenges against the State in his first and second amended complaints.  *Id.*, ECF Docs. # 16, 66.

On February 9, 2012, McGuire filed a third amended complaint, which became his final operative pleading.  *See McGuire I*, No. 2:11-cv-1027-WKW, ECF Doc. 74.  Count II of the third amended complaint alleged that ASORCNA deprived McGuire of his "fundamental rights to marry, to travel, to carry on familial relationships and to privacy" because ASORCNA prevented him from living with

his wife, caring for his mother, and obtaining employment in the Montgomery area. *Id.* ¶¶ 87, 94–95.  McGuire also claimed his equal protection rights were violated and asserted an as-applied ex post facto challenge to ASORCNA in its entirety.  *Id.* ¶¶ 103–10.

The court held that the third amended complaint stated an ex post facto claim but dismissed all other constitutional claims.  *See McGuire v. City of Montgomery*, No. 2:11-cv-1027-WKW, 2013 WL 1336882, at *3–12 (M.D. Ala. Mar. 29, 2013). After a bench trial, the court ruled in McGuire's favor on ASORCNA's then-existing dual weekly in-person reporting requirements for in-town homeless registrants and dual travel permit requirements for in-town registrants and in the State's favor on all other claims.  *See McGuire v. Strange*, 83 F. Supp. 3d 1231 (M.D. Ala. 2015).  In its opinion following the bench trial, the court noted, "Mr. McGuire challenges ASORCNA's registration, notification, driver's license inscription, and registration-fee requirements, as well as its residency, employment, and travel restrictions." *McGuire*, 83 F. Supp. 3d at 1243.  The court entered a final judgment on February 5, 2015.  *McGuire I*, No. 2:11-cv-1027-WKW, ECF Doc. 284.  The case remains on appeal.  *Id.*, ECF Docs. 287, 291.  Still, it is final for res judicata purposes because "a final judgment retains all of its res judicata consequences pending decision of the appeal."  *Jaffree v. Wallace*, 837 F.2d 1461, 1467 (11th Cir. 1988) (quoting 18

40

CHARLES ALAN WRIGHT, ET AL., FED. PRAC. & PROC. § 4433, at 308 (1981 & Supp. 1987)).

### b.  Present Claims

The Eleventh Circuit requires that district courts first address the "rights and duties" test, even though the answer is not dispositive.  At the highest level of generality, the rights and duties asserted in the prior and present litigation are similar. McGuire argues that he has a right not to be unconstitutionally burdened and restrained by ASORCNA and that the State Defendants have a duty to enforce ASORCNA in accordance with the Constitution.  Because both litigations involved myriad specifically alleged rights and duties against multiple defendants, some that are similar to rights alleged here and some that are not, the court will proceed to this Circuit's dispositive test: the nucleus of operative fact test.

ASORCNA was substantially amended twice after *McGuire I*, so the question presented is whether the 2015 or whether the 2017 amendments or changes in McGuire's circumstances give rise to new claims.  A few claims are plainly barred. ASORCNA's internet dissemination, community notification, and quarterly fee provisions all applied to McGuire at the time of *McGuire 1*.  (*McGuire 1*, Doc. # 74, ¶¶ 61, 102, 107, 173; *see also McGuire 1*, Doc. # 283, at 5–6.)  The dual reporting requirements for "in-town" registrants and the weekly reporting requirements for

homeless[5] registrants were central to the final opinion in *McGuire 1*, which struck down the dual weekly reporting requirement for homeless registrants but kept in place the dual quarterly reporting requirement for all in-town registrants.  (*See McGuire I*, Doc. # 283, at 60–63.)  All of McGuire's challenges to those provisions are barred by res judicata, and his portion of Count 5, which appears to challenge the dual quarterly registration and weekly homeless registration requirement, must be dismissed.

McGuire's challenge to the employment provision is not barred by res judicata at this time.  The 2017 amendments deleted a requirement that registrants report applications for employment, banned registrants from working at amusement or water parks, and made cosmetic changes to the language regarding "volunteering." *See* ASORCNA 2017 § 15-20A-13.  None of these changes inflicted new injuries on McGuire, and his allegations that he turns down opportunities to play music are substantially similar to his allegations in *McGuire 1*.  (*See McGuire 1*, Doc. # 283, at 16; Compl. ¶ 95 (citing the final opinion in *McGuire 1* for the allegation that "Mr. McGuire is a musician.  He currently uses his musical talents to supplement his fixed

---

[5]   McGuire did not allege that he was homeless in his last complaint in *McGuire 1*. However, the combination of his deposition testimony and the timeline of his residences given in that complaint reveal he was homeless by the winter of 2010.  (*See McGuire 1*, Doc. # 74, at 8 (alleging he "moved into the Regency Inn on or about April 27, 2010 and lived there until July 19, 2010"); *McGuire 1*, Doc. # 166-13, at 22 (testifying he lived with his brother for a couple of months after leaving the Regency Inn, after which point he was homeless)).  His homelessness was litigated and proved central to the final opinion.

income, earning up to $125 per musical performance.")).  He now alleges that he is "unsure whether . . . *ad hoc*, intermittent performances subject him to criminal penalty pursuant to ASORCNA's reporting requirements and employment exclusion zones" and that the employment provisions chill or proscribe his ability to work or volunteer for a church.  (Compl. ¶¶ 103, 114.)  But the law has not become vaguer since *McGuire 1*.  McGuire's musical performances could have been characterized as *ad hoc* at the time of *McGuire 1*.  (*Compare McGuire 1*, Doc. # 251, at 70 (McGuire testifying that he gets calls to play that are "usually on the spur of the moment" and testifying that he usually does not get calls to perform at times that would allow him to apply for a travel permit); *id.* at 24–25 (McGuire testifying that he receives weekly invitations to perform and testifying that "a lot of the areas that I was asked to play at were restricted areas"), *with* Compl. ¶¶ 96, 98 (alleging that McGuire receives weekly calls to perform and that he has turned down opportunities to perform for pay due to ASORCNA)).  Still, Defendants bear the burden on their res judicata arguments, and McGuire is not required to plead every possible injury in his Complaint.  The five-year passage of time between *McGuire 1* and the present day makes it plausible, perhaps even likely, that a modification of significant facts has occurred during the additional years McGuire was subject to this draconian law.  For instance, *McGuire 1* did not involve any allegations related to McGuire's

religious practices or his desires to work for a church.  Therefore, McGuire can challenge the employment provisions.

McGuire may challenge one of the relief provisions of ASORCNA, § 15-20A-23(a).  The 2015 amendments added an additional ground under which a registrant may seek relief from ASORCNA's residency provision: where "the sex offender has a debilitating medical condition requiring substantial care or supervision or requires placement in a residential health care facility."  ASORCNA 2015 § 15-20A-23(a). The 2017 amendments removed judges' discretion to deny relief if they found that a registrant had a qualifying condition.   ASORCNA 2017 § 15-20A-23(g). McGuire's equal protection claim appears to challenge the fact that McGuire is treated differently from other registrants because he is ineligible for relief.  (Compl. ¶¶ 379, 410(11).)

At first glance, the amendments do not appear to have materially changed McGuire's factual circumstances:  He was not able to apply for relief in 2011, and he does not qualify for relief under the added provision.  But viewed in the context of McGuire's constitutional claims, the fact that the class of people who are treated differently from McGuire has increased is a material development.   Because Defendants did not specifically address the relief provisions in their briefing, they have not carried their burden of showing that McGuire's claims against § 15-20A-23 are barred.  Still, McGuire cannot challenge ASORCNA's two other provisions

for relief for adult offenders, §§ 15-20A-24 and 25, because amendments to those provisions did not materially change McGuire's opportunities for relief. ASORCNA 2017 §§ 15-20A-24, 25 (amending those provisions to remove judges' discretion to deny relief if they found that a registrant did not pose a substantial risk of perpetrating any future sex offense).

McGuire can bring new claims to ASORCNA's residency restrictions due to the 2017 amendments' new definitions of "overnight visit" and "reside." *See* § 15-20A-4(12), (20). When *McGuire 1* was decided, "the residency and employment restrictions d[id] not prohibit registrants from spending virtually unlimited amounts of time day or night within the restricted zones." 83 F. Supp. 3d at 1264. The court further stated, "[w]hile a registrant would be barred from sleeping at a residence within 2,000 feet of a school, nothing in ASORCNA would make it a crime for the registrant to spend *all of his or her waking, daytime hours* at that same residence . . . ." *Id*. (emphasis added).

Due to the aggregate-hours provisions in the 2017 amendments, this is no longer true. *See* § 15-20A-4(20). ASORCNA's 2017 amendments defined an overnight visit as "[a]ny presence between the hours of 10:30 p.m. and 6:00 a.m." ASORCNA 2017 § 15-20A-4(14). Prior to this amendment, overnight visits with minors were prohibited, but the term was undefined, likely allowing registrants

greater flexibility to visit homes with minors so long as they did not sleep there. *See* Ala. Code § 15-20A-11(d) (2011).

McGuire's Complaint demonstrates how these amendments have inflicted new injuries that ASORCNA 2011 did not. He is further limited in the time he can spend at his brother's home, his wife's home, his other family members' homes, and at his church because of the new aggregate-hours requirements. He also cannot be present at his brother's home, where his minor nieces and nephews live, between 10:30 p.m. and 6:00 a.m. (Compl. ¶¶ 88-90, 92-94, 109-111, 114.) Because Mr. McGuire could not have pursued these claims before the 2017 amendments, his challenges to these provisions are not barred by res judicata.

The State's method of branding identifications changed as a result of the *Doe 1* litigation. The State has allowed some registrants, including McGuire, to swap their old driver's license branded with "CRIMINAL SEX OFENDER" for one with a numbered code. McGuire alleges that he was substantially hindered in his attempts to obtain a new license and that he should not be required to carry a code-branded license. (Compl. ¶¶ 126–133.) The switch to a code-branded license is a modification of significant facts, and he could not have challenged this scheme in *McGuire 1*. While the code-branded license may be a lesser evil than the word-branded license, it still inflicts a new injury upon McGuire, and he may seek recourse in this litigation.

McGuire may challenge the travel notification provisions. The 2017 amendments characterized the state's system as a "notification," rather than a "permitting" system. While this language suggests lighter restrictions, the 2017 amendments added requirements that registrants report their "intended destination or destinations" and "any other information reasonably necessary to monitor a sex offender who plans to travel." ASORCNA 2017 § 15-20A-15(b). And the amendments require that registrants certify "that the information he or she provided on the travel notification document is true and correct." ASORCNA 2017 § 15-20A-15(d). The amendments add that it is a Class C felony for registrants to knowingly "provide false information on the travel notification document." ASORCNA 2017 § 15-20A-15(d), (h).

McGuire alleges that his church's music ministry and that other ministries travel to perform and minister. He alleges that the "exercise of his religious beliefs is chilled or proscribed due to ASORCNA's . . . travel permit requirements." (Compl. ¶ 114.) Because the relationship between the travel restrictions and religious activities was not raised in *McGuire 1*, this claim is not barred. Additionally, McGuire alleges that he has been chilled from taking spontaneous weekend trips, and it is plausible that being required to report "intended destinations" under felony penalty could add new challenges to his ability to take a spontaneous road trip. Consequently, McGuire may challenge the travel provisions.

Finally, to the extent that changes in these provisions of the law interact with ASORCNA's main in-person reporting (§ 15-20A-10), residence transfer fee (§ 15-20A-22(b)), retroactivity, and lifetime adherence provisions, which have not changed, McGuire may challenge those provisions. At this stage of litigation, it is difficult to disentangle allegations regarding ASORCNA's specialized reporting provisions from these provisions.

Analyzing McGuire's ex post facto claim for the purposes of res judicata is trickier considering the breadth of his claim, which challenges "the *cumulative*, punitive effects of ASORCNA imposed upon Plaintiffs since August 1, 2017, coupled with limitless retroactivity and required lifetime adherence . . . ." (Compl. ¶ 412.) Mr. McGuire litigated this exact claim to a final judgment in his earlier suit, which analyzed the provisions he had standing to challenge individually and as a whole. McGuire has not sufficiently alleged that he is affected by changes in other provisions such as would allow him to bring another *cumulative* claim. Therefore, his ex post facto claim is limited to the provisions previously discussed.

### 2. *JEB*

#### a. Procedural History

JEB was Plaintiff John Doe # 7 in *Doe 1*. (Compl. ¶ 6.) *Doe 1* began with a complaint on August 20, 2015, naming then-Attorney General Luther Strange and ALEA Secretary John Richardson as defendants. In that complaint, JEB alleged he

was subject to ASORCNA's residency, employment, travel, identification, lifetime adherence, and quarterly in-person reporting requirements. JEB also alleged in the *Doe 1* suit, among many other claims, that ASORCNA's residence, employment, and travel restrictions violated his substantive due process rights, that its employment and residence restrictions were unconstitutionally vague, that the sex offender identification requirement unconstitutionally compelled speech, and that the internet reporting requirements chilled protected speech. From the outset of the *Doe 1* litigation, JEB/Doe # 7 alleged he was harassed and arrested for ASORCNA violations by Chilton County Sheriff's Investigator Derrick Bone.

At the motion to dismiss stage, the court permitted JEB/Doe # 7's as-applied challenge to ASORCNA's prohibition on living with minors based on the right to intimate association, vagueness challenge to ASORCNA's employment restrictions, compelled speech claim regarding identifications, and overbreadth challenge to the internet reporting requirements to proceed to discovery. *See Doe 1*, No. 2:15-cv-606-WKW, 2018 WL 1321034 (M.D. Ala. Mar. 14, 2018). JEB was allowed to supplement his complaint to add a vagueness challenge to ASORCNA's residence restrictions based on arbitrary enforcement. *Id.*, ECF Doc. # 137.

The court resolved all claims in the *Doe 1* litigation on the parties' cross-motions for summary judgment. *See Doe 1*, No. 2:15-cv-606-WKW, (M.D. Ala. Feb. 11, 2019), ECF Docs. 164, 165; *Doe 1 v. Marshall*, 367 F. Supp. 3d 1310 (M.D.

Ala. 2019).  The court granted summary judgment for the State on most claims, but it ruled that the "CRIMINAL SEX OFFENDER" designations on the plaintiffs' licenses were unconstitutionally compelled speech and that the internet reporting requirements were unconstitutionally overbroad.  *Doe 1*, 367 F. Supp. 3d at 1324–31.

### b.  Present Claims

Res judicata bars JEB from challenging all but four of the ten provisions that he has standing to challenge.  Plaintiffs' only argument regarding JEB is a conclusory statement that "JEB's challenges assert new and ongoing injuries since the disposition of *Doe v. Marshall*."  (Doc. # 43, at 107.)  When assessing JEB's claims, "claims that 'could have been brought' are claims" that were "in existence at the time the" Second Amended Complaint in *Doe* was filed on August 22, 2016, "or claims actually asserted by supplemental pleadings or otherwise in the earlier action."  *Manning v. City of Auburn*, 953 F.2d 1355, 1360 (11th Cir. 1992). Therefore, Defendants' assertion that JEB had a previous opportunity to challenge any provision of the 2017 version of ASORCNA is not quite true.  In *Doe 1*, the court assessed the lawfulness of the 2017 version of the law in light of facts that, for the most part, arose prior to its passage.  The court only allowed the *Doe 1* plaintiffs to supplement their vagueness challenge to the residency restrictions with additional facts regarding uneven enforcement actions taken after the 2017 amendments.  (*Doe*

*I*, Doc. # 137, at 9.)  As a result, JEB introduced factual allegations concerning his May and June 2018 arrests by Bone, but he could not raise new legal claims based on these facts.  (*See* ¶¶ 151–173.)

As in McGuire's case, a "rights and duties" analysis would likely be too simplistic to shed light on which claims should be barred.  Both cases involve constitutional challenges to ASORCNA, but the precise rights and duties alleged vary in some respects.  The court will proceed to the nucleus of operative fact test.

Some of JEB's claims regarding provisions he has standing to challenge can be easily dismissed.  ASORCNA's internet dissemination, community notification, and quarterly fee provisions all applied to him at the time of the *Doe 1* litigation. (*Doe 1*, Doc. # 81, ¶¶ 1, 88, 304.)  None of the provisions has changed in a manner that could inflict a new injury, nor has JEB alleged a harm from changes to these provisions.  The internet dissemination requirement has changed only to clarify the meaning of disseminating information about "internet identifiers" and to bar the State from disseminating the identity of the sex offender's internet service providers. JEB has not alleged that he is harmed by these particular changes.  Indeed, he hardly makes a particularized claim regarding them at all.  He could have challenged these provisions in *Doe 1*, so these claims are barred.

Additionally, JEB's factual allegations regarding the employment provisions are almost identical to the ones he alleged in *Doe 1*.  The *Doe 1* Plaintiffs brought a

vagueness challenge to the employment requirements.  JEB claimed he had to turn

down construction jobs because he was limited by the employment zones.  (*Doe*

Doc. # 81, ¶ 225.)  JEB makes virtually the same claim here:

> JEB currently wishes to supplement his fixed income by working
> periodically as a general construction laborer.   ASORCNA's
> employment zones of exclusion prevent him from knowing where he
> may lawfully work.  JEB has, since October 1, 2018 turned down jobs
> when he knows the location is restricted by ASORCNA, but also has
> turned down intermittent jobs when he is unsure whether locations are
> restricted or not.   Bone does not provide an employment location
> preapproval process which will enable JEB to know where he may
> lawfully accept employment.

(Compl. ¶¶ 185–87.)  The employment provision was not amended in a manner that

could and did inflict any new injury upon him.  And none of the new enforcement

actions alleged by Bone involves the employment provisions.  However, in *Doe 1*,

JEB's challenge to the employment provisions was not considered on the merits

because he lacked standing at that time. Then, he was disabled, receiving Social

Security disability payments, and admitted "that he proved he was physically unable

to work and that he does not foresee his condition improving enough to work 'in the

near future.'"  (*Doe 1*, Doc. # 164 at 44.)  JEB still alleges that he has recently

received disability payments, but now claims that he is "capable of performing some

intermittent construction work duties."   Res judicata is inappropriate for now, as

discovery may reveal a modification of significant facts regarding JEB's ability to

work, which in turn could modify the severity of ASORCNA's impact upon him.

JEB's only reference to the travel restrictions is that he "is afraid that he will be arrested again by law enforcement for . . . failing to report his daily choices in people or places he visits; . . . or, any combination of ASORCNA's residency, employment, travel and in[-]person reporting restrictions and requirements." (Compl. ¶ 183.)  While his "new" arrests did not involve the travel provisions, he, like McGuire, may be injured by the new ways in which he could be found to have violated ASORCNA's travel provisions.  At this stage of the proceedings, his claims are not barred.

Finally, JEB's new arrests allow him to bring new challenges to ASORCNA's residency and reporting requirements.  Most of JEB's grievances are with Bone and can best be characterized as claims that Bone selectively enforced the residency and reporting requirements.  (Compl. ¶¶ 151–174, 183.)  These events occurred after the *Doe 1* plaintiffs filed their motion to supplement the complaint, but the events were documented in discovery and discussed in the final opinion.  The court found that these claims were not appropriately brought through a vagueness challenge to the residential restrictions (a legal theory alleged in the Second Amended Complaint in 2016), but due to procedural timing, JEB did not have an opportunity to present any new legal claims based on these facts.[6]

---

[6]   JEB also alleges he was arrested for an outstanding bond revocation warrant and subjected to additional criminal proceedings that were not raised in *Doe*.  (Compl. ¶¶ 177–182.)

All of JEB's allegations regarding his arrests culminate in the statement that "Mr. JEB is afraid that he will be arrested again by law enforcement for any of the many ways he can be unjustly deemed by Bone to have violated ASORCNA's restrictions; for failing to report his daily choices in people or places he visits; places where he can obtain work; or, any combination of ASORCNA's residency, employment, travel and in person reporting restrictions and requirements."  While JEB likely feared unjust enforcement when the *Doe* Plaintiffs filed their Second Amended Complaint, which counsels against permitting JEB to challenge the residency and reporting requirements, the arrests do qualify as "new" facts. Defendants have not carried their burden of showing that these claims are barred.

Finally, to the extent that changes in these provisions of the law interact with ASORCNA's main in-person reporting (§ 15-20A-10), residence transfer fee, retroactivity, and lifetime adherence provisions, JEB may challenge those provisions for the same reasons that McGuire may do so.

### D. **Statute of Limitations**

Defendants argue that Plaintiffs' claims are barred by the statute of limitations because their injuries accrued at the time each Plaintiff was required to register under ASORCNA.  (Doc. # 36, at 30–32.)  McGuire registered in 2010.  (Compl. ¶¶ 76–

---

However, these allegations have little to do with ASORCNA and nothing to do with these Defendants.

78.)  KLL registered in 2015.  (Compl. ¶¶ 203–04.)  JEB's registration date is not

contained in the Complaint.  However, Plaintiffs allege, "In *Doe v. Marshall*, JEB

described how he had been previously arrested and convicted for a felony pursuant

to Chilton County Investigator Derrick Bone's and Chilton County prosecutor's

selective enforcement of ASORCNA's residential zones of exclusion provisions.

*Doe v. Marshall*, doc. 138 ¶¶ 164-196."  (Compl. ¶ 151.)  Plaintiffs cite a section of

the *Doe 1* plaintiffs' Supplemental Second Amended Complaint that indicates that

JEB was arrested for violating ASORCNA in 2015, which clearly indicates that he

was an ASORCNA registrant by then.  The court may consider this extrinsic

document because it is "(1) central to the plaintiff's claim, and (2) its authenticity is

not challenged."  *SFM Holdings, Ltd. v. Banc of Am. Sec.*, *LLC*, 600 F.3d 1334, 1337

(11th Cir. 2010); *see also Harris v. Ivax Corp.*, 182 F.3d 799, 802 n.2 (11th Cir.

1999).  Additionally, Plaintiffs have not contested Defendants' allegations that JEB

registered for the first time within two years before filing the instant lawsuit, and

they state in their supplemental brief that his qualifying conviction occurred 34 years

ago.  (Doc. # 52, at 10.)

Because Plaintiffs filed a claim under 42 U.S.C. § 1983 in Alabama, they are

subject to a two-year statute of limitations.  Ala. Code § 6-2-38(*l*); *McNair v. Allen*,

515 F.3d 1168, 1173 (11th Cir. 2008).  When that clock starts running is a question

of federal law.  *Wallace v. Kato*, 549 U.S. 384, 388 (2007).  In general, "the statute

of limitations begins to run from the date the facts which would support a cause of action are apparent or should be apparent to a person with a reasonably prudent regard for his rights." *Brown v. Ga. Bd. of Pardons & Paroles*, 335 F.3d 1259, 1261 (11th Cir. 2003) (cleaned up).

"But not all injuries are equal.  Sometimes, there is one discrete point at which the injury occurs. Other times, however, the injury happens over and over again. When the injury occurs determines when the statute of limitations starts running." *Doe 1*, 367 F. Supp. 3d at 1338.

Plaintiffs claim in their first three counts that ASORCNA continuously chills their speech and expressive conduct, is unconstitutionally vague, and violates their equal protection rights.  In Count 5, KLL alleges that he is constantly discriminated against—singled out and subjected to ASORCNA—when individuals who engaged in the same conduct in Alabama would not be subject to enforcement.  If the allegations plausibly state claims for relief, then ASORCNA afflicts a fresh injury each day that Plaintiffs are subject to the law.  In *Kuhnle Brothers v. County of Geauga*, for example, the Sixth Circuit held that a claim for the deprivation of the right to travel accrues every day while the unconstitutional law is in effect.  103 F.3d 516, 522 (6th Cir. 1997); *see Hillcrest Prop., LLC v. Pasco Cty.*, 754 F.3d 1279, 1283 (11th Cir. 2014) (citing *Kuhnle* with approval).  In *Beavers v. American Cast Iron Pipe Co.*, the Eleventh Circuit held that each week in which a discriminatory

56

insurance policy was in effect constituted a new Title VII violation.  975 F.2d 792, 798 (11th Cir. 1992); *cf. also Montin v. Estate of Johnson*, 636 F.3d 409, 416 (8th Cir. 2011).

Plaintiffs allege they are bound in perpetuity by discriminatory, overbroad, and allegedly vague laws.  Thus, every day dawns a new winter of their discontent. To the extent the law is enforced, Plaintiffs will suffer new injuries.  *See Maldonado v. Harris*, 370 F.3d 945, 956 (9th Cir. 2004).

As this court stated in *Doe 1*:

> This in no way conflicts with the Eleventh Circuit's pronouncements in *Moore v. Federal Bureau of Prisons*, 553 F. App'x 888 (11th Cir. 2014) (per curiam), and *Meggison v. Bailey*, 575 F. App'x 865 (11th Cir. 2014) (per curiam).  In those cases, the plaintiffs alleged that they were not sex offenders but were wrongly registered as offenders.   The Eleventh Circuit held their injury accrued when they learned that they had been wrongly registered.  *Moore*, 553 F. App'x at 890; *Meggison*, 575 F. App'x at 867; *see also  Cibula v. Fox*, 570 F. App'x 129, 136 (3d Cir. 2014); *Romero v. Lander*, 461 F. App'x 661, 668 (10th Cir. 2012).   And in *Mims v. Bentley*, a district court found that an *ex post facto* challenge to a sex-offender registration requirement accrued when the alleged *ex post facto* punishment was imposed—that is, when the plaintiff registered.   No. 15-cv-119, 2015 WL 5736829, at *2 (N.D. Ala. Oct. 1, 2015); *see also Smelcher v. Att'y Gen. of Ala.*, No. 18-cv-1099, 2019 WL 142323, at *4 (N.D. Ala. Jan. 9, 2019) (reaching the same conclusion when another plaintiff attacked the need to register as [a] sex offender).

> But the injury caused by wrongful registration is not the same injury caused by the constant deprivation of fundamental rights. Yes, registration triggers ongoing obligations, but the plaintiffs in *Moore*, *Meggison*, and *Mims* challenged registration itself. That is different from claiming that certain restrictions on everyday activities violate the First Amendment.

*Doe 1*, 367 F. Supp. 3d at 1338–39 (alteration added).

At first glance, it would appear that Count 5 should be barred by applying this distinction.  (Compl. ¶ 204; Doc. # 43, at 107.)  That appearance is deceiving when one looks to the nature of KLL's constitutional claim.  KLL claims that ASORCNA is either selectively enforced against him or that he is in a class of one.  Both claims sound in equal protection.  Therefore, KLL's claim is an argument that each day he is singled out for enforcement when other similarly situated persons are not.  That discrimination claim represents a continuing violation.

The only statute of limitations question meriting discussion is whether the 2017 amendments reset the clock on some of the provisions challenged in Plaintiffs' ex post facto claims.  A cause of action for an ex post facto claim accrues when the punishment was imposed.  *Brown*, 335 F.3d at 1261–62.  Defendants claim that this punishment is imposed when one registers under ASORCNA.  But that cannot be *per se* true without considering how the requirements imposed upon registrants have changed.  Under Defendants' logic, the State could amend ASORCNA to require that prior registrants be put in stockades for an hour every week, and persons who registered more than two years prior would be unable to bring ex post facto challenges.  Because all Plaintiffs registered for the first time more than two years before filing this suit, any claims to earlier versions of ASORCNA are barred, leaving only the question of whether the 2017 amendments impose any new

58

punishments. *See id.* ("Rather, Brown's injury, to the extent it ever existed, was when the Georgia Parole Board applied its new policy, eliminating the requirement of parole review every three years for Brown, retroactively.").

The amendments were enacted on August 1, 2017, and Plaintiffs' motion to amend the complaint and to add JEB's and KLL's claims was timely filed on May 21, 2019. Therefore, the question is the same one raised by Defendants' res judicata arguments: Did the amendments impose any new punishments that constitute a new cause of action? For the reasons stated in the res judicata section, the amendments to the residency and travel restrictions and the State's changed branded-identification practices constitute new causes of action. The employment provisions and relief provisions are not challengeable because they were not substantially amended in 2017. The reporting provision is challengeable to the extent that it intersects with other provisions. The loitering provision, which only applies to KLL, was not amended in 2017.

All of Plaintiffs' claims that stem from injuries inflicted by the 2017 amendments would be timely, even if the continuing violations doctrine did not apply. This includes Plaintiffs' claims regarding the residency, branded identification, and travel provisions. Defendants may reassert their statute of limitations arguments at later stages in this litigation when the parties have the benefit of additional facts.

### E. Declaratory and Injunctive Relief: Availability of an Adequate Remedy at Law for KLL

Defendants argue that this court should decline to hear KLL's suit for declaratory and injunctive relief because KLL may be able to petition in state court for relief from some or all of ASORCNA's provisions.  (Doc. # 36, at 32–36.) Defendants also contend that KLL may qualify for complete relief from ASORCNA's provisions under § 15-20A-24 because his offense was only criminal in Louisiana because of the age of the victim.  Defendants further assert that "[e]ven assuming KLL did not receive complete relief from ASORCNA under that provision, Alabama Code § 15-20A-25 provides him with a means of obtaining relief from its employment restrictions."  They add that the court should also decline to hear KLL's corresponding claims for injunctive relief.  (Doc. # 36, at 35–36.)

Federal courts have discretion to decline to hear claims for declaratory judgments if there is an adequate alternative remedy.

> Although Fed. R. Civ. P. 57 specifically provides that the existence of 'another adequate remedy does not preclude a judgment for declaratory relief in cases where it is appropriate,' a court, 'in the exercise of the discretion that it always has in determining whether to give a declaratory judgment, may properly refuse declaratory relief if the alternative remedy is better or more effective.

*Angora Enters., Inc. v. Condo. Ass'n of Lakeside Vill., Inc.*, 796 F.2d 384, 387–88 (11th Cir. 1986) (quoting 10A Charles A. Wright, Arthur R. Miller & Mary

KAY KANE, FEDERAL PRACTICE AND PROCEDURE: CIVIL, § 2758, at 621–23 (2d ed. 1970) (emphasis added)).

Additionally, "courts generally will refuse to grant injunctive relief unless plaintiff demonstrates that there is no adequate legal remedy."  11A CHARLES A. WRIGHT, ET AL., FED. PRAC. & PROC.: CIV. § 2944 (3d ed.).  "It is a 'basic doctrine of equity jurisprudence that courts of equity should not act . . . when the moving party has an adequate remedy at law and will not suffer irreparable injury if denied equitable relief.'"  *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992) (quoting *O'Shea v. Littleton*, 414 U.S. 488, 499 (1974)).  "[T]he legal remedy must be as complete, practicable, and efficient as that which equity could afford."  *Boise Artesian Hot & Cold Water Co. v. Boise City*, 213 U.S. 276, 281 (1909).

KLL is eligible to petition a state court for relief from ASORCNA's employment provisions.  Section 15-20A-25 permits a registrant to petition for relief from the employment provisions so long as he is not convicted of rape, sodomy, first degree sexual abuse, sexual abuse of a child under 12, sexual torture, or any sex offense involving a child under 12.  If the registrant is statutorily eligible, "[t]he court shall issue an order releasing the sex offender from the requirements of the employment restrictions pursuant to subsection (b) of Section 15-20A-13 if the court finds by clear and convincing evidence that the sex offender does not pose a substantial risk of perpetrating any future sex offense."  The state court may consider

the "nature of the offense, [p]ast criminal history of the sex offender, [t]he location where the sex offender is employed or intends to obtain employment, or [a]ny other information deemed relevant by the court."  § 15-20A-25(f).

KLL was convicted of contributing to the delinquency of a juvenile, which "is the intentional enticing, aiding, soliciting, or permitting, by anyone over the age of seventeen, of any child under the age of seventeen" to "[p]erform any sexually immoral act."  LA. STAT. ANN. § 14:92(A)(7).  Regarding the events giving rise to his Louisiana conviction, KLL alleges he was 18 when he engaged in consensual sexual relations with a 16-year-old girl.  Louisiana's statutory definition of contributing to the delinquency of a juvenile, coupled with KLL's factual allegations, make clear that his crime did not involve force, lack of consent, or a child under the age of 12.  Hence, KLL's Louisiana crime is not equivalent to any of the disqualifying offenses listed in § 15-20A-25(a) that would prevent him from petitioning a state court for relief from ASORCNA's employment restrictions.  While this indicates that KLL may have an adequate alternative remedy under § 15-20A-25, it makes little sense to decline KLL's challenges to the employment provisions while hearing McGuire's and JEB's.  Therefore, the court will not decline to entertain KLL's request for declaratory relief concerning the employment restrictions at this time.  The court likewise will not foreclose equitable relief at this time.  *See Adelphia Cable Partners, Inc. v. E & A Beepers Corp.*, 188 F.R.D. 662,

666 (S.D. Fla. 1999) ("Although equitable relief ultimately may not be awarded where there exists an adequate remedy at law, Plaintiff certainly may plead alternative equitable relief.").

Additionally, under § 15-20A-24(a)(5), KLL's other potential avenue of relief, registrants may petition a state court for a complete exemption from ASORCNA if they were convicted of one of the four delineated Alabama sex offenses that focus principally on the age of the victim (discussed below) or for "[a]ny crime committed in this state or any other jurisdiction which, if had been committed in this state under the current provisions of law, would constitute" one of the enumerated age-based offenses under Alabama law.   § 15-20A-24(a)(5) (emphasis added). [7]  Defendants' broader argument that this provision provides an adequate remedy at law is unavailing for two reasons.  First, the statute permits a judge to award less than complete relief from ASORCNA.  *See* § 15-20A-24(h). Therefore, this remedy is not as complete or efficient as that which equity could afford and could result in a multiplicity of suits.  Second, Plaintiffs have raised a

---

[7]  To be sure, KLL currently does not have standing to challenge § 15-20A-24.  *See infra*, at 29 n.3.  Specifically, KLL does not allege that he has attempted to petition a state court for relief, much less been denied said relief, pursuant to § 15-20A-24.  Nevertheless, KLL would have standing to challenge § 15-20A-24 if he petitioned for relief and the state court denied his request because his Louisiana crime did not precisely meet the first set of requirements spelled out in 15-20A-25(a)(1)-(4).  In that case, KLL would have grounds to bring an appropriate constitutional claim, along with any accompanying declaratory judgment claim, directly challenging § 15-20A-24.

colorable argument that KLL is ineligible to seek complete relief under § 15-20A-24.

Plaintiffs argue that KLL cannot seek relief because his Louisiana crime would not constitute one of the enumerated offenses in § 15-20A-24(a)(1)–(4). (Doc. # 43, at 108; Doc. # 52, at 10.)  The eligible offenses are rape in the second degree, sodomy in the second degree, sexual misconduct, and sexual abuse in the second degree.  Rape and sodomy in the second degree are defined as those respective acts committed by a person over the age of 15 upon a person between the ages of 12 and 15, provided the perpetrator is at least two years older than the victim. §§ 13A-6-62, 64.  Sexual misconduct criminalizes sexual relations where consent is obtained by fraud, artifice, or stratagem.  § 13A-6-65 & Commentary.  Sexual abuse in the second degree is essentially a catchall provision that criminalizes, among other acts, "[b]eing 19 years old or older, [and] subject[ing] another person to sexual contact who is" between the ages of 13 and 15.  § 13A-6-67.  To obtain relief, the registrant must also "prove by clear and convincing evidence" that the sex offense did not involve force, that it was a crime due only to the age of the victim, that the victim was 13 years of age or older at the time of the offense, and that the registrant was less than 5 years older than the victim at the time of the offense.  § 15-20A-24(b).

Because KLL alleges he was 18 when he engaged in consensual sexual relations with his 16-year-old girlfriend, he easily meets the lack of force and age-related eligibility requirements for relief.  However, he does not precisely meet the first set of requirements, 15-20A-25(a)(1)–(4), because his crime of conviction in Louisiana would not be criminal in Alabama.  It would be surprising if state courts could grant relief to registrants convicted of Alabama's age-related sex crimes but not to those convicted of age-related offenses that Alabama does not criminalize at all.  Still, courts "should not interpret a statute in a manner inconsistent with the plain language of the statute, unless doing so would lead to an absurd result."  *United States v. Silva*, 443 F.3d 795, 798 (11th Cir. 2006).  The speculative nature of Defendants' argument is cause for hesitation because a literal interpretation of the statute's text would find KLL ineligible for relief—undoubtedly an absurd result given KLL's unique factual circumstances.  Due to the uncertainty surrounding his eligibility for relief under § 15-20A-24, and the possibility of an absurd result, the court will exercise its discretion to hear KLL's declaratory judgment claims.

### F.  <u>Shotgun Pleading (and Shotgun Briefing)</u>

Plaintiffs' Complaint bears many of the hallmarks of a shotgun pleading.  It is over 88-pages and 400-paragraphs long. *Magluta v. Samples*, 256 F.3d 1282, 1284 (11th Cir. 2001) (holding that a complaint was a shotgun complaint when, among other issues, the complaint was 58-pages long and contained at least 146 numbered

paragraphs).  Within its overbreadth and equal protection counts, Plaintiffs challenge at least a dozen ASORCNA provisions.  Although Plaintiffs' Second Amended Complaint is far from a "short and plain statement of the claim(s) showing that [they] are entitled to relief," Plaintiffs were granted leave to file their amended complaint for three reasons.  Fed. R. Civ. P. 8(a)(1).

First, ASORCNA is not a short and plain statute.  Its enacting act is nearly 100 pages long, Ala. Act No. 2011-640, and the 2017 amending act is over 80 pages long, Ala. Act. No. 2017-414.  Its chapter in the Alabama Code now spans 48 sections.  Ala. Code §§ 15-20A-1 through 15-20A-48.  Second, Plaintiffs have legitimate reasons to be concerned that, if they do not bring their constitutional claims in this action, res judicata and the statute of limitations may prevent them from bringing future challenges to ASORCNA's restrictions.  Third, paragraphs 267 through 395 provide substantial guidance to Defendants and to this court as to which factual allegations match which claims.[8]  *See Hawkins v. Holy Family Cristo Rey Catholic High Sch.*, No. 2:18-CV-00638-ACA, 2018 WL 6326485, at *3 (N.D. Ala. Dec. 4, 2018) ("Despite the shotgun nature of Ms. Hawkins's second amended complaint, the court finds that dismissal on this ground is not appropriate because it is not 'virtually impossible to know which allegations of fact are intended to support

---

[8]  Of course, Plaintiffs' legal conclusions in these paragraphs, on their own, cannot state a claim.  *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.").

which claim(s) for relief.'" (quoting *Weiland v. Palm Beach Cnty. Sheriff's Office*, 792 F.3d 1313, 1325 (11th Cir. 2015))).

Defendants, in turn, were able to fashion a response to Plaintiffs' claims. (Doc. # 35.)  Plaintiffs' initial Response, however, threatens to carry this case off the rails.   (Doc. # 43.)   In it, Plaintiffs use more than 53 pages to address their overbreadth claim.  In those pages, Plaintiffs reveal that their overbreadth challenge to the State's branded identification practices and ASORCNA's community notification and internet dissemination provisions are more properly characterized as compelled speech claims.  (Doc. # 43, at 57–75.)  Some of the provisions that Plaintiffs argue implicate speech or expressive conduct are hardly alluded to in their complaint—namely, ASORCNA's requirement that registrants report any phone numbers used or changes in their physical descriptions.  (*Compare* Doc. # 43 at 48–49 & nn.12–13, *with* Compl. ¶¶ 22, 285 (stating generally that ASORCNA requires such reporting).)  Their overbreadth arguments rely on cases involving substantive due process rights to interstate travel, substantive due process rights to privacy, and the free exercise clause.  (Doc. # 43, at 39–45.)

Defendants lacked fair notice of these claims.  Plaintiffs allege injuries that may give rise to some as-applied freedom of speech or free exercise claims, but they ultimately note that Americans' "lawful expressive conduct is limited largely, only by that which we can imagine."  (*Id.*, at 50.)  Federal courts adjudicate cases and

controversies, not every possible constitutional infringement that Plaintiffs can imagine.  For these reasons, all but one of Plaintiffs' facial overbreadth claims are due to be dismissed.

Plaintiffs fashion a serviceable justification of their vagueness claims, but originally did not respond at all to Defendants' motions to dismiss Counts 3–5. While this court could decipher and rule on Plaintiffs' ex post facto and selective enforcement claims without further briefing, it could not interpret and rule on Plaintiffs' equal protection challenges to over a dozen ASORCNA provisions without arguments and therefore ordered additional briefing.  (Doc. # 50.)  Plaintiffs' supplemental brief incorporated by reference many of the fundamental rights arguments that Plaintiffs made in the overbreadth section of their initial response. (*See* Doc. # 52, at 4–7.)  Plaintiffs' intermingled overbreadth and equal protection arguments lead the court to question whether Plaintiffs, who are represented by counsel, fail to comprehend or simply fail to care about what body of law should apply to their claims.  As a result, most of Plaintiffs' shotgun (bordering on grenade-blast) arguments are unavailing, and most of Plaintiffs claims are due to be dismissed.

### G.  Count 1:  Overbreadth (Facial)

After traveling through the funnels of Defendants' jurisdictional and procedural objections, Plaintiffs are left with the following overbreadth claims.  KLL

may challenge ASORCNA's retroactivity, lifetime adherence, internet dissemination, quarterly reporting, residency, employment, travel, loitering, branded identification, community notification, and fee provisions.[9]  JEB may challenge the travel, employment, and residency provisions.  JEB may also challenge the main in-person reporting (§ 15-20A-10), residence transfer fee (§ 15-20A-22(b)), retroactivity, and lifetime adherence provisions insofar as the provision intersects with changes to other provisions.  McGuire may challenge the provisions that JEB may challenge.  Additionally, McGuire may challenge one relief provision (§ 15-20A-23), and the state's current branded identification practices.  No Plaintiff has standing to challenge the provisions of ASORCNA that apply only to juveniles and their guardians, so Plaintiffs' overbreadth claims to those provisions (as delineated in Doc. # 43, at 90–97) are due to be dismissed.  Ultimately, only the residency provisions plausibly implicate the First Amendment, and discovery is warranted to determine if the provisions are substantially overbroad.  Therefore, all but one of Plaintiffs' facial claims fail, but they may move to amend their complaint to bring an as-applied compelled speech challenge to the branded identification provision as explained herein.

---

[9]  KLL may also challenge ASORCNA's catchall provisions (§ 15-20A-5(37), (38)), but Plaintiffs' Response suggests that KLL challenges those provisions through his selective enforcement/class of one claim in Count 5.  (Doc. # 43, at 93.)

Analysis of Count 1 "entails a three-part inquiry: First, do the challenged provisions implicate the First Amendment?  Second, if so, what level of scrutiny should be applied?  And third, have Plaintiffs stated a claim that the challenged provisions fail under the proper standard of review?"  *Doe #1 v. Marshall*, No. 2:15-CV-606-WKW, 2018 WL 1321034, at \*14 (M.D. Ala. Mar. 14, 2018).

### 1.  *Implicating the First Amendment*

"The Constitution gives significant protection from overbroad laws that chill speech within the First Amendment's vast and privileged sphere." *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 244 (2002).  Though a state may burden speech if it has a strong enough interest, it cannot overburden speech.  Still, this doctrine does not provide citizens with a basis for challenging every statute that regulates their activities.  "[I]t is the obligation of the person desiring to engage in assertedly expressive conduct to demonstrate that the First Amendment even applies." *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 294 n.5 (1984).

First Amendment protection extends to protected speech and "to conduct that is inherently expressive." *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 66 (2006).  "[I]n determining whether conduct is expressive, we ask whether the reasonable person would interpret it as some sort of message, not whether an observer would necessarily infer a specific message." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1270 (11th Cir. 2004).  The "overbreadth

doctrine's concern with 'chilling' protected speech 'attenuates as the otherwise unprotected behavior that it forbids the State to sanction moves from 'pure speech' toward conduct.'" *Hicks*, 539 U.S. at 124 (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973)). "Rarely, if ever, will an overbreadth challenge succeed against a law or regulation that is not specifically addressed to speech or to conduct necessarily associated with speech (such as picketing or demonstrating)." *Id.* at 124.

At the outset, it is worth noting that the 53 pages that Plaintiffs devote to championing their overbreadth claims are long on legal arguments (many of which are not *overbreadth* arguments) and short on references to the three Plaintiffs' concrete allegations.

The court must first construe the statute and determine what the statute covers. *United States v. Williams*, 553 U.S. 285, 293 (2008). The contours of the challenged provisions are detailed in the background section above, and the court will further elaborate in each section.

Most of  Plaintiffs' facial claims fail at the threshold stage of overbreadth analysis: implicating the First Amendment.  None of the provisions that Plaintiffs are able to challenge directly limits registrants' speech or "conduct necessarily associated with speech (such as picketing or demonstrating)." *Hicks*, 539 U.S. at 124. The provisions do not inevitably single out those "engaged in First Amendment protected activities for the imposition of its burden." *Arcara v. Cloud Books, Inc.*,

478 U.S. 697, 704–705 (1986) (discussing *Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue*, 460 U.S. 575 (1983), wherein the Supreme Court "struck down a tax imposed on the sale of large quantities of newsprint and ink because the tax had the effect of singling out newspapers to shoulder its burden"). When their Complaint is stripped of conclusory legal arguments, only a few of Plaintiffs' factual allegations allege a desire to engage in speech, expressive association, or expressive conduct, casting doubt on their arguments that a substantial number of the statute's applications violate the First Amendment.

On the whole, each of Plaintiffs' arguments is analogous to the claim in *Virginia v. Hicks*, and all but one fails at the threshold for the same reason. In *Hicks*, Mr. Hicks challenged a housing authority policy barring him from entering a housing authority property after he had twice been convicted of trespassing thereon. 539 U.S. at 117. The Supreme Court unanimously held that the written provision authorizing the arrest of those who received such a barment notice

> certainly does not violate the First Amendment as applied to persons whose postnotice entry is not for the purpose of engaging in constitutionally protected speech. And Hicks has not even established that it would violate the First Amendment as applied to persons whose postnotice entry *is* for that purpose. Even assuming the streets of Whitcomb Court are a public forum, the notice-barment rule subjects to arrest those who reenter after trespassing and after being warned not to return—*regardless* of whether, upon their return, they seek to engage in speech. Neither the basis for the barment sanction (the prior trespass) nor its purpose (preventing future trespasses) has anything to do with the First Amendment. Punishing its violation by a person who wishes to engage in free speech no more implicates the First Amendment than

> would the punishment of a person who has (pursuant to lawful regulation) been banned from a public park after vandalizing it, and who ignores the ban in order to take part in a political demonstration. Here, as there, it is Hicks' nonexpressive *conduct*—his entry in violation of the notice-barment rule—not his speech, for which he is punished as a trespasser.

*Id.* at 123.

ASORCNA registrants are akin to barment notice recipients. The basis for their restrictions (their prior sexual offenses) and the purpose of the restrictions ("to protect the public, especially children," § 15-20A-2(4)), are unrelated to the First Amendment. *See Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 706–07 (1986) ("[W]e have not traditionally subjected every criminal and civil sanction imposed through legal process to 'least restrictive means' scrutiny simply because each particular remedy will have some effect on the First Amendment activities of those subject to sanction. Rather, we have subjected such restrictions to scrutiny only where it was conduct with a significant expressive element that drew the legal remedy in the first place . . . or where a statute based on a nonexpressive activity has the inevitable effect of singling out those engaged in expressive activity . . . ."). And the challenged restrictions apply to all of the conduct of all registrants, "not just to those who seek to engage in expression." *Id.* at 123 ("[T]he notice-barment rule . . . appl[ies] to all persons who enter the streets of Whitcomb Court, not just to those who seek to engage in expression. The rules apply to strollers, loiterers, drug dealers, roller skaters, bird watchers, soccer players, and others not engaged in constitutionally

protected conduct—a group that would seemingly far outnumber First Amendment speakers."). Plaintiffs have not made a plausible showing that the challenged provisions, except for the residency provision, prohibit "a 'substantial' amount of protected speech in relation to [their] many legitimate applications" that could allow them to bring a facial claim. *See Id.* at 124 (alteration added).

### a. Travel and Employment Restrictions

Plaintiffs' challenges to the travel and employment provisions that fail to state a claim will be addressed first. Plaintiffs' claims regarding the travel provisions are undisguised substantive due process claims combined with an argument that the provisions affect a prior restraint on expression. ASORCNA's travel restraints are serious restraints, but they are not restraints (prior or otherwise) on speech or expressive conduct. *See Alexander v. United States*, 509 U.S. 544, 550 (1993) ("The term prior restraint is used 'to describe administrative and judicial orders *forbidding* certain communications when issued in advance of the time that such communications are to occur.' (emphasis in original) (quoting M. NIMMER, NIMMER ON FREEDOM OF SPEECH § 4.03, p. 4-14 (1984))). While the travel provisions do limit registrants' abilities to leave their county of residence for more than three days, they do not enable officials to "deny access to a forum for expression before the expression occurs." *United States v. Frandsen*, 212 F.3d 1231, 1236–37 (11th Cir.

2000).  Neither the sanction nor its purpose is related to speech, and punishment for its violation is a punishment for conduct that is not inherently expressive.

Plaintiffs' allegations center on how the travel provisions restrict their ability to engage in the nonexpressive conduct of working and leisure traveling. (Compl. ¶¶ 117–21, 219–22.)   And the possibility that there may be "some kernel of expression" in an activity "is not sufficient to bring the activity within the protection of the First Amendment."  *City of Dallas v. Stanglin*, 490 U.S. 19, 25 (1983).[10]  Even if the travel provisions implicated the First Amendment, Plaintiffs have not plausibly alleged that any overbreadth is "substantial" enough to warrant discovery on a facial challenge.

Plaintiffs do not devote much of their Response to an overbreadth challenge against the employment provisions.  (*See* Doc. # 43, at 39–41, 48.)  To the extent that they do lodge a facial challenge against these provisions, it fails for the same reasons their travel-related overbreadth claim fails.  The employment provisions can

---

[10]  While the travel provisions incorporate ASORCNA's definition of residence by requiring notification before registrants leave their "county of residence," this language does not sufficiently tether the travel provisions to the residency provisions such that facial claims against both provisions must rise and fall together.  (Doc. # 43, at 40–41 n.7.)  Provisions in ASORCNA's residency restrictions (§ 15-20A-11(e)(2)) and general reporting requirement (§ 15-20A-10(e)(2)) define transferring or terminating a residence as "vacat[ing] his or her residence or fail[ing] to spend three or more consecutive days at his or her residence without previously notifying local law enforcement or completing a travel notification document."  To the extent that this issue is material, these provisions are challengable through Plaintiffs' overbreadth claim against ASORCNA's residency restrictions.  The employment provisions are likewise untethered from the residency provisions.

conceivably restrict speech or expressive conduct by, in KLL's and McGuire's examples, limiting registrants' abilities to labor for their church or perform music or by limiting registrants' abilities to work for organizations whose missions involve protected expression, such as political parties or advocacy groups. However, KLL and JEB chiefly allege being unable to work in the nonexpressive fields of construction and refurbishment. As in *Hicks*, the group of registrants engaged in nonexpressive careers "would seemingly far outnumber First Amendment speakers." 539 U.S. at 123.

Neither the employment restrictions nor their purpose is related to speech, and punishment for their violation is a punishment for conduct that is not inherently expressive. Even if these provisions implicated the First Amendment, Plaintiffs have not plausibly alleged that any overbreadth is "substantial" enough to warrant discovery on a facial challenge.

### b.  In-Person/Quarterly Reporting and Fee-Payment Provisions

Plaintiffs argue that the in-person-reporting and fee-payment requirements infringe upon their right to privacy (a substantive due process or equal protection claim), are prior restraints on speech or expressive conduct, and vest law enforcement officers with vast discretion to regulate expressive conduct. Except for insofar as these provisions overlap with ASORCNA's residency restrictions, Plaintiffs' arguments are unavailing and do not merit further overbreadth analysis.

Plaintiffs' Response does identify some reporting requirements that come closer to implicating speech or expressive conduct: the requirements that registrants quarterly report any telephone number used (§ 15-20A-7(8)), immediately report any changes in telephone numbers (§ 15-20A-10(e)), and quarterly and immediately report any changes in physical description (§ 15-20A-7(11), 10(e)(1)).   (Doc. # 43, at 49 & n.13.)   However, their 400-paragraph complaint does not allege any concrete injuries under these provisions and gives Defendants no notice that they should expect these arguments.   (*See* Compl. ¶¶ 22, 285 (noting the existence of the telephone reporting provisions).)   That the provisions apply to Plaintiffs is not enough to create an injury in fact, and the court will not adjudicate a hypothetical claim raised for the first time in Plaintiffs' Response.

### c. Branded Identification, Community Notification, and Internet Dissemination

Plaintiffs' overbreadth challenge to the branded identification, community notification, and internet dissemination requirements are, with one possible exception, undisguised compelled speech claims.   (Doc. # 43, at 57–64; 68–75.) Plaintiffs could have brought such claims in this action.   But they cannot bait Defendants into responding to *overbreadth* claims, which are governed by a distinct body of First Amendment law, and then attempt to defeat a motion to dismiss by arguing that they had pleaded compelled speech claims.   To allow this switch would undermine the federal system of notice pleading.   Plaintiffs' arguments that these

provisions chill them from freely moving to and about new communities (Doc. # 43, at 71) only implicate their ability to engage in non-expressive conduct. Therefore, Plaintiffs shall be granted leave to file a motion to amend their complaint if they desire to add a compelled speech claim. The proposed amendment must clearly identify what type of branded identification each Plaintiff currently carries and what injuries have flowed therefrom.

Plaintiffs' challenge to ASORCNA's requirement that registrants not "mutilate, mar, reproduce, alter, deface, disfigure or otherwise change the form of any" state-issued identification, Ala. Code § 15-20A-18(e), sounds in overbreadth but fails for now due to lack of standing. (*See* Doc. # 43, at 65–68.) Plaintiffs argue that this provision is similar to the draft card anti-mutilation law analyzed in *United States v. O'Brien*, 391 U.S. 367 (1968). The prohibitions are analogous, but the claims contained in Plaintiffs' Complaint are not. In *O'Brien*, Mr. O'Brien challenged his conviction for burning his draft registration certificate on the grounds that his act of burning was itself symbolic speech. *Id.* at 375. The court assumed "that the alleged communicative element in O'Brien's conduct" was sufficient to implicate the First Amendment and applied a four-part test to determine the statute's constitutionality. *Id.* at 376–77.

Plaintiffs allege that they disagree with being forced to carry and display a branded license—a compelled speech claim—not that they or others desire to

physically alter their licenses at all, let alone *as an affirmative expressive act*. (*Compare* Compl. ¶¶ 126; 188; 211 (relaying Plaintiffs' disagreement with the identifying text and desire to have identifying language removed), *with* ¶ 303 (noting the existence of the anti-mutilation restriction).)   The overbreadth doctrine is concerned with restrictions that prevent or chill citizens from affirmatively exercising their own rights to speech and expressive conduct.   Compelled speech doctrine is concerned with restrictions that force citizens to engage in speech when they otherwise would not.   Therefore, it does not appear that Plaintiffs are actually interested in bringing an overbreadth claim in the same vein as *O'Brien*.   And they lack standing to request prospective injunctive relief when they do not allege a desire to violate this provision, and they therefore lack a "substantial likelihood that [they] will suffer injury" under this provision "in the future."   *Stevens*, 877 F.3d at 1311 (quotation and internal quotation marks omitted).

While *a* plaintiff may be able to allege a cognizable facial or as-applied claim under this provision, *these* Plaintiffs have not alleged qualifying injuries nor did their complaint put Defendants on notice to expect a claim of this kind.   If Plaintiffs have such injuries, they may seek leave to litigate them in an amended complaint.

### d.  Loitering Restrictions

The loitering restrictions likewise do not implicate the First Amendment.  A plurality of the Supreme Court explained why a similar anti-loitering statute was not overbroad in *City of Chicago v. Morales*,

> [T]he law does not have a sufficiently substantial impact on conduct protected by the First Amendment to render it unconstitutional.  The ordinance does not prohibit speech.  Because the term "loiter" is defined as remaining in one place "with no apparent purpose," it is also clear that it does not prohibit any form of conduct that is apparently intended to convey a message.  By its terms, the ordinance is inapplicable to assemblies that are designed to demonstrate a group's support of, or opposition to, a particular point of view.

527 U.S. 41, 52–53 (1999) (plurality op.).  Analogously, ASORCNA's prohibition on certain registrants remaining in certain places with "no legitimate purpose" does not have a substantial enough impact on speech or expressive conduct to render it facially unconstitutional.

### e.  Residency Restrictions

Plaintiffs' only plausible facial claim rests against the residency restrictions and minor cohabitation requirement.  Plaintiffs claim that the residency restrictions "infringe upon registrants' fundamental right to determine their own nuclear and extended familial associations without governmental interference," (Doc. # 43, at 36; *see also, e.g.*, Compl. ¶¶ 85–94, 162–168, 136–139, 290–92 335, 335, 336) and KLL and McGuire allege that these provisions interfere with their ability to associate for the purpose of religious expression (Compl. ¶¶ 108–114, 223–226,

293–98).    The Supreme Court has distinguished individual rights to intimate association—"choices to enter into and maintain certain intimate human relationships"—from rights to expressive association—associating "for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion."  *See Roberts v. U.S. Jaycees*, 468 U.S. 609, 617–18 (1984).  The Eleventh Circuit has held that the First Amendment protects both forms of association.  *Gaines v. Wardynski*, 871 F.3d 1203, 1212 (11th Cir. 2017).  The Complaint and Response also implicate registrants' ability to access and remain in forums for expression.

ASORCNA's residency and minor-visitation restrictions, in particular ASORCNA's new restrictions on spending more than four hours in a location on three consecutive days or on ten total days within a given month, have a strong potential to restrict Plaintiffs' access to both public forums—where they may engage in pure speech, expressive association, and expressive conduct—and to private gathering places where they may enjoy their rights to intimate or expressive association.  Plaintiffs allege that "[r]egistrants' habitual or systematic presence at locations during their participation in leisurely time at parks (*e.g.*, McGuire's volunteer musical performances and KLL's bonding with his younger brother), political activities, organizational gatherings, and free associations with other

citizens are chilled because of ASORCNA's reporting requirements, exclusion zones and presence restrictions."  (Compl. ¶ 300.)

While the conclusion that expression is chilled is a conclusion of law that may be disregarded, Plaintiffs plausibly allege that ASORCNA limits registrants' abilities to attend and participate in demonstrations, associational meetings, and other expressive activities that the First Amendment protects.  *See Hodgkins ex rel. Hodgkins v. Peterson*, 355 F.3d 1048, 1059 (7th Cir. 2004) (holding that a law imposing a nighttime curfew on juveniles implicated the First Amendment because "[b]eing out in public is a necessary precursor to almost all public forums for speech, expression, and political activity"); *Nunez by Nunez v. City of San Diego*, 114 F.3d 935, 950 (9th Cir. 1997) (holding that a minor curfew law implicated the First Amendment and applying the test for time, place, and manner restrictions); *Johnson v. City of Opelousas*, 658 F.2d 1065, 1074 (5th Cir. 1981) (holding that a minor curfew law was overbroad).  Any potential chilling effect from these provisions is exacerbated by the steep penalties—imprisonment for one to ten years—Plaintiffs face upon a conviction for violating the residency restrictions.  As JEB's allegations demonstrate, even the suspicion that a registrant has violated the residency restrictions can result in months of pretrial detention.  (Compl. ¶ 182.)  These provisions plausibly implicate the First Amendment.

Plaintiffs' specific allegations chiefly implicate the right to intimate association.  McGuire alleges that "time spent with his nieces, nephews and other minor family members is chilled or proscribed" and that he is limited in his ability to visit his wife and engaging in "bonding activities" with other family members. (Compl. ¶¶ 90–94.)  JEB alleges that he has been arrested for being present at a friend's residence and fears being arrested for violating the residency provisions in the future.  (Compl. ¶¶ 161–68, 183.)  KLL, like McGuire, alleges "ASORCNA's minor cohabitation restriction chills or prevents KLL from spending important bonding time with several family members when minors or minor family members visit his home."  (Compl. ¶ 215.)

> At a minimum, the right of intimate association encompasses the personal relationships that attend the creation and sustenance of a family—marriage, childbirth, the raising and education of children, and cohabitation with one's relatives.  Whether the right extends to other relationships depends on the extent to which those attachments share the qualities distinctive to family relationships, such as "relative smallness" and "seclusion from others in critical aspects of the relationship."

*McCabe v. Sharrett*, 12 F.3d 1558, 1563 (11th Cir. 1994) (quoting *Roberts*, 468 U.S. at 620) (internal citation omitted).

In this Circuit, the First Amendment right to intimate association often has been invoked when public employees allegedly have been subject to an adverse employment action for their familial association with a certain person.  *See, e.g.*, *Shahar v. Bowers*, 114 F.3d 1097 (11th Cir. 1997) (involving a claim that a woman's

employment offer was revoked because she was married to another woman); *McCabe v. Sharrett*, 12 F.3d 1558, 1562 (11th Cir. 1994) ("McCabe's claim is that appellees have impermissibly burdened her freedom of association right to be married to Joel McCabe by conditioning her secretary job on her not exercising that right."); *Cummings v. DeKalb Cnty.*, 24 F.3d 1349, 1354 (11th Cir. 1994) (rejecting an assertion of this right when the plaintiffs could not establish that their association with a disfavored employee was entitled to special constitutional protection). But the Supreme Court has held that there is no "generalized right of social association." *City of Dallas v. Stanglin*, 490 U.S. 19, 25 (1989) (internal quotation marks omitted). Therefore, it is highly questionable whether Plaintiffs' claimed right to bonding time with relatives is constitutionally protected. Moreover, only the minor cohabitation restriction—not the 2,000-feet rule—implicates Plaintiffs' rights to cohabitate with one's relatives because the 2,000-feet rule only limits *where* Plaintiffs may cohabitate, not with *whom* they may cohabitate.

McGuire's and KLL's most weighty accusations are that ASORCNA inhibits their ability to attend and participate in church activities. "[I]mplicit in the right to engage in activities protected by the First Amendment [is] a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, *religious*, and cultural ends." *Roberts*, 468 U.S. at 622 (emphasis and alterations added). Because a registrant's house of worship is more difficult to

84

relocate than a registrant's own family residence, Plaintiffs' claims suggest that ASORCNA-compliant registrants may need to either select their house of worship with ASORCNA's 2,000-feet rule in mind or limit their time within it.  This state of affairs puts registrant's right to expressive association in play.[11]

"In two different lines of cases, the Court has acted to ensure that individuals are not disadvantaged or discriminated against on account of their associational commitments.  In the first line of cases, the Court has held that the government is prohibited from 'seek[ing] to impose penalties or withhold benefits from individuals because of their membership in a disfavored group.'"  Scott M. Noveck, *The Promise and Problems of Treating Religious Freedom As Freedom of Association*, 45 GONZ. L. REV. 745, 759 (2010) (quoting *Roberts*, 468 U.S. at 622); *see also id.* ("The government cannot deny employment at a state university or a defense facility, nor refuse admission to the state bar, simply because of past association with the Communist party; nor can a state university refuse recognition to a student association solely because of its affiliation with a disfavored national group." (footnotes and citations omitted)).  "In a separate line of cases, the Court has held that the government cannot compel disclosure of association's membership list where such disclosure would open a disfavored group to harassment or

---

[11] Still, for the purpose of a facial claim, a restrictive statute need not "fall in toto because it [is] capable of some unconstitutional applications . . . ."  *Broadrick v. Oklahoma*, 413 U.S. 601, 614 (1973).

intimidation." *Id.*  Although their allegations do not fit neatly into either of these categories, Plaintiffs have, at this point in the litigation, stated a cognizable claim under the Supreme Court's expressive association doctrine because the residency provisions create draconian restrictions on where registrants may live and even be present.

Accordingly, Plaintiffs have stated a plausible claim that the residency and minor cohabitation restrictions implicate registrants' First Amendment rights by restricting their access to forums for expression and restricting their right to expressive association.  Discovery is needed on whether any potential overbreadth is substantial.

### 2. Applying Intermediate Scrutiny

The persuasive case of *Hodgkins ex rel Hodgkins v. Peterson* reinforces the plausibility of Plaintiffs' claim and provides guidance on what standard of review to apply to this facial claim.  355 F.3d 1048.  In that case, the minor children brought an overbreadth challenge against Indiana's minor curfew law.  *Id.* at 1051, 1056. The Seventh Circuit found that the law was subject to a facial overbreadth claim because minors who wished to engage in First Amendment activities were required "to subject themselves to arrest—including the possibility of breathalyser tests, urine tests and intrusive questioning about their family life—and then prove at a later time

that the activity they were engaging in fell within the affirmative defense for First Amendment activity." *Id.* at 1056–57.

Similarly, here, registrants who wish to engage in First Amendment activities must subject themselves to the risk that law enforcement will arrest them upon suspicions that they were present in a place for more than four hours on three or more consecutive days or on ten or more days within a month. *See* § 15-20A-4(20). JEB's allegations suggest that registrants face a realistic threat of arrest for merely not being at their listed address or for being present at a non-residence at the precise times officers choose to check. (Compl. ¶¶ 159–68 & nn.6, 8); *see also Hodgkins*, 355 F.3d at 1056 (stating that "[t]he Supreme Court has often noted that a realistic threat of arrest is enough to chill First Amendment rights" and collecting cases). To paraphrase *Hodgkins*, being outside of one's residence "is a necessary precursor to almost all public forums for speech, expression, and political activity." *See* 355 F.3d at 1059. Because they face potential felony convictions for failing to register a residence or for residing at a non-compliant address, registrants have good reason to avoid even the slightest appearance of habitual presence in any non-residence. This plausibly chills speech.

"Having determined that the statute is one that is eligible for facial attack, our next task is to decide through which of the many First Amendment lenses we will analyze the constitutionality of the curfew law." *Id.* at 1057. Plaintiffs ask the court

to apply an intermediate scrutiny test to this claim.  (Doc. # 43, at 86–87.)  The court

agrees that a law that regulates speech without reference to its content, receives "an

intermediate level of scrutiny."  *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622,

642 (1994).  The Supreme Court explained intermediate scrutiny as follows:

> Under *O'Brien*, a content-neutral regulation will be sustained if "it
> furthers an important or substantial governmental interest; if the
> governmental interest is unrelated to the suppression of free expression;
> and if the incidental restriction on alleged First Amendment freedoms
> is no greater than is essential to the furtherance of that interest." [367
> U.S.] at 377.  To satisfy this standard, a regulation need not be the least
> speech-restrictive means of advancing the Government's interests.
> "Rather, the requirement of narrow tailoring is satisfied 'so long as the
> . . . regulation promotes a substantial government interest that would be
> achieved less effectively absent the regulation.'"  *Ward* [*v. Rock
> Against Racism*, 491 U.S. 781, 799 (1989)] (quoting *United States v.
> Albertini*, 472 U.S. 675, 689 (1985)).  Narrow tailoring in this context
> requires, in other words, that the means chosen do not "burden
> substantially more speech than is necessary to further the government's
> legitimate interests."  *Ward*, 491 U.S. at 799.

*Id.* at 662.

It is undisputed that the State's interest is a compelling one: protecting the

vulnerable from predatory sex offenders.  *See* § 15-20A-2(4) ("The Legislature

declares that its intent . . . is to assist law enforcement in carrying out their duties

and, most importantly, to protect the public, especially children.").  This interest

cannot be gainsaid.  *E.g.*, *Doe v. Shurtleff*, 628 F.3d 1217, 1223 (10th Cir. 2010)

("We have no doubt that the State . . . has a compelling interest in investigating

kidnapping and sex-related crimes.").  And, importantly, this interest does not stem

from the suppression of free expression. *See O'Brien*, 391 U.S. at 377 (rejecting governmental interests in the suppression of free speech as sufficient to justify a restriction on speech).

But the hurdle for the State is proving that Alabama narrowly tailored ASORCNA's residency restrictions so as to not "burden substantially more speech than is necessary to further the government's legitimate interests." *Ward*, 491 U.S. at 799. There are several reasons to doubt such a conclusion.

First, registrants who wish to engage in protected activities outside of the home for more than the permissible aggregate hours must determine whether the additional residence would comply with ASORCNA's 2,000-feet rule. If the residence does not comply, then they are definitively limited in the time they can spend engaging in protected activity in that location. If the residence complies with the 2,000-feet rule, registrants must determine if their desired expression is worth the hassle of reporting the residence and potentially paying a $10 fee (if they have terminated their current residence). To do so would be physically inconvenient and "undoubtedly chills speech and deters expressive activity." *Doe 1*, No. 2:15-CV-606-WKW, 2018 WL 1321034, at *16 (M.D. Ala. Mar. 14, 2018).

Second, ASORCNA's aggregate hour restrictions include no exception for engaging in First Amendment activities. The State appears to suggest that registrants who exceeded their aggregate hours at a church should not fear

prosecution because ASORCNA provides that "[w]hether a person is residing at a place shall be determined by the totality of the circumstances, including the amount of time the person spends at the place and the nature of the person's conduct at the place."  (Doc. # 36, at 41–42 (quoting § 15-20A-4(20)).)  However, the following sentence introducing the aggregate hours requirement in the Act states, without reservation:

> The term reside *includes*, but is not limited to, spending more than four hours a day at the place on three or more consecutive days; spending more than four hours a day at the place on 10 or more aggregate days during a calendar month; or spending any amount of time at the place coupled with statements or actions that indicate an intent to live at the place *or to remain at the place* for the periods specified in this sentence.

§ 15-20A-4(20) (emphasis added).  This court sees no reason to depart from its previous interpretation that the "totality of the circumstances" language is a catch-all provision and that the three included examples specify circumstances in which a registrant will *always* have established a residence.  *Doe 1*, No. 2:15-CV-606-WKW, 2018 WL 1321034, at *4 n.7 (M.D. Ala. Mar. 14, 2018); *see also id.* at *4 ("These three circumstances, as the Act makes clear, are illustrations rather than limitations of the definition.").  Therefore, the State's contention is unfounded, and registrants have a plausible fear of being arrested, for example, while protesting in a public park for five hours a day, three days in a row.

Third, it is difficult to escape the underlying fact that slip-ups by noncompliant registrants can result in felony convictions under ASORCNA. "The severity of

criminal sanctions may well cause speakers to remain silent rather than communicate even arguably unlawful words, ideas, and images." *Reno v. ACLU*, 521 U.S. 844, 872 (1997). Finally, the reporting requirements apply for life without regard to risk of reoffending.

Because it chills such a wide swath of protected speech under penalty of a felony, Plaintiffs have plausibly alleged that the residency requirements "burden substantially more speech than is necessary to further the government's legitimate interests." *Ward*, 491 U.S. at 799.[12]

### H.  Void For Vagueness (Facial)

Plaintiffs contend in Count 2 that the employment restrictions and loitering restrictions are unconstitutionally vague. *See* Ala. Code §§ 15-20A-13, 15-20A-17. Vague laws trespass on the constitutional guarantee of due process.[13] *See Johnson v. United States*, 135 S. Ct. 2551, 2556 (2015). A statutory provision is void for vagueness if it (1) fails to provide people of ordinary intelligence with fair notice of what conduct it proscribes or (2) is so unclear that it authorizes or encourages discriminatory enforcement. *United States v. Williams*, 553 U.S. 285, 304 (2008).

---

[12]  The court has reviewed Plaintiffs' other arguments and has determined that they do not merit further discussion because they are poorly briefed and frivolous. (*See, e.g.,* Doc. # 43, at 41–44 ("ASORCNA's travel permit requirement impermissibly infringes upon registrants' conduct expressed through interstate travel").)

[13]  Plaintiffs oddly place their vagueness arguments in the midst of the overbreadth section of their response. (Doc. # 43, at 78–84.) However, their Response and Complaint clearly identify the correct source of their constitutional arguments: due process. (Doc. # 43, at 79; Compl., at 81.)

To succeed on a void-for-vagueness challenge, the plaintiff must show that the statutory provision is "impermissibly vague in all of its applications." *Ala. Educ. Ass'n v. State Superintendent of Educ.*, 746 F.3d 1136, 1139 (11th Cir. 2014) (quoting *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495 (1982)).  If the statutory provision at issue clearly proscribes some conduct in which the challenger engages, the challenger cannot complain of the statute's vagueness. *Id.* 1139–40.

Defendants' motion to dismiss will be addressed as it applies to the employment restrictions and the loitering restrictions. With respect to Plaintiffs' claims in Count 2, Defendants' motion to dismiss is due to be denied.

### 1. *Employment Restrictions and Vagueness*

Challenging ASORCNA's employment provisions as unconstitutionally vague, Plaintiffs allege that the employment provisions limit registrants "from seeking and accepting employment because there is no preapproval process available to registrant[s]," and that the statute does not  "make clear whether intermittent employment within employment zones of exclusion constitutes felonious activity." (Compl. ¶ 325.)  KLL alleges that "[h]e collects furniture and appliances left for trash on curbs on streets in his city, restores and repairs the items, and earns money by reselling those items."  (Compl. ¶ 217.)  He alleges that he "is unsure whether he is violating the law by collecting items from the curb because he does not know

whether the locations are restricted by ASORCNA's employment zones of exclusion," and even if "those locations are prohibited, KLL does not know if the short time he spends during his pick-ups violate the restrictions." (Compl. ¶ 217.) Both JEB and McGuire similarly allege that they have turned down employment when they do not know if their prospective employment locations are unlawful, and they complain that ASORCNA does not provide a pre-approval process that would aid that determination. (Compl. ¶¶ 99–103, 185–87.) Like KLL, McGuire has turned down ad hoc, intermittent employment because he is unsure whether such employment subjects him to ASORCNA's reporting requirements and exclusion zones. (Compl. ¶ 103.)

Plaintiffs' allegations indicate that registrants of ordinary intelligence are not put on adequate notice as to the extent or the effect of the employment exclusion zones. *See Johnson*, 135 S. Ct. at 2556. Without a safe-harbor provision or a publicly available land-use database, registrants can only guess at whether their place of employment falls within a zone of exclusion. *See Doe v. Snyder*, 101 F. Supp. 3d 672, 683 (E.D. Mich. 2015) (striking down geographic exclusion zones in part because "Michigan has not provided registrants with a map of exclusion zones or a list of all school properties"). The law also offers no guidance whatsoever for registrants whose employer is located in a compliant zone (such as KLL's residence), but who have to perform service calls or other intermittent work in zones

of exclusion.  The allegations also are sufficient to support the reasonable inference

that the employment restrictions allow for arbitrary enforcement.  *See Williams*, 553

U.S. at 304.  Defendants' motion to dismiss is due to be denied as to this portion of

Count 2.

### 2. Loitering Restrictions and Vagueness

ASORCNA proscribes registrants, like KLL, who were convicted of a sex

offense involving a minor from loitering within 500 feet of "the property line of any

property on which there is a school, childcare facility, playground, park, athletic field

or facility, school bus stop, college or university, or any other business or facility

having a principal purpose of caring for, educating, or entertaining minors."  § 15-

20A-17(a)(1).  The statute defines the term "loiter" to mean "to enter or remain on a

property while having no legitimate purpose or, if a legitimate purpose exists,

remaining on that property beyond the time necessary to fulfill that purpose."  § 15-

20A-17(b).

KLL alleges that he "likes to take his younger brother to parks and ball fields

to play with him.  He also likes sports and wishes to go to high school and college

football, basketball and baseball games."  (Compl. ¶ 226.)  He alleges that he "has

no idea what the [sic] constitutes a 'legitimate purpose.'"  (Compl. ¶ 230.)  And

"because he does not understand the terms of the loitering proscription, he limits the

time he shares with his brother in public parks and fields and, although he would

like to, he simply does not go to sporting events for fear" he will be arrested for loitering.  (Compl. ¶ 230.)

Defendants correctly argue that the school check-in provisions (§ 15-20A-17(b)(1)–(3)) that affect KLL's ability to attend K-12 school activities are not vague and clearly inform KLL as to how he may attend high school sporting events.[14] However, both parties appear to agree that § 15-20A-17(a) is similar to the loitering

---

[14]    Plaintiffs direct their challenge towards ASORCNA's "loitering" provisions, even though KLL's fear of attending high school sporting events is more properly traceable to ASORCNA's school check-in provisions.  For clarity, Ala. Code § 15-20A-17(b) declares:

> (b)(1) No adult sex offender, after having been convicted of a sex offense involving a minor, shall enter onto the property of a K-12 school while school is in session or attend any K-12 school activity unless the adult sex offender does all of the following:
>
> a.   Notifies the principal of the school, or his or her designee, before entering onto the property or attending the K-12 school activity.
>
> b.   Immediately reports to the principal of the school, or his or her designee, upon entering the property or arriving at the K-12 school activity.
>
> c.   Complies with any procedures established by the school to monitor the whereabouts of the sex offender for the duration of his or her presence on the school property or attendance at the K-12 school activity. For a public K-12 school, the local school board shall adopt a policy to effectuate this section.
>
> (2) Procedures established to effectuate this subsection are limited to rules that allow the principal of the school, or his or her designee, to discreetly monitor the adult sex offender.
>
> (3) For the purposes of this subsection, a K-12 school activity is an activity sponsored by a school in which students in grades K-12 are the primary intended participants or for whom students in grades K-12 are the primary intended audience including, but not limited to, school instructional time, after school care, after school tutoring, athletic events, field trips, school plays, or assemblies.

statute declared void for vagueness in *City of Chicago v. Morales*, 527 U.S. 41 (1999).

In *Morales*, a Chicago ordinance provided for criminal penalties if 1) a police officer reasonably "believed that at least one of the two or more persons present in a public place is a criminal street gang member;" 2) the persons were loitering by "remaining in any one place with no apparent purpose;" 3) the officer ordered "all of the persons to disperse;" and 4) a person (regardless of whether they were a gang member) disobeyed the order. *Id.* at 47 (alterations, internal quotation marks, and quotation omitted).

ASORCNA's loitering provisions similarly require that the registrant be asked to leave by an authorized person before he or she may be subject to criminal penalty. § 15-20A-17(a)(2); *see also id.* ("An authorized person includes, but is not limited to, any law enforcement officer, security officer, any owner or manager of the premises, a principal, teacher, or school bus driver if the premises is a school, childcare facility, or bus stop, a coach, if the premises is an athletic field or facility, or any person designated with that authority."). ASORCNA also similarly appears to grant such authorized persons broad discretion to determine what is and is not a "legitimate" purpose. A plurality of the Supreme Court held that such a "prior order" requirement was insufficient to save a vague statute.

> Although it is true that a loiterer is not subject to criminal sanctions unless he or she disobeys a dispersal order, the loitering is the conduct

that the ordinance is designed to prohibit.  If the loitering is in fact harmless and innocent, the dispersal order itself is an unjustified impairment of liberty.  If the police are able to decide arbitrarily which members of the public they will order to disperse, then the Chicago ordinance becomes indistinguishable from the law we held invalid in *Shuttlesworth v. Birmingham*, 382 U.S. 87, 90 (1965).  Because an officer may issue an order only after prohibited conduct has already occurred, it cannot provide the kind of advance notice that will protect the putative loiterer from being ordered to disperse. Such an order cannot retroactively give adequate warning of the boundary between the permissible and the impermissible applications of the law. . . .  The Constitution does not permit a legislature to "set a net large enough to catch all possible offenders, and leave it to the courts to step inside and say who could be rightfully detained, and who should be set at large." *United States v. Reese*, 92 U.S. 214, 221 (1876). This ordinance is therefore vague "not in the sense that it requires a person to conform his conduct to an imprecise but comprehensible normative standard, but rather in the sense that no standard of conduct is specified at all." *Coates v. Cincinnati*, 402 U.S. 611, 614 (1971).

*Morales*, 527 U.S. at 58–60 (plurality op.) (cleaned up).  The fact that the class of "authorized persons" includes, "*but is not limited to*," persons with certain institutional roles compounds this provision's potential vagueness.  A registrant who is "asked to leave" a covered area may even need to guess whether the asker is authorized.  The only significant distinction between ASORCNA's provision and the law in *Morales*, that this statute imposes a scienter requirement of "knowing" conduct, is not significant enough to save this claim from discovery.

The State invites this court to apply a limiting construction and interpret this provision "to mean that the sex offender guilty of a sex offense involving a minor has no reason to be on the property given its intended use and the circumstances

make it objectively reasonable to believe the sex offender is there for the improper purpose of making contact with potential minor victims."  (Doc. # 36, at 52.)  It invites this invidious interpretation, *and seeks to dismiss KLL's claim without relief.* Such a course of action would be tantamount to a declaration that KLL has correctly challenged a vague statute but that he should lose because Defendants admit that the statute is vague.

Defendants correctly note that a state's highest court may issue a binding interpretation of state law that saves a statute and thereby may avoid ruling on a constitutional question.  (Doc. # 36, at 52–53).  But it is not within a federal court's "power to construe and narrow state laws."  *Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972); *see also Gooding v. Wilson*, 405 U.S. 518, 520–21 (1972) (facially overbroad statute that state has not construed narrowly may not be given narrow construction by federal court); *Tunick v. Safir*, 209 F.3d 67, 75 (2d Cir. 2000) ("[B]ecause a state law is at play, only the state court can ultimately determine whether a saving interpretation is appropriate under the canons of interpretation of the particular state whose statutes it is called upon to construe.").

If Defendants are willing and able to bind the State to such a limiting construction, they must suit their actions to their words, and their words to their action.  *See* William Shakespeare, Hamlet, Act 3, Sc. 2 ("suit the action to the word, the word to the action").  Defendants may negotiate with KLL to either settle out of

court or to seek entry of a consent decree, at which point this court would need to consider whether the statute is susceptible to such a construction and engage in "a severance inquiry concerning whether the legislature would have enacted the law as limited."  Mark L. Rienzi, *Federal Courts, Overbreadth, and Vagueness: Guiding Principles for Constitution Challenges to Uninterpreted State Statutes*, 2002 UTAH L. REV. 381, 468 n.418; *see also id.* at 468–69; *see also United States v. Stevens*, 559 U.S. 460, 481 (2010) ("This Court may impose a limiting construction on a statute only if it is readily susceptible to such a construction.  We will not rewrite a law to conform it to constitutional requirements, for doing so would constitute a serious invasion of the legislative domain and sharply diminish Congress's incentive to draft a narrowly tailored law in the first place." (cleaned up)).  Courts must be cognizant of their limited role and reserve lawmaking and law enforcement to the branches to which the people have entrusted those respective powers.[15]  For now, discovery will proceed on KLL's challenge to § 15-20A-17(a).

## I.   **Count 3:  Equal Protection (Facial and As-Applied)**

The equal protection claim in Count 3 challenges specific requirements with which ASORCNA registrants must comply, including the residency, travel, and

---

[15] Indeed, federal courts have been criticized in other contexts for failing to give the legislative branch's express commands their proper weight when presented with contrary executive interpretations.  *See* John C. Brinkerhoff Jr., *FOIA's Common Law*, 36 YALE J. ON REG. 575, 608 (2019).

branded identification requirements.  (*See* Doc. # 31, at 83–84 ¶ 410 a.–l.).)  The discussion of this count addresses KLL separately from McGuire and JEB.

### 1. *KLL*

As a threshold issue, only McGuire and JEB are mentioned in Count 3.  Unlike the equal protection claim in Count 5, KLL is not named individually as a Plaintiff in this count.  (*See* Compl. ¶ 409 ("Registrants like McGuire and JEB are subject to ASORCNA for life . . . .").)   The incorporation-by-reference allegation that introduces Count 3 provides only confusion, rather than clarification, because it is a quintessential shotgun allegation.  *See also Strategic Income Fund, L.L.C. v. Spear, Leeds & Kellogg Corp.*, 305 F.3d 1293, 1295 (11th Cir. 2002) (explaining that one form of a shotgun complaint "contains several counts, each one incorporating by reference the allegations of its predecessors, leading to a situation where most of the counts (*i.e.*, all but the first) contain irrelevant factual allegations and legal conclusions.").  Notwithstanding KLL's omission from Count 3, it will be assumed that KLL is a Plaintiff in this count.  (*See* Doc. # 52, in which Plaintiffs argue as if KLL is included in this count).

The absence of allegations in Count 3 as to KLL makes it difficult to decipher the contours of his equal protection claim.  Considering the totality of the complaint against the briefing, however, the court makes two specific findings as to KLL's claim in Count 3.  First, to the extent that his claim in Count 3 challenges his

enslavement to ASORCNA's restrictions on grounds that his Louisiana conviction does not subject him to registration under ASCORNA in the first instance, that claim is repeated in Count 5 and need not be addressed independently here. (*See* Compl. ¶¶ 415–16.) As discussed *infra*, based on KLL's unique facts, his equal protection "class-of-one" claim in Count 5 (and only his) survives Rule 12(b)(6) review. But to the extent that KLL's joins McGuire's and JEB's equal protection theory in Count 3—that appears to be that as *valid initial registrants* of ASCORCNA who no longer pose a threat to others, they are subject to more than a dozen onerous requirements without "individualized assessments of future risk of recidivism for any registrant," and, thus, are the same as but treated differently than non-registrants—KLL's claim fails for substantially the same reason that McGuire's and JEB's claims fail.

### 2. *McGuire and JEB*

"The Equal Protection Clause requires the government to treat similarly situated persons in a similar manner." *Leib v. Hillsborough Cty. Pub. Transp. Comm'n,* 558 F.3d 1301, 1305 (11th Cir. 2009). "[E]qual protection analysis requires strict scrutiny of a legislative classification only when the classification impermissibly interferes with the exercise of a fundamental right or operates to the peculiar disadvantage of a suspect class." *Mass. Bd. of Ret. v. Murgia*, 427 U.S. 307, 312 (1976) (footnote omitted) (alteration added). "In determining whether a right is sufficiently 'fundamental' to trigger strict equal protection scrutiny," courts seek

"guidance in substantive due process jurisprudence, in which fundamental-rights issues arise with some frequency." *Morrissey v. United States*, 871 F.3d 1260, 1269 n.7 (11th Cir. 2017). "Where no fundamental right or suspect class is implicated, courts evaluate equal protection claims under the rational basis test." *Id.* at 1268.

As Defendants correctly note, sex offenders are not a suspect class, nor do various sub-classifications of offenders—based on the offender's "parental relationship to victim, status of [the] offender as a minor, insanity or civil commitment of the offender, [or] release of [the] offender from supervision prior to enactment of the statute"—divide offenders into suspect classes. *Doe v. Moore*, 410 F.3d 1337, 1346 (11th Cir. 2005); s*ee also United States v. LeMay*, 260 F.3d 1018, 1030 (9th Cir. 2001) ("Sex offenders are not a suspect class."). Therefore, McGuire and JEB may only obtain strict scrutiny of their equal protection claims if they can plausibly allege that they are similarly situated to "any other citizen of the state" (Compl. ¶ 331) and that ASORCNA's provisions impermissibly interfere with the exercise of one or more of their fundamental rights.

To support the argument that strict scrutiny applies to their equal protection claim, McGuire and JEB allege that (1) ASORCNA's residency provisions burden familial and other associational rights; (2) ASORCNA's residency, employment, reporting, travel, and loitering restrictions burden rights to religious expression and other forms of expressive and associative conduct; (3) ASORCNA's in-person

102

reporting requirements, including dual in-town and weekly homeless reporting burden registrants' rights to liberty and free movement; (4) ASORCNA's branded-identification, community notification, flier distribution, and internet dissemination provisions unduly burden speech and violate their rights to privacy; and (5) ASORCNA's travel provisions burden their right to interstate travel.

McGuire and JEB also allege that ASORCNA's additional fees for in-town and homeless registrants violate their rights to be free from excessive fines. Only McGuire has standing to challenge these provisions, and his challenges against them are barred by res judicata because he could have (and to some degree did) challenge these provisions in his first suit. *See supra*, at 40–47. Plaintiffs' challenges to provisions that apply only to juveniles and their guardians (Doc. # 62, at 8 (citing Doc. # 46-1, at 90, 93–94)) are due to be dismissed for lack of standing.

In response, Defendants primarily contend that rational basis review applies to McGuire and JEB's equal protection claim because sex offenders are not a suspect class. As explained below, both the arguments from both sides fail to address the fundamental flaw concerning Count 3—Plaintiffs are not similarly situated to non-registrant Alabama citizens.

With some lack of clarity, McGuire and JEB appear to allege that registrants like them who "are no longer subject to formal punishment, have not harmed minors or pose no discernable threat to children" are similarly situated and should be treated

the same as non-registrant Alabama citizens.  (Compl. ¶ 409; Doc. # 52, at 11 ("[T]he vast majority of current ASORCNA registrants, including the Plaintiffs, pose risk to the public and children that is so low, it is indistinguishable from any other citizen one faces in a random encounter.").)  McGuire and JEB's averments identifying other non-registrant Alabama citizens as similarly situated comparators are insufficient to plausibly state an Equal Protection claim.  Here's why.

The "threshold inquiry in an Equal Protection case is whether the plaintiff and the proposed comparator are similarly situated, since the Equal Protection Clause requires that 'persons similarly situated . . . be treated alike.'"  *S&M Brands, Inc. v. Georgia ex rel. Carr*, 925 F.3d 1198, 1203 (11th Cir. 2019) (quoting *City of Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985)); *Strickland v. Alderman*, 74 F.3d 260, 265 (11th Cir. 1996) ("Different treatment of dissimilarly situated persons does not violate the Equal Protection Clause.") (citation omitted).  "If the plaintiff has not been treated differently than a similarly situated comparator, no Equal Protection violation exists."  *Id.* (citation omitted).  Importantly, to be considered similarly situated for the purposes of an Equal Protection violation, the plaintiff and the alleged comparator must be "in all relevant respects alike."  *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992) ("The Equal Protection Clause does not forbid classifications.  It simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike.").

Here, McGuire and JEB are not similarly situated in all relevant respects to other non-registrant Alabama citizens.  McGuire and JEB have been convicted of crimes that require them to register under ASORCNA while their alleged comparators have not.  But they have not identified an Alabama resident who was convicted of a crime that required registration under ASORCNA, but who was not required to register.  *See Biester v. Lanier*, 249 F. App'x 782, 783 (11th Cir. 2007) (holding that the plaintiff could not "establish equal protection violations based on his status as a sex offender . . . because he ha[d] not shown that sex offenders are similarly situated to non-sex offenders" (citing *Jones v. Ray*, 279 F.3d 944, 946–47 (11th Cir. 2001))).  McGuire's and JEB's status as sex offenders under ASORCNA is a "relevant" aspect of any difference in treatment they have received as compared to non-sex offenders in Alabama who are not required to register under ASORCNA. *Nordlinger*, 505 U.S. at 10.

McGuire and JEB are attempting to compare themselves to Alabama non-sex offenders.  This key distinction provides a valid basis for the State to treat them differently from every other Alabama resident who has not been convicted of a sex offense necessitating registration under ASORCNA.  No amount of discovery will change these unescapable facts.  Thus, McGuire and JEB's equal protection claim is due to be dismissed on this basis alone.

Even if McGuire and JEB were similarly situated to other non-registrant Alabama citizens, their equal protection claim would still fail because many of the challenged provisions of ASORCNA survive rational basis review.[16]  Generally, a successful equal protection claim requires that a plaintiff show he was treated less favorably than others similarly situated and that the discriminatory treatment was based on some constitutionally protected interest, such as race.  *Jones v. Ray*, 279 F.3d 944, 946–47 (11th Cir. 2001).  Sex offenders are not a suspect class, nor do various sub-classifications of offenders based on the offender's "parental relationship to victim, status of [the] offender as a minor, insanity or civil commitment of the offender, [or] release of [the] offender from supervision prior to enactment of the statute" divide offenders into suspect classes.  *Doe v. Moore*, 410 F.3d 1337, 1346 (11th Cir. 2005); *see also United States v. LeMay*, 260 F.3d 1018, 1030 (9th Cir. 2001) ("Sex offenders are not a suspect class.").  Accordingly, strict scrutiny will not apply to most of Plaintiffs' equal protection claims.

Instead, classifications based on sex offender status are subject to rational basis scrutiny, which asks "whether they are 'rationally related to a legitimate governmental purpose.'"  *Moore*, 410 F.3d at 1346 (quoting *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985)).  Here, the Alabama Legislature

---

[16] To the extent that strict scrutiny applies to certain aspects of Plaintiffs' equal protection claim if a similarly situated comparator were properly alleged, the court declines to reach that issue.

laid out ample justification for its sex offender laws, Ala. Code § 15-20A-2(1), and even if it had not, it is not difficult to imagine the laws' legitimate governmental purpose.   *See Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995) (emphasizing that when applying rational basis scrutiny, "[t]he actual motivations of the enacting governmental body are entirely irrelevant" (emphasis in original)).

### J.  <u>Count 4:  Ex Post Facto (not labeled as facial or as-applied, but seeks facial relief)</u>

Count 4 of the Complaint alleges Alabama's sex offender registration laws violate the Ex Post Facto Clause when applied to registrants convicted before either August 1, 2017 (the effective date for ASORCNA's 2017 amendments) or July 1, 2011 (the effective date for the first iteration of ASORCNA).   (Compl. ¶¶ 412.) While Plaintiffs' response fails to put forward any argument in defense of their ex post facto claims, the court is guided by their complaint and the prior opinion in *McGuire I*.  As indicated in the statute of limitations section of this opinion, only new punishments imposed by ASORCNA's 2017 amendments may be challenged. *See supra*, at 54.  Because the only question at bar is whether ASORCNA's 2017 amendments impose a retroactive punishment, these provisions have been retroactively applied to KLL, granting him standing to bring this claim.  With one exception,[17] all Plaintiffs may challenge the state's recently changed branded

---

[17]  JEB does not appear to have standing to challenge the code-branded licenses.

identification practices, the residency and travel provisions, and other ASORCNA provisions (such as lifetime adherence, the generalized reporting provisions, and residence transfer fee) insofar as they are intertwined with changes to these restrictions.  Plaintiffs have stated a claim for relief with respect to ASORCNA's residency and travel restrictions.  However, Plaintiffs fail to plausibly allege an ex post facto claim concerning the branded identification provision of Act. Accordingly, Defendants' motion is due to be denied in part and granted in part.

The United States Constitution prohibits states from passing any "ex post facto Law."  U.S. Const. Art. I, § 10.  The Ex Post Facto Clause prohibits criminalizing conduct retroactively—"mak[ing] an action, done before the passing of the law, and which was innocent when done, criminal."  *Calder v. Bull*, 3 U.S. 386, 390 (1798) (Chase, J.).  In addition to prohibiting retroactive criminalization of the act itself, the Ex Post Facto Clause prohibits increasing punishment for criminal acts after their commission.  *Id*.

When a statute applies retroactively, a two-step analysis determines whether that statute violates the Ex Post Facto Clause.

> If the intention of the legislature was to impose punishment, that ends the inquiry.  If, however, the intention was to enact a regulatory scheme that is civil and nonpunitive, we must further examine whether the statutory scheme is so punitive either in purpose or effect as to negate [the state's] intention to deem it civil.

*Smith v. Doe*, 538 U.S. 84, 92 (2003) [hereinafter *Smith*] (internal quotations omitted). The Supreme Court of the United States has identified a number of guideposts useful in the second step of that analysis, when considering whether the effect of a statute is so punitive that it overwhelms a civil purpose. Those guideposts ask "whether, in its necessary operation, the regulatory scheme: has been regarded in our history and traditions as a punishment; imposes an affirmative disability or restraint; promotes the traditional aims of punishment; has a rational connection to a nonpunitive purpose; or is excessive with respect to this purpose." *Id.* at 97 (citing *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168–69 (1963)).

Beginning at *Smith*'s first step, with legislative intent, circumstances suggest that the legislative intent underpinning ASORCNA was civil, not punitive. When it enacted the first iteration of ASORCNA, the Alabama legislature intended to protect "vulnerable populations, particularly children." Ala. Code § 15-20A-2(5). The Legislature expressly disclaimed that its intent was to punish; rather, it meant "to protect the public and, most importantly, promote child safety." *Id.* This statement of intent has not changed.

In addition to the plain language of the statute, "the manner of the statute's classification" is also relevant to determining whether the legislative intent was punitive. *United States v. W.B.H.*, 664 F.3d 848, 854 (11th Cir. 2011). ASORCNA is codified in Title 15 of the Alabama Code, the title containing the state's criminal

procedures and other nonpunitive, nonsubstantive provisions for the administration of criminal law.  ASORCNA's home in Alabama's criminal procedure code does not "support a conclusion that the legislative intent was punitive."  *Smith*, 538 U.S. at 95 (considering Alaska's registration law and its codification in that state's criminal procedure code).  Thus, the analysis continues to *Smith's* second step and the *Mendoza-Martinez* guideposts.

*Smith's* second step asks whether the effect of the law is so punitive that it overwhelms the legislature's civil intent.  The "second step is a steep one for those challenging a statute on those grounds."  *W.B.H.*, 664 F.3d at 854 (citing *Smith*, 538 U.S. at 92).  Courts "ordinarily defer to the legislature's stated intent," *id.*, and statutes enjoy a presumption of constitutionality.  *Smith*, 538 U.S. at 110 (Souter, J., concurring).  "[O]nly the clearest proof will suffice to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty."  *Id.* at 92; *see also W.B.H.*, 664 F.3d at 855 ("[S]ome evidence will not do; substantial evidence will not do; and a preponderance of the evidence will not do.").  At this stage, the parties have had no opportunity to develop proof—clear or otherwise.  Taking the *Mendoza-Martinez* guideposts in turn to analyze ASORCNA's effect, the court finds that Plaintiffs' ex post facto claim survives Defendants' motions to dismiss.

The first guidepost asks "whether the regulatory regime has been regarded in our national history and tradition as punishment." *W.B.H.*, 664 F.3d at 855. The Supreme Court in *Smith* held that adult sex offender registries, like Alabama's, have not been so regarded. Community notification provisions—which exist to disseminate accurate and public information about criminal convictions—are unlike historic practices such as public shaming and branding, which are unquestionably punitive. *Smith*, 538 U.S. at 98; *see also W.B.H.*, 664 F.3d at 855 (holding that the first guidepost did not indicate that the effect of the federal sex offender registry was punitive).

To the extent that Plaintiffs allege that the branded identification provisions amount to public shaming, this claim fails. In *Smith*, the Supreme Court explored the historical practice of public shaming in light of Alaska's sex offender community notification provisions and recognized that "[s]ome colonial punishments indeed were meant to inflict public disgrace." 538 U.S. at 98. However, the Court narrowed its description of public shaming, noting that such punishments were historically carried out by holding "the person up before his fellow citizens for face-to-face shaming." *Id.*

Whether their licenses are branded with "CRIMINAL SEX OFFENDER" or a code, showing such licenses is undoubtedly an embarrassing experience. However, important differences exist between ASORCNA's license-labelling

requirement and the "scarlet-letter-type punishment" referenced by the Eleventh Circuit in *W.B.H.*, 664 F.3d at 855. Offenders have some degree of control over when and where to present an identification, unlike those during colonial times who had their transgressions aired publicly at all times, without any power to contain or control the extent or timing of the humiliation. Thus, while there may be other constitutional concerns with requiring registrants to carry a branded license, the court cannot say that the license-labelling provision is closely analogous to the historical practice of public shaming.

But at this stage, discovery is necessary to determine whether the residency restrictions amount to banishment, another historically punitive practice. While such restrictions do not literally "expel" registrants from their communities or prevent them from accessing prohibited areas except to live or work, they could have, depending on the facts shown, a practical effect similar to expulsion in some communities, particularly now that registrants are limited in the total hours that they can spend in any one place during a given month. *See Doe v. Miami-Dade Cty., Fla.*, 846 F.3d 1180, 1185–86 (11th Cir. 2017) (holding that sex offenders had stated a plausible ex post facto claim against Miami-Dade County's lifetime ban on certain sex offenders "residing within 2,500 feet of any school" (alteration omitted)); *Does #1-5 v. Snyder*, 834 F.3d 696, 705 (6th Cir. 2016) (holding that a Michigan law severely restricting where sex offenders could live, work, or loiter violated the Ex

112

Post Facto Clause); *cf. Doe v. Miller*, 405 F.3d 700, 719 (8th Cir. 2005) ("*Miller*") (holding that Iowa's residency restrictions did not amount to a banishment).

The second guidepost asks whether the regulatory scheme "imposes an affirmative disability or restraint." *Smith*, 538 U.S. at 97. "If the disability or restraint is minor and indirect, its effects are unlikely to be punitive." *Id.* at 100. ASORCNA does not require confinement, the prototypical form of punitive restraint. *Id.* And ASORCNA's in-person reporting requirements, while inconvenient for registrants, are not punitive, as they "help law enforcement track sex offenders and ensure that the information provided is accurate." *W.B.H.*, 664 F.3d at 857. There is, however, a notable difference between ASORCNA and the laws approved in *W.B.H.* and *Smith*. Unlike ASORCNA, those other laws do not actively restrict locations where registrants may live. Because convictions are already a matter of public record, a potential employer or landlord could learn of a conviction through a routine background check. *Smith*, 538 U.S. at 101; *W.B.H.*, 664 F.3d at 857. With the benefit of that information, a potential employer or landlord may decide not to hire or rent to a registrant. That choice may even be a likely one, but the choice—under those laws—remains in the hands of the potential employer or landlord. By contrast, ASORCNA's active restriction on where registrants may live imposes a direct governmental restraint.

It is also possible that ASORCNA's travel notification requirement amounts to a direct restraint. ASORCNA requires registrants to "complete a travel notification document" when they intend to be away from their home county for three or more consecutive days. Ala. Code § 15-20A-15. While ASORCNA no longer allows sheriffs to deny permits, registrants must appear during what may be limited operating hours (Compl. ¶ 120), provide "dates of travel, the intended destination or destinations, and temporary lodging information, and any other information reasonably necessary to monitor a sex offender who plans to travel," and certify that such information is true on pain of felony conviction. § 15-20A-15. Plaintiffs have plausibly alleged that the provisions impose an affirmative disability or restraint on their ability to travel. (Compl. ¶¶ 117–122, 183, 219, 220, 222.)

The fact that certain provisions may or do impose a direct restraint "does not inexorably lead to the conclusion that the government has imposed punishment." *Kansas v. Hendricks*, 524 U.S. 346, 363 (1997) (internal quotations omitted) (holding that Kansas's civil commitment scheme for sexually violent predators— though it imposed a direct restraint—did not violate the Ex Post Facto Clause). The guideposts are "neither exhaustive nor dispositive," *Smith*, 538 U.S. at 97, and they certainly should not be dispositive at this stage, where questions remain.

Consequently, the analysis continues to the third guidepost, which asks whether the law promotes traditional aims of punishment, namely retribution and

deterrence. *W.B.H.*, 664 F.3d at 858.  The Alabama legislature did not mention retribution but acknowledged deterrence was one purpose of ASORCNA.  Ala. Code § 15-20A-2(1) ("Registration and notification laws aid in public awareness and not only protect the community but serve to deter sex offenders from future crimes through frequent in-person registration.").   But a deterrent purpose will not necessarily render a registration requirement punitive, and an incidental deterrent effect will not do so either.  *Smith*, 538 U.S. at 102.  Thus, this court follows the reasoning of the Supreme Court and the Eleventh Circuit and concludes that ASORCNA's deterrent purpose "is not enough to justify a finding that [its] purpose is punitive" as a matter of law.  *W.B.H.*, 644 F.3d at 858 (citing *Smith*, 538 U.S. at 102).

The fourth—and "most significant"—guidepost asks whether the statute is rationally connected to a nonpunitive purpose.  *Smith*, 538 U.S. at 102.  Again, the reasoning of the Supreme Court and the Eleventh Circuit is instructive.  ASORCNA, like the statutes considered by those courts, embodies the legitimate, nonpunitive aim "of promoting public safety 'by alerting the public to the risk of sex offenders in their community.'"  *W.B.H.*, 664 F.3d at 859 (quoting *Smith*, 538 U.S. at 103). The registration requirements, community notification provisions, and residency and employment restrictions are all connected to the civil, nonpunitive aim "of protecting vulnerable populations, particularly children."  Ala. Code § 15-20A-2(5).

Finally, the fifth guidepost directs the court to consider whether ASORCNA's requirements are excessive with respect to its nonpunitive purpose.  *Smith*, 538 U.S. at 97.  This calls for assessment of the impact of the challenged provisions.  The absence of a particularized risk assessment as to the length of time since the offense or the likelihood of violence or recidivism does not, alone, make ASORCNA excessive and therefore punitive.  Alabama, like any other state, has the authority to make a rule of universal classification, "treating 'convicted sex offenders as a class rather than requiring individual determinations of their dangerousness.'"  *W.B.H.*, 664 F.3d at 859 (quoting *Smith*, 538 U.S. at 104 (alterations omitted)).  The Ex Post Facto Clause allows states to make "reasonable categorical judgments that conviction of specified crimes should entail particular regulatory consequences."  *Smith*, 538 U.S. at 103.  Nonetheless, the categorical treatment of registrants—failing to differentiate among registrants based on their offense, requiring lifetime registration for all registrants—is one factor to consider when assessing ASORCNA's reasonableness.  The residency restrictions, travel restrictions, and the lifetime registration period may impose, cumulatively, an onerous and direct restraint.  The Alabama Legislature has determined that 2,000 feet is the appropriate restrictive radius within which registrants may not live, and such determinations are "the sort of task for which the elected policymaking officials of a State, and not the federal courts, are properly suited."  *Miller*, 405 F.3d at 715.  But the reasonableness

116

of that decision is a determination for the courts.  "The excessiveness inquiry of our ex post facto jurisprudence is not an exercise in determining whether the legislature has made the best choice possible to address the problem it seeks to remedy.  The question is whether the regulatory means chosen are reasonable in light of the nonpunitive objective."  *Smith*, 538 U.S. at 105.  Answering the question of reasonableness requires discovery and a better informed judicial review at summary judgment or trial.[18]  Plaintiffs are entitled to develop facts on which the court may determine the reasonableness of the restrictions and then weigh reasonableness, among the other *Mendoza-Martinez* guideposts, to determine whether Plaintiffs have provided the clearest proof that the punitive effect of the residency and travel provisions overwhelms their civil intent.

**K.   Count 5:  Selective Enforcement/Class of One (as-applied against Defendant Marshall)**

Count 5 is labeled a Fourteenth Amendment "selective enforcement," "class of one" claim on behalf of KLL.[19]  (Compl., at 85–86.)  The Eleventh Circuit has

---

[18]  Defendants cite this court's findings in *McGuire 1* that McGuire had not proven that ASORCNA's 2011 versions of these provisions to argue for dismissal.  (Doc. # 36, at 51 (citing *McGuire 1*, 83 F. Supp. 3d at 1240–41, 1258–59, 1269).)  However, those findings were made after a four-day bench trial.  These claims likewise merit the opportunity for further development.

[19]  Although KLL also alleges that he brings Count 5 for a violation of the Fifth Amendment, the Fifth Amendment provides an equal protection remedy only against the federal government.  *See United States v. Houston*, 456 F.3d 1328, 1335 n.5 (11th Cir. 2006) ("[T]he Supreme Court has established that the Due Process Clause of the Fifth Amendment impliedly imposes the same obligations on the federal government as does the Equal Protection Clause on the states . . . .").  As this claim is brought against a State of Alabama official, it implicates only the Equal Protection Clause of the Fourteenth Amendment.  *See id.*

117

recognized that "[e]qual protection claims are not limited to individuals discriminated against based on their membership in a vulnerable class." *Campbell v. Rainbow City, Ala.*, 434 F.3d 1306, 1313 (11th Cir. 2006). Equal protection also encompasses "any individual's right to be free from intentional discrimination at the hands of government officials." *Id.* (citing *E&T Realty v. Strickland*, 830 F.2d 1107, 1112 (11th Cir. 1987)). In *Campbell*, the Eleventh Circuit explained that "[t]o prevail on this traditional type of equal protection claim, basically a selective enforcement claim, . . . Plaintiffs must show (1) that they were treated differently from other similarly situated individuals, and (2) that Defendant unequally applied a facially neutral [law] for the purpose of discriminating against Plaintiffs." *Id. Campbell* also recognized the "newer trend in equal protection law, a 'class of one claim' without a necessary showing of ill will or discriminatory purpose." *Id.* (citing *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam)). In a class-of-one claim, "the plaintiff alleges that [he] has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Olech*, 528 U.S. at 564.

Both tests share the first element: a plaintiff must identify a similarly situated comparator. "To be 'similarly situated,' the comparators must be 'prima facie identical in all relevant respects.'" *Grider v. City of Auburn, Ala.*, 618 F.3d 1240, 1264 (11th Cir. 2010) (quoting *Griffin Indus. v. Irvin*, 496 F.3d 1189, 1202 (11th

Cir. 2007); *Campbell*, 434 F.3d at 1314 (same); *see also Young Apartments, Inc. v. Town of Jupiter*, 529 F.3d 1027, 1045 (11th Cir. 2008) ("[T]he same strict 'similarly situated' standard applies whether an equal protection claim is brought under a 'class of one' theory or a traditional theory of unlawful discrimination (quoting *Griffin Indus. v. Irvin*, 496 F.3d 1189, 1204–05 (11th Cir. 2007)). As to the second element of the tests, the distinctions in application, if any, are less clear under Eleventh Circuit decisions. The Eleventh Circuit has suggested, though, that the application of a rational basis standard under the *Campbell* test is appropriate where, as here, a non-suspect class is involved. *See Young Apartments, Inc.*, 529 F.3d at 1046 n.8 ("We also note that the district court's summary judgment ruling applied a rational basis standard to the second prong of the *Campbell* test . . . . *Campbell*, 434 F.3d at 1314. If Young Apartments is able to reassert its unequal enforcement claims by offering new evidence of disparate treatment vis-a-vis the landlords of non-Hispanic tenants, then strict scrutiny of Jupiter's motivations would, of course, apply.").

In their briefing, Plaintiffs advanced no arguments in support of Count 5. While their introductory section states that they "will respond to the State's motion to dismiss on counts 3 through 5," this promise went unfulfilled. (Doc. # 43, at 19.) Notwithstanding the lack of argument, the allegations in Count 5 have been construed liberally in Plaintiffs' favor.

Regarding JEB's and McGuire's share of Count 5, Plaintiffs' shotgun complaint makes it "virtually impossible to know which allegations of fact are intended to support which claim(s) for relief." *Anderson v. Dist. Bd. of Trs. of Cent. Fla. Cmty. Coll.*, 77 F.3d 364, 366 (11th Cir. 1996).  McGuire appears to allege that the requirement that in-town registrants register quarterly with and pay $10 to both city and county law enforcement and the weekly homeless reporting requirement are selectively enforced against him.  (*See* Compl. ¶¶ 359–60 ("ASORCNA creates a broad class of similarly situated persons, including homeless registrants, all who are subject to reporting in-person requirements.  But members of the state-created class (Ala. Code § 15-20A-5) of registrants are treated disparately.  Homeless registrants of ASORCNA are subject to the same residential exclusion zones as registrants with homes."); Compl. ¶¶ 361–77, 417.)  This claim, though, is barred by res judicata because McGuire was affected by the homeless and dual in-town reporting requirements at the time of *McGuire 1*.  To the extent that JEB challenges these same provisions, as previously discussed, he lacks standing because he lives outside a municipality at a fixed residence.  (Compl. ¶ 189); *see supra*, at 32–33.

KLL's selective enforcement/class-of-one equal protection claims are more substantial.  KLL claims that ASORCNA's restrictions should not apply to him in the first instance because the consensual sexual relationship he had with his sixteen-year-old girlfriend when he was seventeen years old, although a crime in Louisiana,

is not a crime in Alabama.  (Compl. ¶¶ 414–17; *see also* Compl. ¶¶ 192–96.)  Count 5 alleges that there is no rational basis for requiring KLL to register under ASORCNA where the conduct underlying his Louisiana conviction, *see* La. Rev. Stat. § 14:92(A)(7), "is not a crime in Alabama," while "all other citizens of Alabama" who engage in a similar sexual act are not required to register under ASORCNA.  (Compl. ¶ 415; *see also id*. ¶ 146.)  In other words, KLL identifies his comparator as an Alabama resident who committed a sexual act in Alabama similar to his but who was not required to register under ASORCNA "due to [the] state [of Alabama]'s designation of non-criminality to the sexual act KLL engaged in" while in Louisiana.  (Compl. ¶ 416.)  However, Defendants contend that KLL must identify an individual "who despite being classified as a sex offender in another state and required to register as a sex offender by another state does not have to register as a sex offender in Alabama."  (Doc. # 36, at 63.)  Discovery may prove Defendants correct, but, at the pleading stage, where the allegations are construed in the light most favorable to KLL, he has set forth allegations that plausibly demonstrate the existence of a similarly situated comparator.

To begin, Defendants persuasively present that KLL's comparator must be measured against the ASORCNA provisions that required his registration.  KLL alleges that the State required him to register under "a catch-all provision of ASORCNA, § 15-20-5(38)."  (Compl. ¶ 204.)  Section 15-20A-5(38) provides that

a "sex offense" includes "any offender determined in any jurisdiction to be a sex offender shall be considered a sex offender in this state."  Defendants agree but say that KLL also was required to register under § 15-20A-5(37).  Section 15-20A-5(37) provides that a "sex offense" includes "[a]ny crime committed in another state . . . if that jurisdiction also requires that anyone convicted of that crime register as a sex offender in that jurisdiction."[20]  However, contrary to Defendants' arguments, using these ASCORCNA provisions for sizing up a similarly situated comparator, the court finds that the allegations plausibly plead a comparable comparator that propels KLL past the pleadings to discovery, even if just barely so.

KLL sets forth allegations that suggest that, when he entered his plea agreement, he was not an "offender determined in [Louisiana] to be a sex offender," *see* § 15-20A-5(38), and he had not committed a crime for which he was required to register, § 15-20A-5(37).  Specifically, KLL expressly alleges that he "was *not* required to register as a sex offender after accepting the plea agreement" on his conviction for contributing to the delinquency of a minor.  (Compl. ¶ 198 (emphasis added).)  This allegation, construed in the light most favorable to KLL, suggests some sort of a plea deal whereby KLL was absolved from the sex-offender

---

[20] More specifically, Defendants argue that, as of 1995, Louisiana law required individuals convicted of KLL's crime to register as sex offenders.  *See* 1995 La. Sess. Law Serv. Act 1290 (S.B. 818) (West); *see also* La. Rev. Stat. § 15:541(24)(a) (categorizing a violation of La. Rev. Stat. § 14:92(A)(7) as a sex offense); *id.* § 15:542(A)(1)(a) (requiring adults convicted of a sex offense as defined in § 15:541 to register as a sex offender).  Defendants contend, therefore, that, as a matter of law, § 15-20A-5(37) required KLL to register under ASORCNA.

registration requirement and the designation as a sex offender under Louisiana law. The propriety of a plea deal that excepted KLL from the strictures of Louisiana's law, if that is the case, has not been raised or argued and is premature for resolution on the allegations. Neither the plea agreement itself nor its specific terms are incorporated into the complaint. Discovery is necessary to resolve the particulars surrounding his plea agreement with the State of Louisiana. Whether and how KLL's crime of conviction and status under Louisiana's laws—for reasons of his plea deal or otherwise—initially relieved him from the strictures of Louisiana's sex offender requirements can be sifted during discovery.

Furthermore, as alleged, KLL's conduct that eventually required his registration under Louisiana's sex offender laws was the violation of "the *residency* terms of his probation," not the commission of a sex-offense crime. (Compl. ¶ 199 (emphasis in original).) The court cannot rule on the allegations alone that KLL's subsequent violation of state probation, proceedings which traditionally are civil (not criminal) in nature, constituted a "crime" that required his registration under Louisiana's sex offender laws or that labeled him a sex offender. These underlying factual subtleties, to which Count 5 is tethered, could (or could not) prove significant but, for now, must be construed in the light most favorable to KLL.

In short, the allegations plausibly suggest that KLL was not convicted of a crime in Louisiana that required him to register as a sex offender under Louisiana

law and that he was not determined to be a sex offender under Louisiana law. Under these facts, upon being required to register in Alabama, he was treated differently from non-sex offenders in Alabama who are not required to register.

Furthermore, if the foregoing allegations are true, then KLL plausibly has alleged facts from which it can be inferred that Defendant Marshall intentionally required KLL to register as a sex offender under ASORCNA where he did not require registration by other similarly situated non-sex offenders and that the demand that KLL register was irrational. *See Olech*, 528 U.S. at 565; *see also Carruth v. Bentley*, 942 F.3d 1047, 1058 (11th Cir. 2019) (observing that the Supreme Court has "explained that the class of one theory applies when there is 'a clear standard against which departures, even for a single plaintiff, [can] be readily assessed." (citing *Engquist v. Or. Dep't of Agr.*, 553 U.S. 591, 602 (2008)). Defendant's argument that it is rational for the State to rely on Louisiana's ultimate requirement that KLL register as a sex offender might ultimately prevail but presently is too generic to defeat the factual nuances of KLL's unique situation. (*See* Doc. # 36, at 66.)

In sum, KLL has plausibly alleged a selective enforcement claim, which is premised on a non-suspect classification, under a "class of one" theory. KLL's claim can be revisited in the summary judgment stage if the discovery process undercuts his allegations.

## V.   CONCLUSION

For the foregoing reasons, it is ORDERED that Defendants' motion to dismiss (Doc. # 35) is GRANTED in part and DENIED in part as follows:

(1)   Defendants' motion to dismiss Count 1, which is a First Amendment overbreadth facial challenge, is GRANTED as it relates to ASORCNA's travel restrictions (§ 15-20A-15), employment restrictions (§ 15-20A-13), in-person reporting/quarterly reporting and fee-payment provisions (§§ 15-20A-10, 15-20A-7(a)(4)-(8)), branded identification requirements (§ 15-20A-18), community notification provision (§ 15-20A-21), internet dissemination provision (§ 15-20A-8), and loitering provision (§ 15-20A-17).   These aspects of Count 1 are DISMISSED with prejudice.  However, Plaintiffs are granted leave to file a motion to amend their complaint, on or before **February 1, 2021**, if they desire to add a compelled speech claim in connection with ASORCNA's branded identification requirement.  The proposed amendment must clearly identify what type of branded identification each Plaintiff currently carries and the injuries that have flowed therefrom.

(2)   Defendants' motion to dismiss Count 1 is DENIED as it relates to ASORCNA's residency and minor cohabitation restrictions (§ 15-20A-11). Specifically, Plaintiffs have stated a plausible claim that the residency and minor

cohabitation restrictions implicate registrants' First Amendment rights by restricting their access to forums for expression.

(3)     Defendants' motion to dismiss Count 2, which is a void for vagueness challenge pursuant to the Fourteenth Amendment Due Process Clause, is DENIED in part because Plaintiffs have stated a plausible claim that ASORCNA's employment restrictions (§ 15-20A-13) are unconstitutionally vague and KLL has stated a plausible claim that that ASORCNA's loitering provision (§ 15-20A-17) is unconstitutionally vague.  The motion to dismiss Count 2 is GRANTED as to McGuire's and JEB's challenge to the loitering provision because they lack standing to challenge that portion of the statute.

(4)     Defendants' motion to dismiss Count 3, which is an equal protection claim, is GRANTED, and this claim is DISMISSED with prejudice.

(5)     Defendants' motion to dismiss Count 4, which is a facial ex post facto claim, is GRANTED as it relates to registrants convicted before July 1, 2011 (the effective date for the first iteration of ASORCNA) because such claim is barred by the applicable statute of limitations.  Defendants' motion to dismiss Count 4 is also GRANTED as it relates to the branded identification provisions (§ 15-20A-18) of ASORCNA.  These claims are dismissed with prejudice.

(6)     Defendants' motion to dismiss Count 4 is DENIED as it relates to registrants convicted before August 1, 2017 (the effective date for ASORCNA's

2017 amendments) because Plaintiffs have stated a plausible claim for relief that the changes to the residency (§ 15-20A-11) and travel restrictions (§ 15-20A-15) violate the Ex Post Facto Clause.

(7)     Defendants' motion to dismiss Count 5, which is a selective enforcement/class-of-one claim pursuant to the Equal Protection Clause, is GRANTED with prejudice as to McGuire and JEB.

(8)     Defendants' motion to dismiss Count 5 is DENIED as to KLL.

It is further ORDERED that, to the extent Plaintiffs seek to add REL and ALC as additional plaintiffs to this lawsuit, that request is DENIED.

DONE this 7th day of January, 2021.

/s/ W. Keith Watkins
UNITED STATES DISTRICT JUDGE