IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| MICHAEL A. McGUIRE, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:19-CV-174-WKW |
| | ) | [WO] |
| STEVEN T. MARSHALL, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

There is no doubt that a legislature may pass valid laws to protect the public from predators and sexual abuse. *Packingham v. North Carolina*, 582 U.S. 98, 106 (2017). "But the assertion of a valid governmental interest cannot, in every context, be insulated from all constitutional protections." *Id.* (internal quotations omitted). This is no less true in the troubling context of a law that "imposes severe restrictions on persons who already have served their sentence and are no longer subject to the supervision of the criminal justice system." *Id.* at 107.

Plaintiffs are three adult men who have challenged the facial constitutionality of several provisions of Alabama's sex-offender registry law, the Alabama Sex Offender Registration and Community Notification Act (ASORCNA), by which they are required to register as sex offenders. *See generally* Ala. Code § 15-20A-1 *et seq.* ASORCNA is one of the most comprehensive and debilitating sex-offender schemes in the nation, affecting every

area of Plaintiffs' post-conviction existence.  They have sued Steven T. Marshall, the Attorney General of the State of Alabama, as well as Hal Taylor, the Secretary of the Alabama Law Enforcement Agency.  They seek declaratory and injunctive relief prohibiting enforcement of several of ASORCNA's provisions.  Over a dozen claims were dismissed at the motion-to-dismiss stage.[1]  *See McGuire v. Marshall*, 512 F. Supp. 3d 1189 (M.D. Ala. 2021) (Watkins, J.) [hereinafter *McGuire II*].[2]  The surviving claims are before the court on the parties' dueling motions for summary judgment.  (Doc. # 122); (Doc. # 124).

For the reasons to follow, summary judgment will be granted in Defendants' favor for all claims *except* Plaintiffs' facial First Amendment challenges to ASORCNA's residency provision, Ala. Code § 15-20A-11.  Two aspects of that provision are facially unconstitutional.  *Id.* §§ 15-20A-11(a), 15-20A-11(d).  Importantly, this opinion does not consider the constitutionality of sex-offender residency restrictions generally, but only aspects of Alabama's residency provision

---

[1] Among the dismissed claims were: seven First Amendment overbreadth challenges, an Equal Protection claim, two *Ex Post Facto* Clause claims, and two selective enforcement claims. *McGuire II*, 512 F. Supp. 3d at 1251–52.

[2] This opinion cites three related opinions sharing the name "McGuire."  In a separate case dealing with *Ex Post Facto* Clause challenges to ASORCNA, the court tried the case and entered its opinion in 2015.  That opinion will be referred to as *McGuire I*.  *See McGuire v. Strange*, 83 F. Supp. 3d 1231, 1236–40 (M.D. Ala. 2015) (Watkins, J.).  In 2022, that opinion was ultimately affirmed in part, vacated in part, and remanded in part by the Eleventh Circuit. The Eleventh Circuit's opinion resolving the appeal in that case will simply be referred to as *McGuire*.  *See McGuire v. Marshall*, 50 F.4th 986 (11th Cir. 2022).  Finally, the court's opinion in this case at the motion-to-dismiss stage will be referred to as *McGuire II*.  *See McGuire v. Marshall*, 512 F. Supp. 3d 1189 (M.D. Ala. 2021) (Watkins, J.).

in its current form that plainly fail to survive constitutional review under the First Amendment.

## TABLE OF CONTENTS

I.    **JURISDICTION AND VENUE** ..................................................................... 4

II.   **STANDARD OF REVIEW** ........................................................................... 5

III.  **BACKGROUND** ........................................................................................... 6

   A.    PROCEDURAL HISTORY .......................................................................... 6

   B.    STATUTORY FRAMEWORK ..................................................................... 7

       1.    *The Residency Provision (Ala. Code § 15-20A-11)* ................................. 12

       2.    *The Employment Provision (Ala. Code § 15-20A-13)* .............................. 15

       3.    *The Loitering Provision (Ala. Code § 15-20A-17)* .................................. 16

       4.    *The ID Provision (Ala. Code § 15-20A-18)* ............................................. 17

       5.    *The Internet Dissemination Provision (Ala. Code § 15-20A-8)* ................ 19

   C.    FACTS ....................................................................................................... 20

       1.    *The Plaintiffs and Their Injuries* ............................................................ 20

       2.    *The Plaintiffs' Prior ASORCNA Challenges* ......................................... 24

   D.    OVERVIEW OF PENDING CLAIMS ...................................................... 25

IV.  **DISCUSSION** ............................................................................................. 27

   A.    THE RESIDENCY PROVISION (Count 1) ............................................. 27

       1.    *Standing* .................................................................................................. 30

       2.    *Claim Preclusion* .................................................................................... 38

       3.    *Abstention* ............................................................................................... 42

       4.    *Whether the Residency Provision is Overbroad* ..................................... 44

a)     Construction of "Reside" and "Overnight Visit"................................... 46

b)     Substantial Overbreadth ........................................................... 71

5.     *Whether the Residency Provision is Narrowly Tailored* ............................ 88

6.     *Conclusion and Remedy* ...................................................... 107

B.     THE EMPLOYMENT PROVISION (Count 2) ........................................ 111

1.     *Claim Preclusion* ........................................................... 114

2.     *Statute of Limitations* ....................................................... 116

3.     *Abstention* ................................................................ 117

4.     *Whether the Employment Provision is Vague* ..................................... 117

a)     "No way to know if a location is within the employment zone of exclusion." .... 120

b)     "Whether intermittent working within the zone of exclusion is permitted."........ 132

C.     THE LOITERING PROVISION (Count 2) ................................................ 142

1.     *Abstention* ................................................................ 142

2.     *Statute of Limitations* ....................................................... 144

3.     *Whether the Loitering Provision is Vague* ........................................ 145

D.     THE ID PROVISION or THE CV606 INDICATOR (Count 3) ................................. 153

E.     THE INTERNET DISSEMINATION PROVISION (Count 3) .................................. 159

F.     CONCEDED CLAIMS (Counts 4 and 5) ................................................ 160

V.   **CONCLUSION** ................................................................ 161

# I.     JURISDICTION AND VENUE

Neither personal jurisdiction nor venue is contested, and both are proper. Subject-matter jurisdiction is generally not contested under federal-question

4

jurisdiction, 28 U.S.C. § 1331.  However, jurisdiction is contested to the extent that Defendants assert that Article III standing has not been met for several claims.  The court will address those arguments in its discussion of each claim.

## II.  STANDARD OF REVIEW

Summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits show that there is no genuine dispute as to any material fact and that the moving party is entitled to a judgment as a matter of law.  Fed. R. Civ. P. 56(a), (c).  No genuine dispute of material fact exists if the opposing party fails to make a sufficient showing on an essential element of his case as to which he would have the burden of proof. *Celotex Corp. v Catrett*, 477 U.S. 317, 322–23 (1986).

Just as important, the "mere existence of a scintilla of evidence in support of the [non-moving party's] position" is insufficient to defeat a motion for summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  In making this assessment, the court must "view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party," *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1285 (11th Cir. 1997), and "resolve all reasonable doubts about the facts in favor of the non-movant," *United of Omaha Life Ins. Co. v. Sun Life Ins. Co. of Am.*, 894 F.2d 1555, 1558 (11th Cir. 1990).

The applicable Rule 56 standard is not affected by the filing of cross-motions for summary judgment. *See, e.g., Am. Bankers Ins. Grp. v. United States*, 408 F.3d 1328, 1331 (11th Cir. 2005). "Cross-motions . . . will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed." *United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir. 1984) (per curiam) (citation omitted). When both parties move for summary judgment, the court must evaluate each motion on its own merits, resolving all reasonable inferences against the party whose motion is under consideration. *See Am. Bankers Ins. Grp.*, 408 F.3d at 1331.

## III.   BACKGROUND

The relevant background will be relayed in four parts: (A) procedural history, (B) ASORCNA's statutory framework, (C) facts, and (D) an overview of the pending claims.

### A.   PROCEDURAL HISTORY

Plaintiffs initially filed this case in March of 2019. (Doc. # 1.) That same month, the complaint was amended for the first time. (Doc. # 9.) The second amended complaint came in November 2019. (Doc. # 31.) A motion to dismiss (Doc. # 35) and a motion for preliminary injunction. (Docs. # 42, 51) followed. In early 2021, the motion-to-dismiss opinion greatly narrowed the scope of this case. *See McGuire II*, 512 F. Supp. 3d at 1189.

6

In March of 2021, Plaintiffs filed the third amended complaint (Doc. # 72.) Almost a year later, in January of 2022, Plaintiffs filed the fourth, and currently operative, amended complaint.  (Doc. # 88.)  Defendants answered.  (Doc. # 92.) The case then proceeded through discovery during the bulk of 2022.   During discovery, the Eleventh Circuit issued its opinion in a related case dealing with constitutional challenges to ASORCNA.  *See McGuire*, 50 F.4th 986.  In the fall of 2022, Plaintiffs filed a motion to exclude evidence.  (Doc. # 107).   Thereafter, Defendants Marshall and Taylor filed a motion for summary judgment. (Doc. # 122.)  Similarly, Plaintiffs JEB, KLL, and McGuire filed their own motion for summary judgment.   (Doc. # 124.)   The motions are fully briefed. (Docs. # 122, 125, 129, 130, 133, 134.)

All told, the briefing (not including exhibits) is over 650 pages.  Now, four years, five complaints, a motion-to-dismiss opinion, the Eleventh Circuit's *McGuire* opinion, a developed record, and well over a thousand total pages of briefing into this litigation, the motion to exclude (Doc. # 107) and dueling motions for summary judgment (Docs. # 122, 124) are before the court.

## B.    STATUTORY FRAMEWORK

The Alabama Sex Offender Registration and Community Notification Act (ASORCNA) is "the most comprehensive and debilitating sex-offender scheme in the nation."   *McGuire II*, 512 F. Supp. 3d at 1198; *see generally* Ala. Code §§ 15-20A-1  through  15-20A-48.   ASORCNA applies  to  adults

7

convicted of any of hundreds of different sex offenses, ranging from Class A felonies, like rape in the first degree, to misdemeanors, like indecent exposure. Ala. Code § 15-20A-1.[3]   Importantly, though it applies to people based on their criminal history, ASORCNA is not part of a qualifying registrants' criminal sentence: It overlays their sentence by implementing vast, lifelong probation-like restrictions. ASORCNA enforces its prohibitions, not through the potential revocation of probation or supervised release, but through the creation of new, categorical, element-based felonies.   That is, ASORCNA imposes severe restrictions that apply after a person has already completed his or her sentence (and any supervision) for the initial conviction and is returned to society. *See United States v. Bobal*, 981 F.3d 971, 978 (11th Cir. 2020) (explaining the difference between conditions of supervised release and laws that create "entirely new felon[ies]").   Over 16,000 people are registered under ASORCNA and subject to

---

[3] While ASORCNA broadly regulates all sex offenders, ASORCNA is most restrictive on registrants convicted of sex offenses involving a child. A few special rules apply only to those registrants. But even when the categorical restrictions apply only to sex offenses involving a child, the sweep of offenses that fall into that narrower category is still extremely broad.   For example, "the overbreadth of § 15-20A-11(d)(4) is breathtaking." *Henry v. Abernathy*, No. 2:21-CV-797-RAH, 2024 WL 115795, at *6 (M.D. Ala. Jan. 10, 2024) (Huffaker, J.).   That section commands that no "adult sex offender [who] has been convicted of any sex offense involving a child" may reside with a minor.   Ala. Code § 15-20A-11(d)(4).   But "[t]he spectrum of circumstances [§ 15-20A-11(d)(4)] encompasses" is vast and ranging.   *Henry*, No. 2:21-CV-797-RAH, 2024 WL 115795, at *6.   "The statute treats all sex offenses involving a child the same, including child pornography offenses.   It applies equally to, for example, a 19-year-old male college freshman convicted for downloading sexually explicit content of his 16-year-old high school girlfriend, to the worst of the worst offenders—like one who trafficked and raped children."   *Id.* (finding § 15-20A-11(d)(4) unconstitutional under the Due Process Clause because a lifetime, non-appealable prohibition on parenting a child that applies to a sweeping class of offenses, without any mechanism for relief, is "simply not tailored").

its restrictions.  *See Criminal Justice Information Services,* Alabama Law Enforcement Agency, https://www.alea.gov/node/270 (last visited May 22, 2024). The stated purpose of ASORCNA's restrictions is "not to punish sex offenders but to protect the public and, most importantly, promote child safety."  Ala. Code § 15-20A-2.

ASORCNA has forty-eight provisions, each of which can contain dozens of affirmative duties and prohibitions.  *See generally* Ala. Code §§ 15-20A-1 through 15-20A-48.  Many of these provisions reference and interlock with each other, often requiring three or more cross-references before the contours of a given provision become understandable.  ASORCNA's forty-eight provisions cumulatively touch on virtually every aspect of registrants' daily lives—where registrants can live or work, who they can live or work with, where they can volunteer and who they can volunteer with, where they can go and for how long and for what purposes can they go there.  Their official identification bears a code labelling them as sex offenders.  Their personal information is published by the Alabama Law Enforcement Agency (ALEA) on a public website.

For the duration of their lives, registrants have to appear in person before local law enforcement every three months to confirm their registration information: name, date of birth, "address of *each* residence," name and address of any school, name and address of any employer, vehicle information and frequent location of where that vehicle is kept, any telephone numbers, any email addresses, any

"monikers" used in internet communications, a current photograph, a physical description of themselves, fingerprints, palmprints, DNA, list of any internet service providers used, and so forth. *Id.* § 15-20A-7 (emphasis added); § 15-20A-10(f). Upon changing any of this information, registrants must immediately notify local law enforcement either in person or, for things like a change in email address, telephonically. *Id.* § 15-20A-10(e)(1).

Most of the provisions apply to all registrants for life with only narrow exceptions and without any opportunity for appeal or a mechanism to evaluate individualized dangerousness, risk of recidivism, the range of seriousness of the underlying facts of a conviction, or changed circumstances post-conviction.[4] ASORCNA's provisions apply retroactively. Nearly every duty and prohibition created by ASORCNA is undergirded by a Class C Felony. That threatens registrants with one to ten years in prison and is the same or greater level offense than many of the sex offenses that initially compel registration. This case is about

---

[4] Some classes of registrants may be excused from ASORCNA's restrictions. Under the so-called "Romeo and Juliet" exception, a state court may excuse an individual convicted of a sex offense from complying with ASORCNA if the court finds that the sex offense did not involve force and was a crime only because of the victim's age, the victim was at least 13 years old at the time of the offense, and the registrant was less than five years older than the victim. Ala. Code § 15-20A-24(b), (i). Alabama also allows registrants to petition for relief on a number of other grounds: relief from the employment restriction if the offender was not convicted of certain serious sex crimes and poses little risk of committing a future sex crime; relief from the residency restriction if the offender is seriously ill or disabled; and relief from a registration period of life for juvenile offenders. *See id.* §§ 15-20A-23, 15-20A-25, 15-20A-34.

five of ASORCNA's provisions.  Before turning to those provisions, a brief history of the life and times of ASORCNA is in order.

The State of Alabama enacted its first sex-offender statute over five decades ago.  *Doe 1 v. Marshall*, 367 F. Supp. 3d 1310, 1319 (M.D. Ala. 2019) (citing Ala. Act No. 1967-507) [hereinafter *Doe 1*].  "That law required offenders to submit their name to their county sheriff, and only law enforcement could access that roster."  *Id.* (citing Ala. Act No. 1967-507 §§ 1, 2).  Since then, Alabama has repeatedly amended its sex-offender laws to make them broader and more restrictive, including by adding "most of the restrictive features used by various other jurisdictions" as well as unique restrictions that are "nonexistent elsewhere."  *See McGuire I*, 83 F. Supp. 3d at 1236.  The current statute comprises mostly legislation from 2011, 2015, and 2017.  *See* Ala. Act No. 2011-640; Ala. Act No. 2015-463; Ala. Act. No. 2017-414.

The 2017 amendments expanded the scope of some of ASORCNA's provisions.  *See Doe 1 v. Marshall*, 2018 WL 1321034, at *2 (M.D. Ala. Mar. 14, 2018) (explaining generally that the 2017 amendments were a "far-reaching rewrite" of some ASORCNA provisions).  Some provisions were only marginally modified while still other provisions were completely unaffected by the 2017 amendments.

While ASORCNA in its current form has dozens of provisions, many of which interlock and overlap in their impact, the five provisions challenged here

are: (1) the residency provision, Ala. Code § 15-20A-11; (2) the employment provision, Ala. Code § 15-20A-13; (3) the loitering provision, Ala. Code § 15-20A-17; (4) the ID provision, Ala. Code § 15-20A-18; and (5) the internet dissemination provision, Ala. Code § 15-20A-8. Of these, only the residency provision's definitional framework was relevantly changed by the 2017 amendments. The ID statutory provision itself did not change but, after this court's prior ruling, ALEA changed the sex-offender indicator that is required by the provision from "CRIMINAL SEX OFFENDER" in large, red font, to a code, "CV606," in small, black font. *See McGuire*, 50 F.4th at 994 (explaining that the ID indicator changed two years after the 2017 amendments to ASORCNA and after this court's ruling in *Doe I*, 367 F. Supp. 3d at 1310).

Much of this case hinges on statutory interpretation. It is therefore appropriate to provide the complete statutory text of the challenged provisions, as drafted and codified into law by the Alabama Legislature. *See Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1114 (11th Cir. 2022) (reiterating the value of not characterizing a statute's text in lieu of providing the text itself). Each provision will be taken in turn.

### 1. The Residency Provision (Ala. Code § 15-20A-11)

ASORCNA's "Prohibited Residence Locations" provision, or the residency provision, is codified at Ala. Code § 15-20A-11. The first subsection provides: "No adult sex offender shall establish a residence or maintain a residence after

release or conviction within 2,000 feet of the property on which any school, childcare facility, or resident camp facility is located unless otherwise exempted pursuant to Sections 15-20A-23 and 15-20A-24."[5]   *Id.* § 15-20A-11(a). Additionally, the residency provision also provides that "[n]o adult sex offender shall reside or conduct an overnight visit with a minor."   *Id.* § 15-20A-11(d). ASORCNA's registration provision separately requires in-person registration of new residences "[i]mmediately upon establishing a new residence."   *Id.* § 15-20A-10(b).

After establishing a residence, a registrant "transfer[s] or terminate[s] his or her residence" if he or she "fails to spend three or more consecutive days at his or her residence without previously notifying local law enforcement."   *Id.* § 15-20A-10(e)(2).   If a registrant transfers his or her residency by failing to be there for three consecutive days, he or she must "immediately appear in person and update the [residency] information with local law enforcement in each county in which the adult sex offender resides."   *Id.* § 15-20A-10(e)(1).

---

[5] Section 15-20A-23 enables sex offenders to petition for relief from the residency provision "during the time a sex offender is terminally ill or permanently immobile, or the sex offender has a debilitating medical condition requiring substantial care or supervision or requires placement in a residential health care facility."   This exception is somewhat redundant of Section 15-20-11(f) of the residency provision itself, which excepts "the time the adult sex offender is in the facility of a licensed health care provider" from the application of the residency provision's prohibition on residing within 2,000 feet of certain areas.   Meanwhile, Section 15-20A-24 enables certain non-violent sex offenders to petition for and obtain relief from ASORCNA if the petitioner proves by clear and convincing evidence that: "(1) [t]he sex offense did not involve force and was only a crime due to the age of the victim . . . (2) [a]t the time of the commission of the sex offense, the victim was 13 years of age or older . . . [and] (3) [a]t the time of the commission of the sex offense, the sex offender was less than five years older than the victim."

"RESIDENCE," as used in Section 15-20A-11, is defined as: "A fixed residence as defined by this section *or other place where the person resides*, regardless of whether the person declares or characterizes such place as a residence." *Id.* § 15-20A-4(21) (emphasis added).

"RESIDE" is defined as:

> To be habitually or systematically present at a place. Whether a person is residing at a place shall be determined by the totality of the circumstances, including the amount of time the person spends at the place and the nature of the person's conduct at the place. The term reside includes, but is not limited to, spending more than four hours a day at the place on three or more consecutive days; spending more than four hours a day at the place on 10 or more aggregate days during a calendar month; or spending any amount of time at the place coupled with statements or actions that indicate an intent to live at the place or to remain at the place for the periods specified in this sentence. A person does not have to conduct an overnight visit to reside at a place.

*Id.* § 15-20A-4(20)

"OVERNIGHT VISIT" is defined as: "Any presence between the hours of 10:30 p.m. and 6:00 a.m." *Id.* § 15-20A-4(14).

The 2017 amendments added the definitions for "overnight visit" and "reside" to ASORCNA while changing the definition of "residence" to be anchored to where someone "reside[s]."[6]  Knowing violation of any part of the residency provision is a Class C felony. *Id.* § 15-20A-11(i).

---

[6]  Prior to the 2017 amendments, "reside" was undefined.  "Residence" was previously defined as:

(continued…)

2.      *The Employment Provision (Ala. Code § 15-20A-13)*

ASORCNA places "Employment restrictions" on adult sex offenders.  *See*

Ala. Code § 15-20A-13.  The entire employment provision follows:

(a) No adult sex offender shall accept or maintain employment or a volunteer position at any school, childcare facility, mobile vending business that provides services primarily to children, or any other business or organization that provides services primarily to children, or any amusement or water park.

(b) No adult sex offender shall accept or maintain employment or a volunteer position within 2,000 feet of the property on which a school or childcare facility is located unless otherwise exempted pursuant to Sections 15-20A-24 and 15-20A-25.

(c) No adult sex offender, after having been convicted of a sex offense involving a child, shall accept or maintain employment or a volunteer position within 500 feet of a playground, park, athletic field or facility, or any other business or facility having a principal purpose of caring for, educating, or entertaining minors.

(d) Changes to property within 2,000 feet of an adult sex offender's place of employment which occur after an adult sex offender accepts employment shall not form the basis for finding that an adult sex offender is in violation of this section.

---

"[A] place where a *person resides, sleeps, or habitually lives* or will reside, sleep, or habitually live. If a person does not reside, sleep, or habitually live in a fixed residence, residence means a description of the locations where the person is stationed regularly, day or night, including any mobile or transitory living quarters or locations that have no specific mailing or street address. Residence shall be construed to refer to the places where a person resides, sleeps, habitually lives, or is stationed with regularity, regardless of whether the person declares or characterizes such place as a residence.

2015 Alabama Laws Act 2015-463 (H.B. 316) (emphasis added).

(e) It shall be unlawful for the owner or operator of any childcare facility or any other organization that provides services primarily to children to knowingly provide employment or a volunteer position to an adult sex offender.

(f) For purposes of this section, the 2,000-foot measurement shall be taken in a straight line from nearest property line to nearest property line.

(g) Any person who knowingly violates this section shall be guilty of a Class C felony.

*Id*.

Relatedly, ASORCNA defines "EMPLOYMENT" as "[c]ompensated work or a volunteer position *for any period of time*, regardless of whether the work is full-time, part-time, self-employment, or as an independent contractor or day laborer, provided that employment does not include any time spent traveling as a necessary incident to performing the work." *Id.* § 15-20A-4(5) (emphasis added). And a "CHILDCARE FACILITY" is defined as a "licensed child daycare center, a licensed childcare facility, or any other childcare service that is exempt from licensing pursuant to Section 38-7-3, if it is sufficiently conspicuous that a reasonable person should know or recognize its location or its address has been provided to local law enforcement." *Id.* § 15-20A-4(3).

3.   *The Loitering Provision (Ala. Code § 15-20A-17)*

ASORCNA prohibits some adult sex offenders from "[l]oitering in certain areas." *Id.* § 15-20A-17.  "No adult sex offender, after having been convicted of a sex offense involving a minor, shall loiter on or within 500 feet of the property line

16

of any property on which there is a school, childcare facility, playground, park,

athletic field or facility, school bus stop, college or university, or any other

business or facility having a principal purpose of caring for, educating, or

entertaining minors." *Id.* § 15-20A-17(a)(1).

> Under this subsection, loiter means to enter or remain on property
> while having no legitimate purpose or, if a legitimate purpose exists,
> remaining on that property beyond the time necessary to fulfill that
> purpose. An adult sex offender does not violate this subsection unless
> he or she has first been asked to leave a prohibited location by a
> person authorized to exclude the adult sex offender from the premises.
> An authorized person includes, but is not limited to, any law
> enforcement officer, security officer, any owner or manager of the
> premises, a principal, teacher, or school bus driver if the premises is a
> school, childcare facility, or bus stop, a coach, if the premises is an
> athletic field or facility, or any person designated with that authority.

*Id.* § 15-20A-17(a)(2).

"[L]egitimate purpose" is undefined by ASORCNA.   Violation of this

subsection must be done "knowingly," and it is a Class C felony.  *Id.* § 15-20A-

17(c).

### 4.    *The ID Provision (Ala. Code § 15-20A-18)*

ASORCNA's "Identification Requirements," as relevant to this case,

provide:

> (a) Every adult sex offender who is a resident of this state shall obtain
> from the Alabama State Law Enforcement Agency, and always have
> in his or her possession, a valid driver license or identification card
> issued by the Alabama State Law Enforcement Agency. If any adult
> sex offender is ineligible to be issued a driver license or official
> identification card, the Alabama State Law Enforcement Agency shall
> provide the adult sex offender some other form of identification card

or documentation that, if it is kept in the possession of the adult sex offender, shall satisfy the requirements of this section. If any adult sex offender is determined to be indigent, an identification card, or other form of identification or documentation that satisfies the requirements of this section, shall be issued to the adult sex offender at no cost. Indigence shall be determined by order of the court prior to each issuance of a driver license or identification card.

(b) The adult sex offender shall obtain from the Alabama State Law Enforcement Agency a valid driver license or identification card bearing a designation that enables law enforcement officers to identify the licensee as a sex offender within 14 days of his or her initial registration following release, initial registration upon entering the state to become a resident, or immediately following his or her next registration after July 1, 2011.

(c) Whenever the Alabama State Law Enforcement Agency issues or renews a driver license or identification card to an adult sex offender, the driver license or identification card shall bear a designation that, at a minimum, enables law enforcement officers to identify the licensee as a sex offender.

*Id.* § 15-20A-18.

Thus, the ID provision requires ALEA to place on registrants' IDs a "designation that, at a minimum, enables law enforcement officers to identify the licensee as a sex offender." *Id.* § 15-20A-18(c). What that designation looks like is up to ALEA. Currently, ALEA places the code "CV606" in small, black font on registrants' IDs.

18

5.    *The Internet Dissemination Provision (Ala. Code § 15-20A-8)*[7]

Section 15-20A-8 of ASORCNA is titled "Registration information – Public registry website."  This provision will be referred to as the internet dissemination provision.   It requires that certain sex-offender information, including name, address, employer, license plate number, photograph, physical description of the sex offender, crime of conviction, and status of the sex offender be "provided on the public registry website maintained by the Alabama State Law Enforcement Agency and may be provided on any community notification documents." *Id.* § 15-20A-8(a).   "All information shall immediately be posted on the public registry website upon receipt of the information by the Alabama State Law Enforcement Agency."  *Id.* § 15-20A-8(d).  "The website shall include field search capabilities to search for sex offenders by name, city or town, county, zip code, or geographic radius."   *Id.* § 15-20A-8(e).   The website shall also include "instructions on how to seek correction of information that a person contends is erroneous," § 15-20A-8(g), and "a warning that information on the site should not be used to unlawfully injure, harass, or commit a crime against any person named in the registry . . . and that any such action may result in civil or criminal penalties," § 15-20A-8(h).

---

[7] Only the public registry website provision is at issue.  That is, only ALEA's internet dissemination of information about Plaintiffs and other sex offenders is challenged.  However, ASORCNA also requires analog dissemination of sex offender information via mail and or hand delivery to members of the sex offender's community. *See generally* Ala. Code § 15-20A-21.

## C.   FACTS

The relevant facts can be separated into two groups: (1) facts about the Plaintiffs and their injuries, and (2) facts about the Plaintiffs and their prior or non-existent challenges to ASORCNA, which are relevant to several of Defendants' non-merits arguments, such as preclusion.

### 1.   *The Plaintiffs and Their Injuries*

There are three plaintiffs: McGuire, JEB, and KLL.  All three are adult residents of Alabama who are registered as sex offenders under ASORCNA and subject to ASORCNA's lifetime requirements.  Each Plaintiff was convicted of a sex offense over a decade ago.  McGuire was convicted in Colorado in 1986—thirty-eight years ago.  (Doc. # 120-6 at 13, 52–53.)  JEB was convicted in Alabama in 1987—thirty-seven years ago.  (Doc. # 123-16 at 38–52.)  And KLL was convicted in Louisiana in 2012.  (Doc. # 120-25 at 1–6.)  None of Plaintiffs' sex offenses involved a child.  KLL's conviction, however, involved a minor.[8]  He was convicted under a Louisiana juvenile delinquency law for having a sexual relationship with a sixteen-year-old girl when he was a teenager.  (Doc. # 123-22 at 67–79.)   All three Plaintiffs have lived in Alabama as registered sex offenders under ASORCNA for over five years.

---

[8] ASORCNA defines a "child" as a "person who has not attainted the age of 12," while a "minor" is defined as a "person who has not attained the age of 18."  Ala. Code §§ 15-20A-4(2), (13).

As a result of living under ASORCNA's requirements, all three Plaintiffs' lives have been altered in similar ways.  Relevant here, they miss employment opportunities, either as a result of the job being in an exclusionary zone or the employer refusing to hire registrants or the employer rescinding offers or firing them upon discovery of their sex-offender status or because every job location within their profession is within an employment zone of exclusion; they do not attend church and family gatherings as much as they would like out of fear of being deemed to reside there if they are there more than the aggregate-times provided for by ASORCNA's definition of reside, including for more than four hours a day, three days in a row; they routinely leave places, including family gatherings, anytime a minor is present out of fear of conducting an "overnight visit" between the hours of 10:30 p.m. and 6:00 a.m.; they have IDs with the "CV606" sex offender label on it, which is frequently recognized by people in the community when they have to display it to access certain services and goods; they are required to provide certain information to the government, like their address, which the government in turn publishes on a public sex-offender website.

But for the residency provision, McGuire would attend church every Sunday and participate in bible study, music ministry, and the men's ministry, (Doc. # 120-1 at 23); JEB, who used to be a near-daily churchgoer, would go to church more frequently (Doc. # 120-7 at 12, 34); and KLL, who frequently spent more than four

hours a day at church, would attend church more than four hours a day for more than 10 days in a calendar month, (Doc. # 120-17 at 37.)

Prior to the 2017 amendment to the residency provision, JEB would go to church nearly every day because, as he stated, there "[w]asn't no time limit . . . [y]ou could go [to church] and stay all day if you want." (Doc. # 120-7 at 29.) Similarly, KLL used to be a "regular churchgoer" who never missed a Wednesday or Sunday service. (Doc. # 120-17 at 36). He would spend nearly all day at church with his family. *Id.* As he puts it, "[W]e were the first people to get there and the last people to leave was the way I was raised." *Id.* at 37. Likewise, McGuire also fears violating ASORCNA's current residency provision if he attends church in the "habitual, systematic way" that he wishes. (Doc. # 120-1 at 23.) As McGuire puts it, the residency provision stops him from "serv[ing] the Lord" in the habitual and systematic way that he is called to do. *Id.*

For JEB, his abstention from participating in church as frequently as he used to is especially hard because the people at church are some of the only people in his life who "don't care about [him] being a sex offender," because "[e]verybody in the church got something wrong with them." (Doc. # 120-7 at 11.) As JEB stated, there are "alcoholics and everything in the church . . . [t]hat's what they're there for, to better themselves . . . [t]hey go for the worship." *Id.* Similarly, "one of the most fulfilling things" in KLL's life was his ability to volunteer at church "on a daily basis," such as by repairing pews, or organizing food donations, neither

of which he does now on a daily basis out of fear of violating ASORCNA. (Doc. # 120-17 at 96.)

Not only does the residency provision restrict Plaintiffs' ability to attend church regularly, but it also precludes them from daily associating with their families and participating in politics. All three Plaintiffs routinely leave family gatherings early or do not attend the gatherings at all out of fear of violating the residency provision either by being in a prohibited location too long or being present with a minor between 10:30 p.m. and 6:00 a.m. McGuire no longer daily visits his wife's home (whose residence is in an ASORCNA prohibited area) out of fear of violating ASORCNA. As McGuire's wife, Marlene, stated, ASORCNA has "broken up the foundation of our marriage, what makes us work because I can't be there for him every day and he can't be there for me every day." (Doc. # 123-10 at 13.) McGuire also wants to attend multi-day political rallies but does not out of fear of violating ASORCNA. For example, after the 2017 amendments to ASORCNA, McGuire went to one day of a four-day political rally and despite wanting to go back he did not because he was afraid he would be "breaking the law" by being at the rally for more than four hours a day, three days in a row. (Doc. # 120-1 at 24.)

These are only a few examples. The record is replete with testimony from Plaintiffs and Plaintiffs' family members about how Plaintiffs have abstained and continue to abstain from attending church or political protests or family gatherings

23

on a regular basis because of their reading of ASORCNA's residency restrictions and overnight visit prohibition.

Meanwhile, KLL, the only Plaintiff to whom ASORCNA's loitering restriction applies, has his life disrupted in another way.  He is routinely asked to leave parks or other public spaces because of his status as a sex offender.  Many times, he has gone to hang out at a park for recreational purposes but has left after being told he could not be there due to ASORCNA's loitering provision.  The loitering provision prevents certain registrants from being at certain places without a "legitimate purpose."  KLL does not know what is or is not a "legitimate purpose," and he believes that, under the statute's language, any activity or pastime can be subjectively deemed illegitimate.

### 2.    *The Plaintiffs' Prior ASORCNA Challenges*

Relevant to several of Defendants' arguments is the reality that this is not McGuire and JEB's first action alleging ASORCNA is unconstitutional.  Both McGuire and JEB have previously challenged ASORCNA in two different cases.  Both those cases were handled at the trial level by this court.   KLL has not previously challenged ASORCNA.

McGuire previously challenged various ASORCNA provisions in the early-2010s. *See McGuire I*, 83 F. Supp. 3d at 1236.  Final judgment was entered in that case in 2015, meaning that McGuire never had the chance to challenge the substance of ASORCNA's subsequent 2017 amendments—specifically as the

amendments relate to the changes to the residency provision.  McGuire appealed the court's entry of final judgment in that case in 2015.  Seven years later, in 2022, the Eleventh Circuit resolved that appeal, affirming in part and vacating in part. *See McGuire*, 50 F.4th at 986.  Since that case, McGuire, an accomplished musician, has wanted to work in his church's music ministry but does not because of ASORCNA's employment provision.

Similarly, JEB challenged ASORCNA in 2015.  *See Doe 1*, 367 F. Supp. 3d at 1322.  Unlike McGuire though, the 2017 amendments came into play while JEB's case was open and active.   In light of the new amendments, the court permitted JEB to amend his complaint to include new facts related to the new amendments' injurious effect, but the court did not permit JEB to bring any new claims—thus, JEB, like McGuire, did not have a chance to bring new claims that arose from the operation of the 2017 amendments in his previous case.  Moreover, in the first case, JEB was unemployed and not seeking employment and therefore lacked standing to challenge the employment provision.  Now, JEB is seeking employment.

## D.    OVERVIEW OF PENDING CLAIMS

Seven types of claims remain after the court's motion-to-dismiss opinion. They target the five provisions explained above.  Around half of the claims are brought by all three Plaintiffs.  The rest are brought only by KLL.  Neither JEB nor McGuire bring a claim in isolation.

All Plaintiffs bring the same four facial constitutional claims:

(1)    First Amendment challenges to ASORCNA's residency provision, (Doc. # 125 at 42);

(2)    Fourteenth Amendment void for vagueness challenges to ASORCNA's employment provision, (Doc. # 125 at 91);

(3)    First Amendment compelled speech challenges to ASORCNA's ID provision, (Doc. # 125 at 120); and

(4)    *Ex Post Facto* Clause challenges to ASORCNA's residency and travel provisions, (Doc. # 125 at 156.).[9]

Meanwhile, KLL alone brings three additional claims:

(1)    A Fourteenth Amendment void for vagueness challenge to ASORCNA's loitering provision, (Doc. # 125 at 106);

(2)    A First Amendment compelled speech challenge to ASORCNA's internet dissemination provision, (Doc. # 125 at 138); and

(3)    Fourteenth Amendment selective enforcement challenges, (Doc. # 125 at 156–57.).

---

[9]    The travel provision's text was not provided in the background section because Plaintiffs conceded the claim in their briefing.  (Doc. # 125 at 156.)  That claim is included in this overview for completeness purposes.

## IV.    DISCUSSION

The discussion will proceed as follows: (A) First Amendment overbreadth and tailoring challenges to the residency provision; (B) vagueness challenges to the employment provision; (C) vagueness challenges to the loitering provision; (D) compelled speech challenges to the ID provision; (E) compelled speech challenge to the internet dissemination provision; and (F) the remaining claims. Summary judgment will be granted in Defendants' favor for all claims *except* Plaintiffs' facial First Amendment challenges to the residency provision. Summary judgment will be granted in Plaintiffs' favor as to that challenge. It is addressed first.

### A.    THE RESIDENCY PROVISION (Count 1)

All Plaintiffs bring a First Amendment overbreadth challenge and a traditional First Amendment tailoring challenge to ASORCNA's residency provision, Ala. Code § 15-20A-11.[10]    *See* (Doc. # 130 at 53 ("The Residency

---

[10]    Plaintiffs generally challenge the residency provision as facially unconstitutional under the First Amendment. *See* Ala. Code § 15-20A-11.    That provision has two major substantive provisions, Ala. Code § 15-20A-11(a) and Ala. Code § 15-20A-11(d). Together with their challenge to Section 11 *in toto*, Plaintiffs specifically challenge both subsections 11(a) and 11(d), and they are the focus of the court's analysis.    Throughout this opinion, the court will use the term "residency provision" as a shorthand to refer to sections 11(a) and (d) together.    Section 11(a) and section 11(d) are the provisions that the court found plausible facial First Amendment challenges at the motion-to-dismiss stage.    *See McGuire II*, 512 F. Supp. 3d at 1232 ("ASORCNA's residency and minor-visitation restrictions . . . have a strong potential to restrict Plaintiffs' access to both public forums . . . and to private gathering places where they may enjoy their rights to intimate or expressive association.").    Plaintiffs refer to these provisions, and the definitions attached to them, collectively as "the residency provisions." (Doc. # 125 at 44 n.9). Plaintiffs also refer to Ala. Code § 15-20A-11(g) and Ala. Code § 15-20A-11(i) as part of the "residency provisions," but the court does not focus on those subsections.    Section 15-20A-11(g) enables registrants to pre-approve residences.    Section 15-20A-11(i) provides that a knowing

(continued…)

27

Provisions are Substantially Overbroad and Not Sufficiently Tailored").)   The overbreadth doctrine requires facial invalidation of a law that punishes a substantial amount of protected First Amendment expressive activity, when judged in relation to the law's plainly legitimate sweep.   *Virginia v. Hicks*, 539 U.S. 113, 118–120 (2003).   Separately, the First Amendment permits facial invalidation of a law under intermediate scrutiny when a content-neutral regulation that necessarily burdens expressive activity is not "narrowly tailored to serve a significant governmental interest,"   *McCullen v. Coakley*, 573 U.S. 464, 486 (2014), and when the rationale for that finding of insufficient tailoring is "so broad as to render the statute effectively unenforceable,"   *Bd. of Trustees of State Univ. of New York v. Fox,* 492 U.S. 469, 483 (1989) (Scalia, J.).

The essence of Plaintiffs' First Amendment challenges is that ASORCNA's residency provision generally, and its residency and minor-visitation provisions specifically, are not narrowly tailored and criminalize a substantial amount of protected First Amendment conduct—like attending church and family gatherings and political protests—which, as a result, chills them from engaging in that expressive activity out of fear of unconstitutional felony prosecution.   *See* Ala. Code §§ 15-20A-11(a), 15-20A-11(d).   The record is replete with testimony from Plaintiffs and Plaintiffs' family members about how Plaintiffs have abstained and

---

violation of the residency provisions constitutes a class C felony.   Unlike Section 15-20A-11(a) and section 15-20A-11(d), neither subsection (g) or (i) creates a substantive prohibition.

continue to abstain from attending church, political protests, or family gatherings, among other routine life activities, on a daily basis and between the hours of 10:30 p.m. and 6:00 a.m. because of ASORCNA's residency provision, as amended in 2017. Plaintiffs contend that the residency provision is overbroad and not narrowly tailored for many reasons, but particularly because ASORCNA defines "reside" and "overnight visit" in irrational, overinclusive ways that substantially burden First Amendment conduct. *See id.* § 15-20A-4(20) (defining "reside"); *id.* §15-20A-4(14) (defining "overnight visit").

Defendants attack Plaintiffs' First Amendment challenge on four grounds. They argue (1) that Plaintiffs lack standing to assert the claims, (Doc. # 122 at 55); (2) that McGuire's and JEB's previous litigation precludes them from bringing the claims, *id.* at 72; (3) that the court must abstain from ruling on the claims as it relates to KLL, *id.* at 63; and (4) that the constitutional challenge fails on the merits, *id.* at 90. Defendants' first three arguments are threshold issues that will be resolved before reaching the merits.[11] None is persuasive. As to the merits, section 11(a) and section 11(d) of residency provision—when viewed either independently or collectively—facially violate the First Amendment. Ala. Code

---

[11] Defendants do not raise statute of limitations arguments—as they do on other of Plaintiffs' claims—as to the relevant portions of the residency provision challenged here, namely sections 11(a) and 11(d). (Doc. # 122 at 85.)

§§ 15-20A-11(a), 15-20A-11(d).  Summary judgment will be granted in Plaintiffs'

favor as to their First Amendment challenge.

    *1.   Standing*

Defendants first argue that Plaintiffs lack standing to challenge

ASORCNA's residency provision because (1) Plaintiffs' interpretation of the

residency provision's definition of "reside" is wrong, and (2) because Plaintiffs do

not face a credible fear of prosecution under their interpretation.  (Doc. # 122 at

54–56.)  Because Article III standing is jurisdictional, the court must find standing

or else dismiss the claim.  *See Cone Corp. v. Fla. Dep't of Transp.*, 921 F.2d 1190,

1203 n.42 (11th Cir. 1991).  Plaintiffs have standing to bring their facial First

Amendment challenges.

The Article III elements of standing are: (1) the plaintiff must have suffered

an injury in fact—an invasion of a legally protected interest which is (a) concrete

and particularized, and (b) actual or imminent, not conjectural or hypothetical; (2)

there must be a causal connection between the injury and the conduct complained

of—the injury has to be fairly traceable to the challenged action of the defendant,

and not the result of the independent action of some third party not before the

court;  and (3), it must be likely, as opposed to merely speculative, that the injury

will be redressed by a favorable decision.  *Speech First, Inc. v. Cartwright,* 32

F.4th 1110, 1119 (11th Cir. 2022) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555,

560–61 (1992)).

Here, there is no real dispute as to (1)(a), a concrete and particularized injury; (2) causation;[12] or (3), redressability.   The crux of the standing dispute is related to element (1)(b)—whether the concrete and particularized injury is "actual or imminent, not conjectural or hypothetical."  *Lujan*, 504 U.S. at 560–61.   Three criteria typically govern whether a plaintiff's injury is "actual or imminent" in a pre-enforcement First Amendment challenge like this.  The plaintiff must show (1) that he has "an intention to engage in a course of conduct arguably affected with a constitutional interest," (2) that his conduct is "arguably proscribed," and (3) that he is subject to "a credible threat of enforcement."  *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) (cleaned up).

Plaintiffs seek to engage in expressive conduct, like daily churchgoing, that is affected with a constitutional interest.  *See Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020) (holding that denying in-person access to a religious forum, "for even minimal periods of time," is "unquestionably" a constitutional injury under the First Amendment).  The first criterion is satisfied.

---

[12]   In passing, Defendants argue that Plaintiffs have "got the wrong parties" because their injuries derive from the threat of unlawful *arrest* under the residency provision as opposed to the threat of unlawful *prosecution* under the residency provision.  (Doc. # 130 at 72–73.)  This argument construes Plaintiffs' injuries too narrowly.  While Plaintiffs would be, of course, injured by a wrongful arrest for engaging in protected conduct, the thrust of Plaintiffs' cognizable injury is the self-censorship from the threat of unlawful felonious prosecution for engaging in protected conduct.  And to establish traceability and redressability in a lawsuit seeking to enjoin a government official from enforcing the law, a plaintiff must show "that the official has the authority to enforce the particular provision [being] challenged, such that [the] injunction prohibiting enforcement would be effectual."  *Support Working Animals, Inc. v. Governor of Fla.*, 8 F.4th 1198, 1201 (11th Cir. 2021).

The second criterion, whether that protected conduct is "arguably proscribed," brings to bear Defendants' initial argument against standing. As already stated, Defendants contend Plaintiffs' sought conduct (like daily churchgoing) is not arguably proscribed because Plaintiffs' interpretation of the residency provision's definition of "reside" is wrong and because Plaintiffs' interpretation has been "rejected" by the Eleventh Circuit. (Doc. # 122 at 57.) Neither point is correct. First, this court has already twice found that Plaintiffs' interpretation of "reside" is the right one. *See McGuire II*, 512 F. Supp. 3d at 1236. Indeed, Plaintiffs' interpretation was this court's natural, first reading of the statutory text. *See Doe #1 v. Marshall,* No. 2:15-CV-606-WKW, 2018 WL 1321034, at *4 (M.D. Ala. Mar. 14, 2018) (Watkins, J.). Second, Plaintiffs' interpretation (and this court's prior precedent on this point) has *not* been rejected by the Eleventh Circuit. Defendants rely heavily on dicta in *McGuire* to argue that, as a matter of binding law, Plaintiffs' interpretation of the residency provision has been rejected. *See McGuire*, 50 F.4th at 1009; (Doc. # 122 at 92 ("[T]he Eleventh Circuit has rejected Plaintiffs' interpretation.").) This is incorrect. A direct statutory interpretation of ASORCNA's definition of "reside" has never been put to the Eleventh Circuit or the Supreme Court of Alabama.[13]

---

[13] A detailed discussion of the parties' debate over ASORCNA's definition of "reside" is in Subsection (4)(a)(i). There is no need to go into the weeds of the statutory nuances for standing purposes, but Defendants' position that the Eleventh Circuit has already ruled on this issue is wrong and it warrants some detailed discussion.

(continued…)

Rather, based on the plain language of ASORCNA's definition of "reside," Ala. Code § 15-20A-4(20), this court's prior interpretations embracing that plain language, *see McGuire II*, 512 F. Supp. 3d at 1236,[14] and other judges' identical first-impression interpretations, *see Henry*, No. 2:21-CV-797-RAH, 2022 WL 17816945, at *3,[15] Plaintiffs' protected conduct—like daily churchgoing—is

---

In *McGuire*, the Eleventh Circuit wrote,

> [A] registrant may visit the same location in an exclusion zone every day, so long as he does not spend more than four hours a day in the place on three or more consecutive days or on ten or more aggregate days during a calendar month and does not indicate an intention to live there. *See* Ala. Code § 15-20A-4(20).

50 F.4th at 1009.

Defendants say this line proves that the aggregate-time list must be coupled with an intent to live somewhere for a registrant to be deemed to reside under the statute. But this single line, plucked from an *Ex Post Facto* Clause analysis, does not foreclose the interpretative battle in this case. The line is dicta and is therefore only potentially persuasive. It is not persuasive because the Eleventh Circuit was not directly dealing with a statutory interpretation question. And even if that single line was meant to be the Eleventh Circuit's persuasive interpretation of the statute, a crucial clause from the statute was omitted. Per the statutory text, reside "includes, but is not limited to, . . . spending any amount of time at the place coupled with statements or actions that indicate an intent to live at the place *or to remain at the place for the periods specified in this sentence*." Ala. Code § 15-20A-4(20). The "periods specified in this sentence" are, of course, the periods of time provided in the aggregate-time list. *Id.*

[14] At the motion-to-dismiss stage, the court rejected the state's suggestion that "registrants who exceeded their aggregate hours at a church should not fear prosecution because ASORCNA provides that '[w]hether a person is residing at a place shall be determined by the totality of the circumstances, including the amount of time the person spends at the place and the nature of the person's conduct at the place.'" *McGuire II*, 512 F. Supp. 3d at 1236.

[15] In outlining the scope of ASORCNA's definition of "reside," the court in *Henry* read the statute in accord with the present-Plaintiffs' plain-language interpretation because the definition precisely states that "reside" includes, without limitation, "spending more than four hours a day at the place on three or more consecutive days." No. 2:21-CV-797-RAH, 2022 WL 17816945, at *3 (finding that reside includes the aggregate-time list because the statute says it includes the aggregate-time list). Moreover, the only Alabama court to interpret "reside" in a

(continued…)

33

arguably proscribed by the statute.  Plaintiffs satisfy the second pre-enforcement "imminent" injury standing criterion: whether the constitutionally protected interest is "arguably proscribed" by the challenged law.  *Susan B. Anthony List*, 573 U.S. at 159.

Finally, the third and most-often disputed criterion of showing "imminent" injury in the pre-enforcement context is whether a plaintiff is subject to "a credible threat of enforcement."  *Id*.  It is here that Defendants argue most vehemently. They aver that Plaintiffs have failed to provide sufficient evidence to show that they are faced with a credible threat of prosecution for engaging in the protected conduct they assert is proscribed by the residency provision.  Defendants highlight that Plaintiffs have produced almost no evidence of explicit threats of prosecution under Plaintiffs' interpretation of "reside" and that several law enforcement officers across the state testified in discovery that they would not enforce the statute as Plaintiffs interpret it.

But, as an evidentiary matter in the First Amendment pre-enforcement standing context, Plaintiffs need not show that government officials have explicitly launched threats, or that government officials concede that a statute can operate in a certain way, in order to establish that Plaintiffs face a credible threat of prosecution under that statute.  If Plaintiffs were so required, a state could pass a

---

published opinion, interpreted it in a way that also embraces Plaintiffs' interpretation.  *See R.E.H. v. C.T.*, 327 So. 3d 248, 253 (Ala. Civ. App. 2020) (citing Ala. Code § 15-20A-4(20)).

statute that clearly violates the First Amendment, and then take no action to enforce it, all while chilling an enormous amount of speech based on the statute's text alone, without fear of a challenge to its constitutionality in court.  That is not the law.  Although an explicit "threat of formal discipline or punishment is relevant to the inquiry, it is not decisive."  *Cartwright,* 32 F.4th at 1120–21.  Plaintiffs may also establish imminent injury vis-à-vis a credible threat of prosecution by producing evidence showing that the challenged statute itself "objectively chills" speech, regardless of whether certain government officials have publicly opined on the scope of the statute.  *Id.* (holding that there was pre-enforcement standing on the "imminent" injury prong because a policy that objectively chilled speech through its operation, not through explicitly threatened enforcement, "would cause a reasonable [person] to fear expressing unpopular beliefs").

As the Eleventh Circuit recently reiterated in *Cartwright*, the imminent injury "requirement is most loosely applied—particularly in terms of how directly the injury must result from the challenged governmental action—where [F]irst [A]mendment rights are involved, because of the fear that free speech will be chilled even before the law, regulation, or policy is enforced."  *Id.* (quoting *Hallandale Pro. Fire Fighters Loc. 2238 v. City of Hallandale*, 922 F.2d 756, 760 (11th Cir. 1991)).  "Litigants who are being chilled from engaging in constitutional activity . . . *suffer a discrete harm independent of enforcement*, and that harm creates the basis for our jurisdiction."  *Id.* at 1120 (emphasis added) (quoting

*Dana's R.R. Supply v. Att'y Gen., Fla.*, 807 F.3d 1235, 1241 (11th Cir. 2015)). Assembling these principles, the Eleventh Circuit clarified that the "fundamental question" of whether there is an imminent injury, *i.e.*, an injury deriving from a credible threat of prosecution, in the First Amendment pre-enforcement context is whether the challenged policy "objectively chills" protected expression.[16]   *Id.* (string-citing supporting authority for this rule).

The gravamen of Plaintiffs' First Amendment challenge is that the residency provision prevents them from going to places of expression, like church, for more than four hours a day, three days in row or else risk being deemed to reside there, and from going anywhere between 10:30 p.m. to 6:00 a.m. where a minor is present or else risk being deemed to have conducted an overnight visit and thus exposed to felony prosecution.   Plaintiffs' evidence establishes that they refrain from expressive religious, political, and associational conduct because they fear prosecution under an allegedly unconstitutional law, and that this chilling effect is

---

[16] Defendants argue that the Eleventh Circuit's opinion in *Cartwright* was either "confuse[d]" or otherwise "in conflict with decisions of the United States Supreme Court." (Doc. # 133 at 21.)   Whether the Eleventh Circuit was confused or not is irrelevant here. *Cartwright* is binding law.   In any event, the Eleventh Circuit did not at all appear confused on the issue because it explicitly stated that "the threat of formal discipline or punishment is relevant to the inquiry, but it is not decisive. . . [t]he fundamental question . . . is whether the challenged policy 'objectively chills' protected expression."   *Cartwright*, 32 F.4th at 1120.   That is not a confused rule, and it is not in conflict with Supreme Court precedent.   *See Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67, 208 L. Ed. 2d 206 (2020) (holding, in an access-to-religious-forums case, that a challenged state law—which was not operable nor was its enforcement threatened by the state—posed not only an injury sufficient for standing but an *irreparable* injury sufficient for a preliminary injunction because "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.").

exacerbated by the steep penalties—imprisonment for one to ten years—Plaintiffs face upon a conviction for violating any aspect of the residency provision. *See McGuire II*, 512 F. Supp. 3d at 1235 ("Because they face potential felony convictions for failing to register a residence or for residing at a non-compliant address, registrants have good reason to avoid even the slightest appearance of habitual presence in any non-residence."); *cf. Cartwright*, 32 F.4th at 1122–24 (finding a sufficient chilling effect for students who simply faced getting "crossways with the University" and being called "offensive" if they engaged in the desired First Amendment activity).

The third criterion of "imminent" injury in the pre-enforcement standing context is satisfied because Plaintiffs face a credible fear of prosecution based on the statute's text and because their expressive conduct and speech has been and continues to be objectively chilled. *Cartwright*, 32 F.4th at 1122; *Susan B. Anthony List*, 573 U.S. at 159; *see also Dream Defs. v. Governor of the State of Fla.,* 57 F.4th 879, 888 (11th Cir. 2023) (finding sufficient injury in the First Amendment overbreadth context where there was a "fear that the government will enforce [a] riot statute directly against [plaintiffs] by arresting them for engaging" in conduct arguably proscribed by the statute); *Wilson v. State Bar of Ga.*, 132 F.3d 1422, 1428 (11th Cir. 1998) (describing self-censorship as an injury that occurs "when the plaintiff is chilled from exercising [his] right to free expression or

forgoes expression in order to avoid enforcement consequences" (internal quotation marks omitted)).

In sum, Plaintiffs' interpretation of the residency provision's proscriptive breadth is reasonable, and their constitutionally protected conduct is objectively chilled by virtue of the text, which a reasonable registrant could find "astonishing[ly]" broad and "slipper[y]." *Cartwright*, 32 F.4th at 1122; *Broadrick*, 413 U.S. at 612 (explaining that a "statute's very existence" can cause people to suffer injury by "refrain[ing] from constitutionally protected speech or expression"). Accordingly, Plaintiffs have standing to challenge the law under which they self-censor in the face of a credible threat of felony prosecution for engaging in expressive conduct protected by the First Amendment, like daily church worship. *See Cartwright*, 32 F.4th at 1120–22; *Hodgkins ex rel. Hodgkins v. Peterson*, 355 F.3d 1048, 1056 (7th Cir. 2004) (holding that a juvenile had standing to facially challenge a curfew that prevented access to "some of the purest and most protected forms of speech and expression" like evening-time religious services and nighttime political meetings).

2.   *Claim Preclusion*

For their second threshold argument, Defendants contend that McGuire and JEB's First Amendment challenges to ASORCNA's residency provision are precluded by *res judicata* because McGuire and JEB filed challenges to

38

ASORCNA prior to the 2017 amendments.[17]  (Doc. # 122 at 72.)  Claim preclusion applies "when the following four elements are present: (1) there is a final judgment on the merits, (2) the decision was rendered by a court of competent jurisdiction; (3) the same cause of action is involved in both cases; and (4) the parties, or those in privity with them, are identical in both suits." *Baloco v. Drummond Co., Inc.*, 767 F.3d 1229, 1246 (11th Cir. 2014) (citation omitted).  The burden of establishing *res judicata* rests on the party raising it; here, the Defendants. *See In re Piper Aircraft Corp.*, 244 F.3d 1289, 1295, 1296 (11th Cir. 2001).  The parties agree the first, second, and fourth elements are met here, so, only the third element, whether the same cause of action is involved in both cases, is at issue.

Neither McGuire nor JEB's First Amendment challenges to the residency provision is precluded.  As for McGuire, Defendants' claim preclusion argument was raised at the motion-to-dismiss stage and the court found, based on the complaints' allegations, that McGuire can "bring new claims to ASORCNA's residency restrictions due to the 2017 amendments' new definitions of 'overnight visit' and 'reside,'" because McGuire has not challenged those amendments before and because the 2017 amendments to the residency provision changed the scope of the residency provision's restrictions which inflicted new injuries on McGuire—

---

[17]    Defendants do not argue that KLL's First Amendment challenge to the residency provision is precluded because KLL has never challenged ASORCNA before.  (Doc. # 122 at 55.)

injuries that he could not have asserted in his previous suit, including no longer being able to spend all day at church for three days in a row or ten days in a month and no longer being able to go anywhere a minor is present between 10:30 p.m. and 6:00 a.m.  *See McGuire II*, 512 F. Supp. 3d at 1216–17.  Defendants offer no persuasive evidence or law-based reason as to why McGuire was not newly injured by the 2017 amendments to the residency provision.

Instead, Defendants argue that his new injuries "depend on the *mistaken belief* that there is a credible threat of prosecution according to [plaintiffs'] interpretation of [the residency] provisions."  (Doc. # 133 at 28. (emphasis added).  That is, Defendants argue that the 2017 amendments to the residency provision did not actually change the scope of that provision when properly construed and therefore any injuries McGuire asserts as to those amendments are "self-inflicted wounds" that cannot overcome preclusion.  (Doc. # 133 at 28.)  This argument is the standing argument all over again.  It is wrong for the reasons already discussed.  Accordingly, McGuire's challenge to the residency provision is not barred by *res judicata*.

Likewise, JEB is not precluded from challenging the current residency provision.  The court previously found at the pleading stage that JEB was not barred from challenging the 2017 amendments to the residency provision.  *See McGuire II*, 512 F. Supp. 3d at 1219.  Unlike McGuire, who never brought a suit or had the opportunity to amend a complaint after the 2017 amendments to the

residency provision, JEB was permitted to amend his complaint in his previous suit *after* the residency provision was amended in 2017, which makes the preclusion question a closer call.  If JEB could have amended the complaint in his previous suit to include a First Amendment challenge to the amended residency provision, then his claim in this action may be barred.  But he could not.

When JEB amended the complaint in his previous suit, the court did not allow JEB to "raise new legal claims based on [new] facts" related to the 2017 amendments—he could only amend the complaint to provide additional facts for existing claims—and a First Amendment challenge to the residency provision was not an existing claim.  *Id*.  JEB simply could not have raised the claims here in his previous suit even if he wanted to do so.  This too is JEB's first action based on the new factual injuries that the 2017 amendments to the residency provision ushered into his life, like being objectively chilled from attending daily church and spending time in a location where minors are present between 10:30 p.m. and 6:00 a.m.  To disallow him to raise his claim now would stretch the technicalities of claim preclusion past credible boundaries.

Neither McGuire nor JEB's First Amendment challenges to ASORCNA's operative residency provision is barred by claim preclusion.  A contrary result would require the court to erroneously decide, as a matter of statutory interpretation, that the 2017 amendments to the residency provision did not materially increase the provision's scope and therefore increase its injurious effect.

41

Such a decision would defy the plain text of the 2017 amendments and the objective chilling effect that text has had—and continues to have—on McGuire and JEB, as is reflected in the record. *See id.* at 1214 (explaining that ASORCNA, with each new amendment, "has nearly boundless potential to injure old plaintiffs in new ways.").

### 3. Abstention

Defendants' final threshold argument to Plaintiffs' First Amendment challenges is that the court must abstain from ruling on this claim as it relates to KLL because KLL, according to Defendants, can petition the state to lift all of ASORCNA's requirements from him because his Louisiana conviction is an "age-based equivalent non-crime" in Alabama. (Doc. # 122 at 64–67 (citing Ala. Code § 15-20A-24).)

The merits of whether KLL can petition the state to lift ASORCNA's requirements as applied to him aside, this argument is irrelevant vis-à-vis the First Amendment challenge because, as the court has already explained, McGuire and JEB have standing to raise the facial attack and the relief requested is the same for all Plaintiffs. So, even if the court abstained from analyzing the First Amendment challenge as it relates to KLL, it would nonetheless still have to analyze the identical claims seeking identical relief as it relates to McGuire and JEB. Nothing is gained or lost by KLL's absence or presence in relation to the facial First Amendment challenges. *See Doe v. Bolton*, 410 U.S. 179, 189 (1973), *abrogated*

*on other grounds by Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022) (explaining that the jurisdictional and prudential status of alternative parties in a suit need not be addressed when other parties can sufficiently and adequately present identical claims that seek identical remedies); *see also Cheshire Bridge Holdings, LLC v. City of Atlanta*, 15 F.4th 1362, 1365 (11th Cir. 2021) (explaining that an overbreadth challenge is an attack on a statute itself as opposed to a particular application).

Accordingly, Defendants' abstention arguments are hollow.[18]   Now, the merits of Plaintiffs' First Amendment challenges to the residency provision are in focus.  The court will explain first why sections 11(a) and 11(d) of the residency provision fail to satisfy the First Amendment under the overbreadth doctrine, and second, why they separately fail—for reasons that are universal to all registrants— to satisfy the First Amendment under a content-neutral, intermediate-scrutiny tailoring analysis.   So, under either doctrine, the residency provision is unconstitutional on its face.   *See Packingham*, 582 U.S. at 105 (facially invalidating a sex-offender law for failing First Amendment intermediate scrutiny); *United States v. Stevens*, 559 U.S. 460, 473 (2010) (facially invalidating a criminal law under the overbreadth doctrine).

---

[18]   In any event, for the same reasons provided in Section IV.C, the court concludes that KLL does not have an adequate state remedy and that abstention is not appropriate vis-à-vis KLL's First Amendment challenge.

4.      *Whether the Residency Provision is Overbroad*

The overbreadth doctrine is designed "to prevent the chilling of protected expression," *Massachusetts v. Oakes*, 491 U.S. 576, 584, 109 (1989), especially "when the overbroad statute imposes criminal sanctions," *Hicks*, 539 U.S. at 119. A regulation that criminalizes substantially more protected activity than the First Amendment allows is overbroad and thus facially invalid. *Cartwright*, 32 F.4th at 1125. "[A] statute found to be overbroad is totally forbidden until and unless a limiting construction or partial invalidation so narrows it as to remove the seeming threat or deterrence to constitutionally protected expression." *FF Cosmetics FL, Inc. v. City of Miami Beach*, 866 F.3d 1290, 1303 (11th Cir. 2017) (internal quotation marks omitted).

The overbreadth doctrine allows a party to challenge a law "on its face because it also threatens others not before the court—those who desire to engage in legally protected expression but who may refrain from doing so rather than risk prosecution or undertake to have the law declared partially invalid." *Bd. of Airport Comm'rs v. Jews for Jesus, Inc.*, 482 U.S. 569, 574 (1987) (citation and internal quotation marks omitted).  "Many persons, rather than undertake the considerable burden (and sometimes risk) of vindicating their rights through case-by-case litigation, will choose simply to abstain from protected [expression]—harming not only themselves but society as a whole." *Hicks*, 539 U.S. at 119.  However, "there comes a point at which the chilling effect of an overbroad law, significant though it

may be, cannot justify prohibiting all enforcement of that law—particularly a law that reflects 'legitimate state interests in maintaining comprehensive controls over harmful, constitutionally unprotected conduct.'"   *Id.* (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973)).   For that reason, overbreadth relief is "strong medicine" that courts should employ "sparingly and only as a last resort." *Broadrick*, 413 U.S. at 613; *Los Angeles Police Dept. v. United Reporting Publ'g Corp.,* 528 U.S. 32, 39 (1999).

Because overbreadth is a doctrine of last-resort proportions, to succeed Plaintiffs must show that the overbreadth of the challenged provision is "*substantial*, not only in an absolute sense, but also relative to [its] plainly legitimate sweep."   *United States v. Williams*, 553 U.S. 285, 292 (2008).   Put differently, Plaintiffs bear the burden of "demonstrat[ing] from the text of the [challenged provisions] and from actual fact that a substantial number of instances exist in which [the provisions] cannot be applied constitutionally."   *N.Y. State Club Ass'n v. City of N.Y.*, 487 U.S. 1, 14 (1988).   This is not easy to do.

Together then, overbreadth challenges involve two overarching steps.   First, the challenged statute must be properly construed.   "It is impossible to determine whether a statute reaches too far without first knowing what the statute covers." *Williams*, 553 U.S. at 293.   The second step is to determine whether the statute, as properly construed, "criminalizes a substantial amount of protected expressive activity."   *Id.* at 297.   Each step will be taken in turn.   First, despite much debate

over the proper construction of ASORCNA's definition of "reside," the words of that provision are crystal clear. And second, as will be explained, under that clear construction of "reside," and the related definition of "overnight visit," Plaintiffs have carried their difficult burden that sections 11(a) and (d) of the residency provision are individually and cumulatively overbroad in violation of the First Amendment as a matter of law.

a)   Construction of "Reside" and "Overnight Visit"

"To judge whether a statute is overbroad, [one] must first determine what it covers." *United States v. Hansen*, 599 U.S. 762, 770 (2023). The parties sharply disagree as to what the residency provision covers. *See* (Doc. # 130 at 53 ("The Residency Provisions Do Not Say What Defendants Say They Do.")); (Doc. # 122 at 92 ("Construing the challenged statute reveals that it is not overbroad.")); (Doc. # 133 at 34 ("Plaintiffs' tortured interpretation [] tramples the statute's cohesive definition of 'reside'")); (Doc. # 130 at 58 ("[The court] can and should reject Defendants' interpretation of the statute because their interpretation ignores fundamental principles of statutory interpretation.")). The disagreement specifically revolves around ASORCNA's current definition of "reside."

Thus, the overbreadth claim turns on what is meant by the definition of "reside" in § 15-20A-4(20), which necessarily requires the court to interpret and construe that definition before determining whether the statute criminalizes a substantial amount of protected expressive activity. To determine what qualifies as

a residence under § 15-20A-4(20), the court looks to the "actual text of the statute," *Boos v. Barry*, 485 U.S. 312, 329 (1988), as well as "any limiting constructions that a state court . . . has proffered," *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494 n.5 (1982).  Here, there is no binding state court interpretation or narrowing construction, leaving only the statute's actual text.  Before summarizing the parties' arguments, it is necessary to sift that statutory text.

ASORCNA's residency provision has two primary subsections, 11(a) and 11(d).  *See generally* Ala. Code § 15-20A-11.  Section 11(a) provides that "[n]o adult sex offender shall establish a residence or maintain a residence after release or conviction within 2,000 feet of the property on which any school, childcare facility, or resident camp facility is located."  *Id.*  Section 11(d) provides that "[n]o adult sex offender shall reside or conduct an overnight visit with a minor."  *Id*.  Wherever a registrant establishes a residence, and when a residence is changed or vacated, he or she must immediately notify local law enforcement in person.  *Id.* § 15-20A-10.  If a registrant knowingly fails to register a residence in person, knowingly establishes or maintains a residence in a prohibited area, or knowingly resides or conducts an overnight visit with a qualifying minor, the registrant is subject to a Class C Felony.  *Id.* § 15-20A-10(j); *Id.* § 15-20A-11(i).

Section 11(a)'s residency prohibitions are inescapably informed by ASORCNA's definition of "residence" and "reside."  Ala. Code § 15-20A-4(20).

47

Section 11(d)'s prohibition on residing and conducting overnight visits with minors implicates the definition of reside, but it is also anchored to ASORCNA's definition of "overnight visit." *Id.* § 15-20A-4(14). The construction of each will be addressed separately.

### i. *Reside*

So, what is a "residence"? For years, ASORCNA defined "residence" as:

> "[A] place where a *person resides, sleeps, or habitually lives* or will reside, sleep, or habitually live. If a person does not reside, sleep, or habitually live in a fixed residence, residence means a description of the locations where the person is stationed regularly, day or night, including any mobile or transitory living quarters or locations that have no specific mailing or street address. Residence shall be construed to refer to the places where a person resides, sleeps, habitually lives, or is stationed with regularity, regardless of whether the person declares or characterizes such place as a residence.

2015 Alabama Laws Act 2015-463 (H.B. 316) (emphasis added).

That old definition of "residence" was deleted in the 2017 restructuring of the residency provision's definitional scope. A "residence" is now defined as a place "where the person *resides*, regardless of whether the person declares or characterizes such place as a residence." Ala. Code § 15-20A-4(21) (emphasis added); *see also* Ala. Code § 15-20A-11(e)(1) ("[A]n adult sex offender shall be deemed to have established a residence wherever he or she resides following release."). So, under ASORCNA as it stands today, registrants establish a residence wherever they "reside."

48

But how does ASORCNA define where a person "resides"?  Prior to the 2017 amendments, the statute was silent.  In that silence, basic principles of statutory interpretation guided to adopt the ordinary meaning of the word.  As Defendants cite, "reside" in its ordinary and traditional sense means "to dwell permanently or continuously: occupy a place as one's legal domicile." *Reside*, *Merriam-Webster.com Dictionary*, https://www.merriam-webster.com/dictionary/reside.[19]  And this ordinary meaning, which emphasizes the concept of where one continuously dwells or actually lives, was somewhat embraced by ASORCNA's prior definition of "residence" as a place where a person "sleeps, or habitually lives."  2015 Alabama Laws Act 2015-463 (H.B. 316).

Backstepping from this approach, Alabama gave its first definition of "reside" in 2017.  That 2017 statutory definition is at the heart of the parties' interpretative dispute.  ASORCNA currently defines a "residence" as any place "where [a] person resides" and it defines "RESIDE" as follows:

> To be habitually or systematically present at a place. Whether a person is residing at a place shall be determined by the totality of the circumstances, including the amount of time the person spends at the place and the nature of the person's conduct at the place. *The term reside includes, but is not limited to*, spending more than four hours a day at the place on three or more consecutive days; spending more

---

[19] "Residence" is ordinarily defined as "the place where one actually lives as distinguished from one's domicile or a place of temporary sojourn." *Residence*, *Merriam-Webster.com Dictionary*, https://www.merriam-webster.com/dictionary/reside.

than four hours a day at the place on 10 or more aggregate days during a calendar month; or spending any amount of time at the place coupled with statements or actions that indicate an intent to live at the place or to remain at the place for the periods specified in this sentence. A person does not have to conduct an overnight visit to reside at a place.

Ala. Code § 15-20A-4(20) (emphasis added).

Note that ASORCNA's definition of "reside" includes one other term that ASORCNA itself defines: "overnight visit." ASORCNA defines "OVERNIGHT VISIT" as: "*Any presence* between the hours of 10:30 p.m. and 6:00 a.m." *Id.* § 15-20A-4(14) (emphasis added).

So, reading the statutory definitions together, "reside" means:

To be habitually or systematically present at a place. Whether a person is residing at a place shall be determined by the totality of the circumstances, including the amount of time the person spends at the place and the nature of the person's conduct at the place. *The term reside includes, but is not limited to*, spending more than four hours a day at the place on three or more consecutive days; spending more than four hours a day at the place on 10 or more aggregate days during a calendar month; or spending any amount of time at the place coupled with statements or actions that indicate an intent to live at the place or to remain at the place for the periods specified in this sentence. A person does not have to [be present between the hours of 10:30 p.m. and 6:00 a.m.] to reside at a place.

*Id.* § 15-20A-4(20) (emphasis and alterations added).

Crucially, pay attention to the third sentence in the definition of "reside," which follows and clarifies the "habitual[] or systematic[]" definition and the totality-of-the-circumstances test:

*The term reside includes, but is not limited to*, spending more than four hours a day at the place on three or more consecutive days; spending

50

more than four hours a day at the place on 10 or more aggregate days during a calendar month; *or* spending any amount of time at the place coupled with statements or actions that indicate an intent to live at the place or to remain at the place for the periods specified in this sentence.

*Id*. (emphasis added)

This is the statutory sentence, and its interplay with the totality of the circumstances test given in the previous sentence, that has largely sparked the present controversy. The sentence will be referred to as the "aggregate-time list." On one hand, Plaintiffs say that the aggregate-time list provides concrete examples of when a registrant could be deemed to reside somewhere based solely on the amount of time spent at a place, regardless of their conduct at that place.[20] On the other hand, Defendants say that the aggregate-time list does not capture a place as a residence based solely on time spent there, and that the aggregate-time list implicitly requires consideration of other factors, like conduct and intent, in addition to time alone. Thus, more specifically, Defendants say that the statute should be read to mean that "spending more than four hours a day at the place on three or more consecutive days," is *never* sufficient to establish someone's

---

[20] Back in 2017, Defendant Marshall actually agreed with Plaintiffs on this point. In a supplemental brief in *McGuire*, Defendant Marshall stated, while explaining the contours of ASORCNA's new definition of reside, that the aggregate-time list provides "*concrete examples* as to *what constitutes* habitual or systematic presence." Michael A. MCGUIRE, Plaintiffs-Appellant (Cross-Appellee), v. Steve MARSHALL, Attorney General for the State of Alabama, et al., Defendants-Appellees (Cross-Appellants)., 2017 WL 3474163 (C.A.11), 8–9 (emphasis added).

residence.   Ala. Code § 15-20A-4(20).   Plaintiffs say that the statute explicitly provides that "spending more than four hours a day at the place on three or more consecutive days" is *always* sufficient, irrespective of other considerations, to establish someone's residence.  *Id.*

The interpretative battle here is readily demonstrated in one illustration (which happens to be precisely what all three Plaintiffs say they want to do but abstain from doing out of fear of prosecution).   Plaintiffs say that ASORCNA's definition of reside potentially exposes them to felony prosecution for failing to register their churches as residences if they attend church services for more than four hours a day, three days in a row.   Defendants say that ASORCNA's definition of reside does not require Plaintiffs to register a church as a residence if they attend church services for more than four hours a day, three days in a row.

That illustration draws the line neatly on the debated statutory language and the factual record.   What if a registrant attended church services three days in a row from 9:00 a.m. to 5:00 p.m.?  What if a registrant had to take care of a dying parent or spouse every day after work from 5:00 p.m. to midnight before returning to his apartment?  What if a registrant attended a political rally in a park during daylight hours every day over a long weekend?  What if a registrant read books in that same park every weekday for over four hours?  What if a registrant attended a three-day long worship service?  What if a registrant slept under a bridge every night but spent all of her daylight hours working on job applications in a coffee

shop or public library?  What if a registrant went to a fishing hole three days in a row for five hours at a time?  What if a registrant had dinner with his adult siblings after work every night for more than four hours before returning home?  What if a registrant habitually exercised at a jogging track every day for over four hours?[21]  Would those registrants "reside" at the church, the nursing home, the park, the worship retreat, the bridge, the coffee shop, the library, the fishing hole, their siblings' house, and the jogging track?

If Plaintiffs are right, they would face felonious consequences for such conduct, because under the totality of the circumstances, "[t]o be habitually or systematically present at a place . . . . *includes, but is not limited to,* spending more than four hours a day at the place on three or more consecutive days . . . " Ala. Code § 15-20A-4(20) (emphasis added); *see also Dream Defs.,* 57 F.4th at 892 (using hypotheticals to elucidate the relevant statutory debate being had in an overbreadth challenge).   So, if the definition of reside reaches the many examples that Plaintiffs posit, "its applications to protected speech might swamp its lawful applications, rendering it vulnerable to an overbreadth challenge."  *Hansen*, 599 U.S. at 774.

---

[21]  In *McGuire*, Defendant Marshall's appellate brief asserted that: "[I]f a sex offender is habitually or systematically present at a jogging track or baseball stadium, then yes, that sex offender must register his presence there."  *Supra* n.20.

The definition does reach as far as Plaintiffs say it does. "Other than the mercy of a prosecutor," *Stevens*, 559 U.S. at 477, nothing stops registrants from being convicted of a felony under the residency provision for simply going to church, or a public library, or a political rally, for more than four hours a day on three consecutive days (or any other length of time provided in the aggregate-time list) if that place could not otherwise be their residence or if they did not immediately report in person to law enforcement that they have established a new residence at that place or if a minor is present with them.

Defendants' arguments to the contrary are simply efforts to escape the statutory text and their own prior interpretation. ASORCNA's definition of "reside" means what it says: "*The term reside includes, but is not limited to,* spending more than four hours a day at the place on three or more consecutive days; spending more than four hours a day at the place on 10 or more aggregate days during a calendar month; *or* spending any amount of time at the place coupled with statements or actions that indicate an intent to live at the place or to remain at the place for the periods specified in this sentence." Ala. Code. § 15-20A-4(20) (emphasis added). That is, the aggregate-time list provides three clear, concrete examples of when a registrant always resides somewhere. *See McGuire II*, 512 F. Supp. 3d at 1236 (concluding the same). There is no intent or other-conduct requirement for the first two examples in the aggregate-time list. They establish residences based on time alone, irrespective of any other information. The final

example, separated by "or," which confirms that it is an alternative, third way to establish a residence, does consider other conduct—but that is other conduct that "indicate[s] an intent to live at the place or to remain at the place for the periods specified in this sentence," *i.e.*, an intent to remain longer than the first two examples in the aggregate-time list.  Ala. Code. § 15-20A-4(20) (emphasis added). The opening declaration of what reside "includes, but is not limited to," followed by the "or" before the final item in the aggregate-time list establish beyond a doubt that the first two examples establish residency based on time alone, and the final item establishes residency based on *any presence* somewhere with an intent to stay longer than the times proscribed by the first two items.

And the fact that time alone can establish a residence under the aggregate-time list is unsurprising given the context of the surrounding provisions and definitions.  Under ASORCNA's broad language, time alone can vacate or transfer a residence, and time alone constitutes conducting an "overnight visit." Section 15-20A-11(e) provides that a registrant "has transferred his or her residence" if the registrant "fails to spend three or more consecutive days at his or her residence without previously notifying local law enforcement."  *See also* Ala. Code § 15-20A-10(e)(1).  It is undisputed that spending three consecutive days away from a residence can disable that place as a residence (and expose registrants to a felony for failing to report in person the termination of a residence); it should likewise be undisputed under the aggregate-time list that spending three

consecutive days somewhere can establish a residence (and likewise expose registrants to a felony for failing to report in person the establishment of a residence).

Similarly, while a registrant "does *not* have to conduct an overnight visit to reside at a place," § 15-20A-4(20) (emphasis added), registrants conduct an "overnight visit" if they have "*any* presence between the hours of 10:30 p.m. and 6:00 a.m." with a minor, § 15-20A-4(14) (emphasis added). Thus, time alone in the presence of a minor is sufficient to conduct an "overnight visit" with that minor—even if the registrant is present for only a minute, does not spend the night, does not communicate with the minor, and is never alone with the minor. What is true for transferring/terminating a residence and conducting overnight visits is true for establishing a residence. The statutory context surrounding the aggregate-time list confirms that time alone can establish a residence under ASORCNA.[22]

Defendants try to avoid the plain-language mandate of the aggregate-time list because doing so (1) would defy the "ordinary and traditional meaning of 'reside,'" (Doc. # 122 at 92); (2) it would create "absurd results," (Doc. # 122 at 98); and (3) it would effectively "write[] out and give[] no effect" to the statute's

---

[22] If anyone is beating a dead horse here it is the Legislature: Another twist it added to the linguistic knot is the following. "[R]eside" includes "spending any amount of time at the place coupled with statements or actions that indicate an intent . . . to remain at the place for the periods specified in this sentence." Ala. Code § 15-20A-4(20). In the definition of "reside," the Legislature broadly captured nearly every imaginable iteration of a state of being somewhere, intending the criminal scope of this provision to be belted, suspendered, and zip-tied. *See also supra*, pp. 76-80.

totality-of-the-circumstances test, (Doc. # 122 at 96.)  Defendants struggle mightily to escape the plain meaning of the declaratory statement, "The term reside includes . . . ."  Ala. Code § 15-20A-4(20).  But their struggle is futile.

First, Defendants' "ordinary meaning" argument ignores the existence of the noose the legislature tied when it, not Plaintiffs, defined "reside" in an abnormal and extraordinary way.   Defendants argue that Plaintiffs' interpretation of ASORCNA's definition of "reside" is "tortured" and does "violence" to the ordinary (*i.e.,* non-statutory) meaning of "reside" because it would lead to registrants "residing" at places that are clearly not residences (like churches, workplaces, parks, cinemas, hospitals, jogging tracks, coffee shops, libraries, *etc.*) as that term is ordinarily understood.  (Doc. # 133 at 35.)  Armed with Latin and a straight face, Defendants accuse Plaintiffs of doing violence to a word's ordinary meaning because Plaintiffs read the statutory definition to include what the statute explicitly says it includes *without limitation*.  Ala. Code § 15-20A-4(20) ("[R]eside includes, but is not limited to, spending more than four hours a day at the place on three or more consecutive days . . .").   Simply put, it is ASORCNA's statutory definition itself that does "violence" to the ordinary meaning of reside, not the plain-language reading of that definition.[23]

---

[23] Recall that prior to the 2017 revisions, ASORCNA's definition of "residence" was partially anchored to where a registrant "sleeps, or habitually lives."  2015 Alabama Laws Act 2015-463 (H.B. 316).   That language was intentionally removed and replaced with the

(continued…)

Second, Defendants argue that if the aggregate time-list specifies "circumstances in which a registrant will always have established a residence" then (1) "any sex offender with a full-time job establishes a residence at his place of work (he is most certainly spending at least four hours a day at the workplace for three consecutive days);" (2) any "sex offender could establish a residence in the middle of Lake Eufaula by taking a bass boat out three days to fish there;" and (3) any sex offender can "establish a residence" at church by attending church services for longer than the aggregate-time list permits. (Doc. # 122 at 95–98.) All of these outcomes, as Defendants concede, are "absurd" and, per Defendants, it is that absurdity which counsels in favor of rejecting the plain meaning of the aggregate-time list. *Id.* at 98 (quoting *Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1188 (11th Cir. 1997) ("[S]tatutory language should not be applied literally if doing so would produce an absurd result.")).

The court agrees with Defendants: the aggregate-time list is absurd. More to the point: it is absurdly *broad*. But Defendants' absurdity argument turns the overbreadth inquiry on its head. Recognizing that a law's *clear* rule is absurdly broad simply cannot be the basis for throwing out an overbreadth claim. Equally on point, the absurd scenarios the aggregate-time list creates are precisely what Plaintiffs are objectively chilled from doing, like not attending church or a political

---

aggregate-time list, a list that by its own terms gives no quarter to the ordinary, public meaning of reside.

protest or a jogging track, for more than four hours a day for three consecutive days in a row or ten total days in a month, because they may establish a residence in violation of ASORCNA and run the risk of spending years in prison.

Finally, Defendants argue that the aggregate-time list cannot be read as containing concrete examples of what constitutes residing somewhere because (1) doing so would mean that *time alone* is sufficient to establish a residence, which, according to Defendants, (2) would collaterally mean that the "mandatory totality-of-the-circumstances analysis has *no* effect." (Doc. # 133 at 34.)   This syllogism's first premise is right: The aggregate-time list explicitly provides that spending *time alone* somewhere is sufficient for a registrant to establish a residence at that place. Defendants' syllogism falls apart in the second half: Recognizing that "reside includes, but is not limited to, spending more than [the aggregate-times]" somewhere, does not write out or otherwise render null the preceding totality-of-the-circumstances test.   Ala. Code § 15-20A-4(20).   Rather, the aggregate-time list simply provides a legislatively determined list of examples where the totality-of-the-circumstances test is necessarily met.

Defendants overlook the fact that many totality-of-the-circumstances tests can be met by one heightened factor alone, even though other factors are considered.   For example, "reasonable suspicion" in the Fourth Amendment context uses a totality-of-the-circumstances test, but it can and often is met based on one especially heightened factor.   The aggregate-time list does not depart from

the totality-of-the-circumstances approach.  Instead, the Alabama legislature articulated that the-totality-of-the-circumstances test is necessarily met if a registrant spends a sufficient amount of time at a place, regardless of whether other non-temporal factors would cut against a finding of residency.  That is, the Alabama legislature clearly provided concrete examples of when the totality-of-the-circumstances test is always met.  *Cf.* (Doc. # 133 at 35 (Defendants incorrectly arguing that "[i]f ASORCNA's temporal illustrations carry independent effect, the mandatory totality of the circumstances [test] is written out of the statutory scheme.").)

Perhaps in anticipation of the foregoing arguments proving fruitless, Defendants advocate one last position.  They ask for a narrowing construction should the court find that the aggregate-time list "specif[ies] circumstances in which a registrant will always have established a residence."  (Doc. # 55 at 90.) Specifically, Defendants request a narrowing construction of the definition of "reside" to always require more than time alone to establish a residence.[24] (Doc. # 133 at 36 ("[I]f this Court harbors doubts about Defendants' interpretation of 'reside,' it should be adopted as a narrowing construction.")).

---

[24] Ironically, Defendants request a *limiting* construction that would result in "reside" not including "spending more than four hours a day at the place on three or more consecutive days" even though the statute says that "reside includes, but *is not limited* to*, spending more than four hours a day at the place on three or more consecutive days."  Ala. Code § 15-20A-4(20) (emphasis added).

While federal courts have in "appropriate circumstances" proffered narrowing constructions to state laws under the doctrine of constitutional avoidance, a federal court should always be reluctant to independently narrow the terms of a separate sovereign's statutes, and, in any event, a federal court "may not rewrite a . . . law to conform it to constitutional requirements." *Cheshire*, 15 F.4th at 1368 (quoting *Reno v. Am. C.L. Union*, 521 U.S. 844, 884–85 (1997)).  To do otherwise would constitute a "serious invasion of the legislative domain," *United States v. Treasury Emps.,* 513 U.S. 454, 479, n.26 (1995), and sharply diminish a state's "incentive to draft a narrowly tailored law in the first place," *Osborne v. Ohio,* 495 U.S. 103, 121 (1990).

Here, Defendants have requested a narrowing construction, but they have not articulated what that narrowing construction would look like in practice.  The best the court can glean is that an appropriate narrowing construction would be either (1) wholesale deletion of the aggregate-time list, or (2) a rewrite of the definition's third sentence to include a clause at the end of the aggregate-time list that states something to the effect of "but these time periods alone are not sufficient to establish a residence."  The first approach is obviously disallowed.  The second approach would functionally delete the aggregate-time list, make its inclusion totally superfluous, and directly undermine the legislature's decision as to what the term reside includes.  Either way, both approaches would require the

court to legislate from the bench.[25]   To read § 15-20A-4(20) as Defendants "desire[] requires rewriting, not just reinterpretation." *Stevens*, 559 U.S. at 481. Thus, despite Defendants' understandable request for a narrowing construction, "the words of the [provision] simply leave no room for a narrowing construction." *Jews for Jesus, Inc.*, 482 U.S. at 575.

But there are other options.  Under certain circumstances in the overbreadth context, courts have used either abstention or certification when "as here, the state courts have not had the opportunity to give the statute under challenge a definite construction." *Id.*  Both options are in recognition of the constitutional avoidance canon and the principle that state courts are the ultimate arbiters of state law. Neither option is appropriate in this case though because ASORCNA's definition of reside is not "fairly subject to an interpretation which will render unnecessary or substantially modify the federal constitutional question."  *Id.* (quoting *Harmon v. Forssenius*, 380 U.S. 528, 535 (1965)).  *See also McGuire II*, 512 F. Supp. 3d at 1236 (explaining that Defendants' interpretation of "reside" is "unfounded"); (Doc.

---

[25]   And, even if the aggregate-time list could be cut wholesale from ASORCNA's definition of reside, defining "reside" as anywhere someone is "habitually or systematically present," but not necessarily where they spend the night, is vague and likely subject to arbitrary and discriminatory enforcement in the absence of clarifying language, like the aggregate-time list.  *See Habitual*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/habitual ("regularly or repeatedly doing or practicing something or acting in some manner"); *Systematic*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/systematic ("methodical in procedure or plan").  *See also supra* n.20 (Defendant Marshall arguing that "if a sex offender is habitually or systematically present at a jogging track or baseball stadium, then yes, [that is a] residence].").

# 102 (denying Defendants' motion to certify this issue to the Supreme Court of Alabama because "the plain language of [ASORCNA] answers" the issue)). Bottomline, neither certification, abstention, nor a narrowing construction is appropriate because the court cannot "rewrite the *clear* terms of a statute in order to reject a facial challenge." *Dimmitt v. City of Clearwater*, 985 F.2d 1565, 1572 (11th Cir. 1993) (emphasis added).

And, as explained above, ASORCNA's statutory text is crystal clear as to what the "term reside includes." *See* Ala. Code § 15-20A-4(20). Out of an abundance of caution, the foregoing analysis carefully trudged through that statutory text and each of Defendants' arguments. After all, over seventy pages of briefing were dedicated to the issue of how to interpret "reside." But the briefs' focus on it was really not necessary. The result reached here was obvious and inevitable.

First, the statutory text is clear on its face. Second, the Plaintiffs in this case actively self-censor, by, for example, not going to church regularly, based on the plain language of the statute. *See Massachusetts*, 491 U.S. at 584 (explaining that the overbreadth doctrine is designed "to prevent the chilling of protected expression"). Third, this court has already twice construed the statute consistent with the result reached here. *See McGuire II*, 512 F. Supp. 3d at 1236 (citing *Doe 1*, 2018 WL 1321034 at *4, n.7). Fourth, other federal judges looking at the statute

have naturally read it as such as well.[26]  *See Henry*, No. 2:21-CV-797-RAH, 2022 WL 17816945, at *3.  Fifth, the only Alabama state-court opinion dealing with the definition of reside similarly found "reside" to be "a term broadly defined . . . to prohibit [a registrant] from spending significant time at [a place]" and explaining that "significant time" meant "no more than 4 hours per day for 3 consecutive days or no more than 10 days in a month."  *R.E.H. v. C.T.*, 327 So. 3d 248, 253 (Ala. Civ. App. 2020) (emphasis added) (citing Ala. Code § 15-20A-4(20)).  Finally, and not to have buried the lead of this story, Defendant Marshall previously agreed with the court's conclusion when he represented that the aggregate-time list provides "concrete examples as to what constitutes habitual or systematic presence," and that registrants who are "habitually or systematically present at a jogging track or baseball stadium," would have to "register [their] presence" at those locations.[27]

In short, the interpretation adopted in this opinion is Defendant Marshall's original interpretation; this court's first, second, and third interpretations; a state

---

[26] In outlining the scope of ASORCNA's definition of "reside," the court in *Henry* naturally read the statute in accord with the present-Plaintiffs' plain-language interpretation because the definition precisely states that "reside" includes "spending more than four hours a day at the place on three or more consecutive days."  2022 WL 17816945, at *3 (finding that reside includes the aggregate-time list because the statute says it includes the aggregate-time list).  This natural reading was also this court's first reading.  *See Doe #1*, 2018 WL 1321034, at *4 (naturally interpreting the definition of "reside" to include a catch-all habitual-or-systematic presence definition and three specific examples of "reside" that specify circumstances in which a registrant will always have established a residence).

[27] *Supra* n.20.

court's interpretation; another federal judge's interpretation; and the evidence shows it is the interpretation of the people who are actually threatened with felony prosecution and who actually have to live under the words of that law.   Most importantly, though, it is the clear and uncontestable interpretation of the words of the provision.  *McGuire II*, 512 F. Supp. 3d at 1236 (explaining that ASORCNA makes it "clear" that the aggregate-time list "specif[ies] circumstances in which a registrant will *always* have established a residence").

Accordingly, the court once again finds that the aggregate-time list in ASORCNA's definition of "reside" provides concrete circumstances which, if met, necessarily and definitionally establish a residence.  Put differently, a registrant resides *anywhere* a registrant goes, irrespective of the place or the registrant's conduct and manner therein, if the registrant is there for a time longer than proscribed by the aggregate-time list or if the registrant is there with the intent to remain longer than the times proscribed by the aggregate-time list.  *See* Ala. Code § 15-20A-4(20).    As Defendant Marshall recognizes under this construction, that means a registrant could easily establish a residence in violation of ASORCNA at a jogging track or baseball stadium or fishing hole or workplace or gym or coffeeshop or park or political protest venue or foodbank or library or worship retreat or church or synagogue or mosque, and so on.  Anywhere can be a residence.  Under the aggregate-time list, it does not matter where the location is, what the registrant is doing there, or why the registrant is there.  If a registrant

spends a relatively short amount of aggregated time there, then the registrant resides at that place and potentially faces a felony conviction under several different ASORCNA provisions, including sections 11(a) and (d).  Ala. Code §§ 15-20A-11(a), 15-20A-11(d).

### ii.  Overnight Visit

One other point is necessary to determine "what the statute covers." *Stevens*, 559 U.S. at 474.  While Plaintiffs generally challenge the collective burden of the residency provision, Ala. Code § 15-20A-11, they specifically argue that two of that provision's substantive prohibitions, sections 11(a) and 11(d), are individually and cumulatively overbroad.  Section 11(d) is the residency provision's prohibition on registrants' ability to reside and conduct "overnight visits" with minors (that is, persons under the age of 18).

Plaintiffs assert that ASORCNA's definition of "overnight visit," like the definition of "reside," is overinclusive and substantially burdens expressive activity.  Specifically, Plaintiffs assert that because "overnight visit" is defined as "[a]ny presence between the hours of 10:30 p.m. and 6:00 a.m.," Ala. Code § 15-20A-4(14), and because section 15-20A-11(d) prohibits all registrants from conducting "an overnight visit with a minor," that ASORCNA therefore prohibits registrants from spending any amount of time, for any reason, anywhere a minor is present between the hours of 10:30 p.m. and 6:00 a.m., even if the registrant does not know or interact with the minor and even if the registrant is never alone with

the minor. *See* (Doc. # 125 at 81–82.)  As Plaintiffs argue, "a registrant who is at any church, political, or family event after 10:30 p.m. or before 6:00 a.m. reasonably fears having violated ASORCNA if minors are present. . . . a Bible study, political rally, or family gathering that goes into the night; a pre-dawn prayer vigil or protest; an early-morning family fishing or skiing trip—ASORCNA registrants are chilled from engaging in *any* of these activities (and many, many more) if minors are or may be present." *Id.*

Defendants do not argue that Plaintiffs' interpretation of "overnight visit," or its application under section 11(d), is wrong.  Nonetheless, given the magnitude of the overnight-visit rule, it is worth explicitly confirming that Plaintiffs are correct. Section 11(d) unequivocally provides: "No adult sex offender shall reside or conduct an overnight visit with a minor."  Ala. Code § 15-20A-11(d).  "Overnight visit" is unequivocally defined as "[a]ny presence between the hours of 10:30 p.m. and 6:00 a.m." *Id.* § 15-20A-4(14).  "Any presence" includes only one minute or one second in a place, as surely as "no" presence excludes "all" presence in a place.  That means that registrants violate ASORCNA if they are *anywhere* a minor is present between 10:30 p.m. and 6:00 a.m., even if they do not know the minor, do not interact with the minor, are only present for a fleeting moment, and

are only present while other non-registrant adults are also present.[28]  The impact of this rule is immense given that anyone under eighteen years of age is a minor under ASORCNA.  Ala. Code § 15-20A-4(13) (defining minor).

Again, Defendants do not dispute or offer a contrary interpretation to ASORCNA's definition of "overnight visit," or its operation in the context of section 11(d).  Indeed, Defendants make no argument against Plaintiffs' contention that section 11(d) functionally forces registrants to "be locked up inside their houses from 10:30 p.m. to 6:00 a.m.," so as to avoid the possibility of going out into public (such as by walking the dog, or going to a concert, or a movie theater, or late-night political rally, or dawn-prayer vigil, or family gathering) and being in the presence of a minor.  (Doc. # 125 at 83.)  But Defendants' silence as to this point is unsurprising given the clear albeit outlandish definitional scope of

---

[28]   Section 15-20A-11(d)'s prohibition on conducting overnight visits with a minor applies to *all* adult sex offenders, regardless of their offense.  While section 11(d) does provide some circumstances for when certain registrants "may reside with a minor," *if* the minor is a qualifying relative, these exceptions do not attach to section 11(d)'s "overnight visit" prohibition. *See id.* § 15-20A-11(d).  Though one may instinctively read "reside" to necessarily include "overnight visit," and therefore interpret section 11(d)'s exceptions for residing with certain relative minors as implicitly creating similar exceptions for conducting overnight visits with the same minors, such an interpretation is foreclosed by ASORCNA itself, which explicitly separates and disentangles "resid[ing]" and "overnight visits" as distinct.  Indeed, the definition of "reside" states that "[a] person does not have to conduct an overnight visit to reside at a place." Ala. Code § 15-20A-4(20).  Thus, the statute is clear that "reside" is not meant to subsume "overnight visit."  In any event, even if section 11(d)'s familial exceptions for residing did also apply to overnight visits, the prohibition on conducting overnight visits would still apply to a giant category of registrants convicted of sex-offenses involving a child, and for all registrants who "conduct an overnight visit" with a minor who is *not* their child, grandchild, stepchild, sibling, or step sibling.  Either way, the following analysis and outcome here would be the same.  For the sake of clarity, the remainder of the analysis assumes section 11(d)'s familial exceptions for certain registrants residing with certain minors also applies to conducting overnight visits with the same minors—even though the statutory language rejects that less-restrictive rule.

"overnight visit." *See also McGuire*, 50 F.4th at 997 ("During [10:30 p.m. to 6:00 a.m.], a registrant may not be present—for any period or any reason—where a minor is present.").

### iii.    Construction Conclusion

Defendants advised the court to "consider the statutory text rather than [paraphrases] because the statutes speak for themselves."  (Doc. # 129 at 13.) Defendants are right, the statutory text does speak for itself.  It just speaks in extraordinary and conflicting ways.

ASORCNA defines "reside" and "overnight visit" in ways that turn those words' ordinary meanings upside down, and, in doing so, expands the meaning of those words to have a never-before-seen reach.  "Overnight visit" is actually "[a]ny presence" with any minor "between the hours of 10:30 p.m. and 6:00 a.m." Ala. Code § 15-20A-4(14).   A residence is actually anywhere a person is "habitually or systematically present," which includes, but is not limited to, anywhere he or she spends more than four hours a day on three consecutive days or on more than four hours a day on ten non-consecutive days in a month. *Id.* § 15-20A-4(20).  Defendants have provided no explanation, rational basis, or justification for how these definitions were created.  Instead, Defendants insist that ASORCNA does not mean what it says.  But the text is clear.  It takes no

hyper-technical argument or creative imagination to see the scope of "reside" and "overnight visit." They are simply broad and abnormal.[29]

Having properly construed the residency provision—particularly in the context of ASORCNA's definitions of "reside" and "overnight visit"—and determined "what the statute [actually] covers," the next question in the overbreadth analysis is whether the statute, as properly construed, "criminalizes a substantial amount of protected expressive activity" in violation of the First Amendment. *Williams*, 553 U.S. at 293–97.

---

[29] Language, like art, "consists of drawing the line somewhere." G.K. Chesterton, *Quotations of G.K. Chesterton*, Am. Chesterton Soc'y, https://www.chesterton.org/quotations/ (last visited May 3, 2024) (paraphrase with apologies to Chesterton). The Alabama Legislature drew its lines for "reside" and "overnight visit." But the lines defy any reasonable understanding of those words, particularly when they are wed together.

b)      Substantial Overbreadth[30]

With many successful overbreadth challenges, the construction of the statute at issue often "decides the constitutional question."  *See Stevens*, 559 U.S. at 481. Such is the case here.  While Plaintiffs generally challenge the residency provision as overbroad as a whole, they specifically challenge sections 11(a) and 11(d) as individually overbroad.

These two subsections have substantively different prohibitions. Section 11(a) generally prohibits where a sex offender can establish a residence. Section 11(d) generally prohibits sex offenders from residing or conducting overnight visits with minors.  At first glance, those sound similar to sex-offender

---

[30] Unlike a typical facial attack, which requires plaintiffs to prove "that no set of circumstances exists under which the [statute] would be valid," facial overbreadth challenges may succeed even if there are many legitimate applications of the statute so long as the statute punishes a "substantial amount" of protected expressive activity, when "judged in relation to the statute's plainly legitimate speech."  *Doe v. Valencia Coll.*, 903 F.3d 1220, 1233 (11th Cir. 2018) (quoting *Fla. Ass'n of Prof'l Lobbyists, Inc. v. Fla. Office of Legislative Servs.*, 525 F.3d 1073, 1079 (11th Cir. 2008)).  In any event, if a law is fatally overbroad, then there is no set of circumstances under which the law would be valid.  *See Club Madonna Inc. v. City of Miami Beach*, 42 F.4th 1231, 1256 (11th Cir. 2022) (explaining that the "no-set-of-circumstances" language is "correctly understood not as a separate test applicable to facial challenges, but a description of the outcome of a facial challenge in which a statute fails to satisfy the appropriate constitutional framework."); *see also Bd. of Trustees of State Univ. of New York v. Fox*, 492 U.S. 469, 483 (1989) (Scalia, J.) ("Where an overbreadth attack is successful, the statute is obviously invalid in *all* its applications.").  Likewise, if a law fails to pass traditional First Amendment means-end scrutiny under a universally applicable rationale, as here, then too there is "no set of circumstances" under which the statute would be valid.  *Fox*, 492 U.S. at 483; se*e Packingham*, 582 U.S. at 110–118 (Alito, J., concurring) (invalidating a sex-offender law for failing a time, place, or manner analysis even though that law permissibly prohibited access to some forums of expression).  If this were not the case, then the government could pass a broad, plainly unconstitutional law that enabled it to "infringe any right, for any reason," and that law could not be invalidated because there is always at least one factual circumstance where a law, if broad enough, can be used to properly prohibit unprotected conduct.  "[T]hat can't be right."  *Club Madonna*, 42 F.4th at 1256.

prohibitions created by other states. But, when sections 11(a) and 11(d) are properly brought into focus by their definitions of "reside" and "overnight visit," they become anything but typical—and their astonishing breadth becomes clear. Section 11(a) tells registrants that they will have established a residence, potentially in violation of ASORCNA, anywhere they are "habitually and systematically present," which includes anywhere they go if they are there for a relatively short period of aggregated time, irrespective of any conduct or whether the place is actually a residence as that word is ordinarily understood. Ala. Code §§ 15-20A-4(20), 15-20A-11(a). Meanwhile, section 11(d) tells registrants that they violate ASORCNA if they are, for any reason and for any amount of time, in the presence of a minor between the hours of 10:30 p.m. and 6:00 a.m. *Id.* §§ 15-20A-11(d), 15-20A-4(14)

Both section 11(a) and section 11(d) (properly construed) will be analyzed separately, and both are impermissibly overbroad by themselves and due to be individually invalidated. However, both of these sections work in tandem and amplify each other's infirmities, and both are fundamentally anchored to ASORCNA's overinclusive definitions of "reside" and "overnight visit," which shape every structural aspect and possible application of the residency provision.

Accordingly, sections 11(a) and (d), when viewed collectively, are also unconstitutionally broad.[31]

For a law to be overbroad it must "criminalize[] a substantial amount of protected expressive activity." *Williams*, 553 U.S. at 297. Plaintiffs bear the burden of demonstrating that the overbreadth is "substantial, not only in absolute sense, but also relative to the statute's plainly legitimate sweep," *Williams*, 553 U.S. at 292, by showing "from the text of the [challenged provisions] and from actual fact that a substantial number of instances exist in which [the provisions] cannot be applied constitutionally," *N.Y. State Club Ass'n*, 487 U.S. at 14.

"'Substantial overbreadth' is not a precisely defined term." *Doe v. Valencia Coll.*, 903 F.3d 1220, 1232 (11th Cir. 2018) (citation and internal quotation marks omitted). *See* Geoffrey R. Stone et al., The First Amendment 115 (6th ed. 2020) (asking whether "substantiality" should be measured "by the total number of unconstitutional applications" or by the "ratio of possible constitutional to possible unconstitutional applications"). Nevertheless, substantial overbreadth, at

---

[31] A threshold question in the overbreadth analysis is "identifying the scope of the relevant law." *Hicks*, 539 U.S. at 125 (Breyer, J., concurring). For example, a city's speech ordinance for a public park may be overbroad when analyzed in isolation, but when that same ordinance is considered "as one element of the combined policies governing expression in public schoolyards," it may withstand a facial challenge. *Id.* Thus, it is important to establish the denominator used in the overbreadth analysis. Here, the court narrowly looks at both section 11(a) and section 11(d) "in isolation" and concludes they are overbroad. *Id.* The court also looks at sections 11(a) and (d) together as the "residency provision" and concludes that it is overbroad—largely because the residency provision's primary substantive prohibitions are 11(a) and 11(d) and because it is structured around the fatally overbroad definitions of "reside" and "overnight visit." This multi-pronged approach ensures that the "scope of the relevant law" was properly identified. *Id.*

minimum, requires a "realistic danger that the [law] will significantly compromise recognized First Amendment protections of parties not before the [c]ourt." *Valencia Coll.*, 903 F.3d at 1232.  "[T]he mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge." *Members of City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 800 (1984).

As a result, succeeding on a claim of substantial overbreadth is "not easy to do." *Valencia Coll.*, 903 F.3d at 1232.  But it is not impossible.  *See Stevens*, 559 U.S. at 481 (invalidating an animal-cruelty law as substantially overbroad from reading the text of the law and considering its reasonable applications); *Cartwright*, 32 F.4th at 1125 ("Because the [regulation] restricts political advocacy and covers substantially more speech than the First Amendment permits, it is fatally overbroad.").

Under this overbreadth framework, the residency provision is overbroad, both in its component parts, sections 11(a) and 11(d), and in those components' cumulative impact on expression.  Three points guide this analysis: (1) the residency provision broadly burdens expressive activity that is foundational to the First Amendment; (2) the burden is substantial in an absolute sense—that is, in the total number of unconstitutional applications; and (3) the burden is substantial in relation to the residency provision's plainly legitimate sweep—if any such sweep

even exists under ASORCNA's definitions of "reside" and "overnight visit," which infect the entirety of the residency provision and make it unworkable as a whole.

The residency provision implicates rights at the heart of the First Amendment. Defendants attempt to disentangle the residency provision from involving First Amendment protection by suggesting that it does not regulate speech or expressive conduct, but rather simply regulates where registrants can reside and with whom they can reside and be present. The purpose and intent of the residency provision may be semantically detached from speech and expressive activity, but there is no real question that the provision "at issue in this case reaches the universe of expressive activity." *Jews for Jesus, Inc.*, 482 U.S. at 574.

While the residency provision does not explicitly address speech or expressive conduct, it clearly regulates expressive conduct "necessarily associated with speech." *Hicks*, 539 U.S. at 124 (explaining that an overbreadth challenge will "rarely, if ever," succeed on a law that is not "necessarily associated with speech"). Section 11(a) uses the nominal idea of "residency" to categorically time-limit registrants from accessing any and all forums of expressive conduct and therein engaging in First Amendment activity. In this way, section 11(a) is not a run-of-the-mill time, place, and manner restriction that applies to certain public forums; it is a sweeping time restriction that attaches to *all* places (including private churches and every type of public forum) for all manners and types of activity (including worship and political participation). Considering that section

11(a) limits registrants' ability to daily attend church and to daily engage with political forums, it is readily apparent that it is necessarily and inextricably associated with protected expressive activity and free speech. *Hicks*, 539 U.S. at 124.

Meanwhile, section 11(d) prevents registrants from being present—for any period of time and for any reason—anywhere a minor is present between 10:30 p.m. and 6:00 a.m. As Plaintiffs highlight, that rule is functionally a curfew law and it broadly limits registrants' ability to go out in public and access a "wide variety of places associated with First Amendment activity," a necessary antecedent to much speech. *Doe v. Cooper*, 842 F.3d 833, 845 (4th Cir. 2016) (invalidating a law as overbroad that prohibited sex offenders from being "[w]ithin 300 feet of any location intended primarily for the use, care, or supervision of minors"); *Hodgkins*, 355 F.3d at 1058–59 ("[T]he government regulation of nonspeech" via a curfew law "is intimately related to [] expressive conduct" because "[b]eing out in public is a necessary precursor to almost all public forums for speech, expression, and political activity.").

Thus, the regulations at issue here restrict the type of protected activity that is at the First Amendment's core. "A fundamental principle of the First Amendment is that all persons have access to places where they can speak." *Packingham*, 582 U.S. at 104 (invalidating a law that broadly prohibited sex offenders from accessing forums of expression); *see also Cuomo*, 592 U.S. at 19

(explaining that "personal attendance" at, and access  to, religious forums is unquestionably protected by the First Amendment); *Boos,* 485 U.S. at 318 (calling organized political protest "classically political speech" which "operates at the core of the First Amendment"); *Roberts v. United States Jaycees*, 468 U.S. 609, 622 (1984) ("[I]mplicit in the right to engage in activities protected by the First Amendment" is "a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends."). Accordingly, the residency provision "reaches a substantial amount of constitutionally protected conduct," *Cheshire*, 15 F.4th at 1362, that is "necessarily associated with speech," *Hicks*, 539 U.S. at 124.

Not only does the residency provision necessarily implicate expressive conduct that is foundational to the First Amendment, it also substantially burdens that activity in an "absolute sense." *Williams*, 553 U.S. at 285.  As explained at length in this opinion, the residency provision's definition of "reside" is extremely broad on its face.  Briefly, though, the threshold "habitual[] or systematic[]" presence definition of what constitutes residing somewhere is vague and therefore susceptible to overbroad enforcement.  Ala. Code § 15-20A-4(20).  The subsequent totality-of-the-circumstances test somewhat helps cure the vagueness, but, as the Eleventh Circuit has pointed out, totality-of-the-circumstances tests often do little to cure indeterminacy.  *See Cartwright*, 32 F.4th at 1121.  Then, when the definition narrows down to the aggregate-time list, the previous indeterminacy is

replaced with precise clarity—and far-reaching breadth as to what constitutes a residence.  Because the aggregate-time list uses short periods of time alone to dictate how long a registrant can be somewhere (or else run the risk of establishing a residence in violation of ASORCNA), there is limitless innocent conduct a registrant can engage in that is "undoubtedly protected by the First Amendment" but which "could qualify for prohibition under [the provision's] sweeping standards."  *Id.* at 1125.

Many of section 11(a)'s limitations do not overtly sound in traditionally expressive activity, like going to a baseball stadium or park or jogging track or gym or restaurant or coffeeshop or fishing hole, for more than four hours a day on three consecutive days or on ten total days within a given month.  But many others do sound squarely in the First Amendment, like visiting family, participating in worship services, attending political protests, accessing public libraries, and volunteering with nonprofits at a location, for more than four hours a day on three consecutive days or on ten total days within a calendar month.  The range of section 11(a)'s prohibitions on basic First Amendment conduct is facially staggering in an absolute sense.  Making matters worse, the final item in the aggregate-time list provides that "reside" includes "spending *any* amount of time at the place coupled with statements or actions that indicate an intent to live at the place or to remain at the place for the periods specified in this sentence."  Ala. Code § 15-20A-4(20) (emphasis added).  So, per the definition of reside, a

78

registrant would "reside" at church if he went to church services for "any amount of time," with the intent to attend church services for "more than fours hours a day [] on three or more consecutive days."  *Id.*  As Defendants concede under the construction adopted here, the reach of the law is "absurd."  (Doc. # 122 at 97–98.)

Section 11(d) is also substantially overbroad in an absolute sense.  Per the text, it prohibits registrants from going to any of the following places, if a minor is present, for any period of time between 10:30 p.m. and 6:00 a.m.: churches, synagogues, mosques, political fundraisers, political townhalls, libraries, theaters, concerts, fundraising dinner parties, late-night vigils, early-morning prayer gatherings, and the list goes on.  Recall, an "overnight visit" is "*[a]ny* presence [with a minor] between the hours of 10:30 p.m. and 6:00 a.m."  Ala. Code § 15-20A-4(14) (emphasis added).  It does not need to be unsupervised time spent with the minor.  Nor does it need to be at a home, or apartment, or "fixed residence," as ASORCNA defines that term.  *Id.* § 15-20A-4(6).

If the legislature wanted to so limit the overnight prohibition, it could have.  Instead, similar to how a "residence" can be *any place* under ASORCNA, the legislature broadly defined "overnight visit" as *any presence* with a minor at any place, including apartments, streets, parks, cars, and all the forums of First Amendment activity listed above.  From 10:30 p.m. to 6:00 a.m., "a registrant may not be present—for any period or any reason—where a minor is present," including church, synagogue, mosque, townhalls, political fundraisers, and the

79

entire spectrum of public forums, like town squares.  *McGuire*, 50 F.4th at 997.
The unconstitutional applications of section 11(d) abound.

So, the total amount of impermissible applications of both section 11(a) and
section 11(d) is astonishingly high and they each substantially burden expressive
activity in an absolute sense.  But the impermissible applications also greatly
outweigh the permissible applications—and therefore the provision's overbreadth
is substantial in an absolute sense and "relative to the statute's plainly legitimate
sweep."  *Williams*, 553 U.S. at 292.  It is doubtful that there is any "plainly
legitimate sweep," to the residency provision as properly viewed under the
definitions of "reside" and "overnight visit."  *Id.*

To be sure, section 11(a) time-limits protected First Amendment activity at a
location.  But it also time limits *all* activity at a location.  Although time-limiting a
registrant's ability to go to a jogging track or coffee shop may not necessarily
burden First Amendment conduct, that is *not* an example of the provision's
"plainly legitimate sweep."  *Id.*  Just the contrary.  The provision is so broadly
worded that it *arbitrarily* categorizes any place as a residence based on a relatively
short period of aggregate time alone, necessarily capturing innocent conduct like
going to work every day and exercising on a jogging track daily and watching a

three-day series of baseball.[32]  Defendants provide no reason for why, or examples of how, the aggregate-time list could ever constitute a legitimate way to define residency for the purposes of a felony prosecution.  Nor do Defendants explain why or how simply being somewhere for four hours a day, three days in a row— particularly when minors are not present or likely to be present—can constitute a constitutionally acceptable felony, such as by visiting an adult friends' house that happens to be five blocks (or over a third of a mile) away from a school or daycare for longer than the aggregate times.

Likewise, Defendants provide no justification for why being in the presence of a minor between 10:30 p.m. and 6:00 a.m. is a legitimate way to define "overnight visit," nor why simply being present for a minute at a place at the same time as a minor during those hours, like at an early-morning worship service, could ever constitute a constitutionally acceptable felony.  A registrant would violate section 11(d)'s "overnight visit" prohibition by staying at a friend's dinner party until 10:45 p.m. if the host's seventeen-year-old son shared a seat at the adults' table.  A registrant would violate section 11(d) by running in an all-ages marathon that kicked off at dawn.  A registrant would violate section 11(d) by attending a play or a movie in the company of his sister and her teenage children that ran past 10:30 p.m.  A registrant would violate section 11(d) by spending the night in the

---

[32]   One official testified that going to a food bank, church, or friend's house for four days a week, four hours a day, would establish a residence under ASORCNA.  (Doc. # 123-25 at 8.)

emergency room for treatment if minors were also present.[33]   A registrant would violate section 11(d) by working the nightshift at a 24-hour gas station that minors visited.

Those examples may not directly burden protected activity as would attending a late-night religious service where minors are present, but they are clearly not examples of the statute's plainly *legitimate* sweep.  *See Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 966 (1984) ("The flaw in the statute is not simply that it includes within its sweep [] impermissible applications, but that in all its applications it operates on a fundamentally mistaken premise . . .").  If a law that broadly prohibits sex offenders from accessing social media sites that minors may access violates the First Amendment, then so too does a law that broadly prohibits sex offenders from accessing *any place* where a minor may be between 10:30 p.m. and 6:00 a.m.  *See Packingham*, 582 U.S. at 118 (Alito, J., concurring) (explaining that sex-offenders' access to cyberspace may be more susceptible to restrictions than access to physical forums because "it is easier for parents to monitor physical locations . . . [physical world interactions] may be

---

[33]   Here is another oddity about the residency provision that reflects its less-than-carefully drafted nature.  It exempts "the facility of a licensed health care provider" from subsection 11(a), which means that registrants do not violate ASORCNA if they reside in hospitals that are within 2,000 feet of a school or their victim or victim's families' properties.  Ala. Code § 15-20A-11(f).  But that exemption does not apply to subsection 11(d), meaning that registrants cannot reside or be present at a "licensed health care provider" for "anytime between the hours of 10:30 p.m. and 6:00 a.m.," if a minor is present.  Go figure.

observed by parents, teachers, or others . . . [and] the Internet offers an unprecedented degree of anonymity," not afforded in the physical world).

And that's not even mentioning section 11(d)'s breathtaking burden on expressive, intimate association—namely, (1) that it prohibits certain registrants from residing or spending more than four hours per day for three consecutive days or no more than ten days in a month at a given place with their own child, and (2) that it prohibits *all* registrants from ever "resid[ing]", or being present between 10:30 p.m. and 6:00 a.m., with minor cousins, nieces, nephews, aunts, uncles, godchildren, or close family friends.  Section 11(d) "slic[es] deeply into the family itself."  *Moore v. City of E. Cleveland, Ohio*, 431 U.S. 494, 499 (1977).  "On its face it selects certain categories of relatives who may live together and declares that others may not."  *Id.*   Indeed, section 11(d)'s expansive prohibition on parents' ability to visit and be with their child, as recognized by Alabama courts, is a *de facto* termination of parental rights.  *R.E.H.*, 327 So. 3d at 254 ("This state-imposed separation of offenders and children [under section 11(d)] necessarily renders the father unable to assume physical custody of the child and constrains his ability 'to discharge his responsibilities to and for the child.'" (quoting Ala. Code § 12-15-102)).[34]   It is also therefore a *de facto* lifetime prohibition on having

---

[34]  In the lower court proceeding, the juvenile court judge stated: "I'm not saying that this makes sense morally or legally or socially. But under the law as it currently stands, you're just not permitted to have any overnight visitation with a minor child *whether it's your child or not your child*. And . . . that being the case, I can't say that you're able to adequately discharge your

(continued…)

children in the future—if the consideration of having a child hinged on whether the government would let you parent the unborn child, which it surely does. And that lifetime prohibition can attach to registrants who committed a nonviolent sex offense when they were teenagers. *See Henry*, 2024 WL 115795, at *6.

There is no doubt that the impermissible applications of section 11(a) and section 11(d) swamp the permissible applications given the overinclusive way "reside" and "overnight visit" are defined. Accordingly, based on the realistic applications of the plain mandates of the statutory text, both section 11(a) and section 11(d) are impermissibly overbroad because they substantially burden expressive activity in an absolute sense and in relation to their "plainly legitimate sweep." *Williams*, 553 U.S. at 297.

Other than arguing for a contrary construction of "reside," Defendants do not seriously dispute that the potential impermissible applications of section 11(a)

---

responsibility as a parent to a child that you aren't even allowed to have into your home to live with you. So, I'm going to find the child to be dependent." *R.E.H.*, 327 So. 3d at 251 (emphasis added). This is a stark example of how the residency provision cannibalizes traditional principles of family law and the Alabama Juvenile Justice Act. *See* Ala. Code § 12-15-101(b)(2) ("[T]o remove the child from the custody of his or her parent or parents only when it is judicially determined to be in his or her best interests or for the safety and protection of the public."); Ala. Code § 12-15-101(b)(8) ("To achieve the foregoing goals in the least restrictive setting necessary, with a preference at all times for the preservation of the family and the integration of parental accountability and participation in treatment and counseling programs."); Ala. Code § 12-15-101(c) ("Judicial procedures through which these goals are accomplished will assure the parties a fair hearing where their constitutional and other statutory rights are recognized and enforced.").

and section 11(d), as properly construed, outweigh the permissible applications.[35]

Rather, Defendants "substantial overbreadth" arguments boil down to prosecutors

declining to enforce section 11(a) and 11(d) as written because doing so would

result in many absurd (and unconstitutional) prosecutions.   That is, Defendants

assert that "law enforcement testimony reflects that the residency restrictions are

not enforced" to the extent of the law's prohibitions.   (Doc. # 122 at 83).[36]   As

noted earlier, this is a variation of the rejected statutory construction argument all

over again.   In any event, such an appeal to prosecutorial mercy is often the last,

and most helpless, defense to an overbreadth claim.   *See Dimmitt*, 985 F.2d at 1571

("The mere fact that the City has not enforced the requirement . . . is not sufficient

---

[35]   The primary analysis Defendants offer defending the "plainly legitimate sweep" of the residency provision is this: "ASORCNA's residency provisions . . . have an unquestionably legitimate sweep—protecting children (and the general public) from sex offenders" by regulating "where and with whom sex offenders can live."  (Doc. # 133 at 37–38 & n.21.)  This statement is extremely general, and it largely conflates the legitimate interest a law seeks to serve with the permissible sweep of that law's realistic applications.  Other than this statement, Defendants do not expand on the possible permissible applications of the residency provisions when properly construed under ASORCNA's definitions of "reside" and "overnight visit."

[36]   In support, Defendants cite testimony from several law enforcement officials.  *See, e.g.*, (Doc. # 120-48 at 35:10–14 (Lieutenant in the Montgomery County Sheriff's Office expressing: "The intent of a statute is for people . . . who are establishing a residence at a nonregistered address, and the commonsense factor is this: People often spend multiple hours at different locations they don't reside at.")); *id.* at 17:8–9 (responding "I wouldn't apply the -- that scenario as reside" when asked about a hypothetical where someone doing "ministry" for at least four hours a day twelve days a month); *id.* at 35:22–36:9 (responding "I would never apply it that way" in reference to a hypothetical about someone attending church four days a week for four hours each day); (Doc. # 120-49 at 21:13–15 (Captain in the Montgomery County Sheriff's Office expressing: "I mean, he probably goes and gets gas in his car habitually and systematically, too, and he's not living at the Chevron.")); (Doc. # 120-41 at 33:5–18 (Office of Prosecution Services' sex offender resource prosecutor expressing: "Even though you're systematically and presently there, you're not living at your employment or you're not living at the movie theater if you look at the totality of the circumstances.")).

to remove [the statutory] language from our consideration."). "[T]he First Amendment protects against the Government; it does not leave us at the mercy of *noblesse oblige*." *Stevens*, 559 U.S. at 480. A court cannot "uphold an unconstitutional statute merely because the Government promised to use it responsibly." *Id.* As the court previously explained at the motion-to-dismiss stage, "[i]f Defendants are willing and able to bind the State to [] a limiting construction, they must suit their actions to their words, and their words to their action." *McGuire II*, 512 F. Supp. 3d at 1239. Tellingly, Defendants made no such effort.

Defendants' prosecutorial discretion position includes their last argument, *viz.*, that the overbreadth claim must fail because Plaintiffs have provided no evidence "that the challenged provisions have been applied in the scenarios posited by [them]." *Cheshire*, 15 F.4th at 1377. While the lack of such evidence certainly does not bolster Plaintiffs' case, "[s]uch proof is not a requirement in an overbreadth case." *Id.* (citing *N.Y. State Club Ass'n*, 487 U.S. at 14); *see also Cartwright*, 32 F.4th at 1125 (finding a regulation "fatally overbroad" on the realistic applications of its text without any evidence that it had been applied unconstitutionally in the past). While courts must be wary of falling prey to the overbreadth doctrine's tendency "to summon forth an endless stream of fanciful hypotheticals," consideration of the reasonable applications of a given statute's *clear* prohibitions is how overbreadth claims are decided. *Williams*, 553 U.S. at 301; *see Hicks*, 539 U.S. at 122 n.3 (explaining that the overbreadth doctrine

involves the comparison of law's potential valid applications to a law's potential invalid applications); *United States v. Stevens*, 533 F.3d 218, 235 n.16 (3d Cir. 2008), *aff'd*, 559 U.S. 460 (2010) (explaining that the overbreadth doctrine's analysis is anchored to "pos[ing] reasonable but challenging hypotheticals to determine the statute's sweep").   The overbreadth doctrine does not require Plaintiffs, or other registrants, to engage in an unlawful course of conduct in order to evidentiarily show that a law is overbroad; rather, the overbreadth doctrine "requires courts to evaluate the *potential* reach of a statue, *conceivable* sets of circumstances, and *possible* direct and indirect burdens" on expressive activity. *American Booksellers v. Webb*, 919 F.2d 1493, 1499–1500 (11th Cir. 1990) (emphasis in original) (collecting cases).   Accordingly, contrary to Defendants' theme, Plaintiffs need not show that the law has been applied in the scenarios posited by them if they can show that the law is overbroad in its text and the realistic applications that text generates.   *United States v. Pugh*, 90 F.4th 1318, 1331 (11th Cir. 2024) (reiterating that overbreadth can be established from "the text" of the challenged provision).   This, as explained above, Plaintiffs have done.

In summary, ASORCNA's overinclusive definitions of "reside" and "overnight visit" are fatal to section 11(a) and section 11(d) of the residency provision.   When read individually, these provisions are unconstitutionally overbroad on their face.   However, because those subsections are the residency provision's primary prohibitions, because they operate in tandem and amplify each

other's burdens, and because the definitions of "reside" and "overnight visit" infect the structure of residency provision as a whole and make it generally unworkable, sections 11(a) and (d) are also unconstitutionally overbroad when viewed together and with ASORCNA's other provisions.  *See Aptheker v. Sec'y of State,* 378 U.S. 500, 515 (1964) ("The clarity and preciseness of the provision in question make it impossible to narrow its indiscriminately cast and overly broad scope without substantial rewriting.").  By analyzing section 11(a) and 11(d) individually, as well as collectively, and determining that under either "denominator" the law is overbroad, the court ensures that it has identified the proper "scope of the relevant law" in evaluating its burdens on the First Amendment.  *Hicks*, 539 U.S. at 125 (Breyer, J., concurring) (explaining that how a court frames the scope of the relevant law can alter the outcome of an overbreadth analysis).

> 5.   *Whether the Residency Provision is Narrowly Tailored*

Because the residency provision is unconstitutional under a direct application of the overbreadth doctrine, the law must be invalidated on that independent basis and the court need not consider Plaintiffs' secondary argument that the residency provision violates the First Amendment as a statute that impermissibly "lacks proper tailoring," (Doc. # 88 at 60); *see also* (Doc. # 130 at

52 ("The Residency Provisions Are . . . Not Sufficiently Tailored).)[37]   However, the tailoring claim will be addressed because traditional First Amendment scrutiny may be the more appropriate lens from which to view this case,[38] and because the constitutional question is not especially difficult to resolve: The residency provision facially violates the First Amendment because it criminalizes too much protected conduct without sufficient tailoring to the state's significant interests. Accordingly, section 11(a) and section 11(d) are independently unconstitutional on

---

[37] The court agrees with Defendants that the overbreadth and tailoring doctrines are distinct. (Doc. # 129 at 42 (citing *United States v. Dean*, 635 F.3d 1200, 1208 (11th Cir. 2011) ("We address this argument separately from overbreadth because it sounds like a challenge to the statute's narrow tailoring rather than its overbreadth.").   However, Defendants imply that Plaintiffs bring a First Amendment challenge to the residency provision *only* under the overbreadth doctrine.   But the operative complaint, (Doc. # 88), the motion-to-dismiss opinion, (Doc. # 55 at 86), and the Plaintiffs' briefing confirms that Plaintiffs also challenge the residency provision as violative of the First Amendment under a tailoring analysis.   Defendants dismiss Plaintiffs' "exhaustive narrow tailoring discussion" as unrelated to an overbreadth claim and do not, in large part, respond to that discussion.   (Doc. # 129 at 42.)   But a tailoring theory under the First Amendment has always been in this case.   *See* (Doc. # 55 at 86–91("Because it chills such a wide swath of protected speech under penalty of a felony, Plaintiffs have plausibly alleged that the residency requirements 'burden substantially more speech than is necessary to further the government's legitimate interests.' *Ward*, 491 U.S. at 799.") (citing the intermediate scrutiny tailoring test)).   The burden, therefore, was squarely before Defendants to address the tailoring claim.

[38] There is some ambiguity in the caselaw about the best way to approach a facial First Amendment challenge to laws similar to the residency provision.   *Compare Packingham*, 582 U.S. at 92 (applying the content-neutral "time, place, or manner" framework to a sex offender restriction on accessing the internet and determining the law failed to comport with the First Amendment because it sweeps too broadly), *with Doe v. Cooper*, 842 F.3d 833, 845–846 (4th Cir. 2016) (using intermediate scrutiny and narrow tailoring to determine if a sex-offender restriction is unconstitutional "under the overbreadth doctrine"), *and Hodgkins*, 355 F.3d at 1056–57 (using the overbreadth doctrine to justify standing for a facial attack and then using time, place, or manner tailoring analysis to determine that a curfew law violated the First Amendment).   In any event, resolving which analytical lens is the best fit for this case is unnecessary because the law in question cannot satisfy the standard applicable to a traditional tailoring claim or an overbreadth claim.

two First Amendment grounds: (1) a direct application of the overbreadth doctrine, and (2) an application of traditional First Amendment analysis, applying intermediate scrutiny.

The court's conclusion that the residency provision is unconstitutional under the overbreadth doctrine somewhat predetermines the finding that the provision is unconstitutional under a time, place, or manner analysis.   If a law is fatally overbroad, then it stands to reason that it also fails to be sufficiently tailored.  *See Stevens*, 533 F.3d at 235 n.16.   Nonetheless, even if the residency provision was not unconstitutional under the overbreadth doctrine, sections 11(a) and 11(d) independently and collectively fail to satisfy the First Amendment under a traditional time, place, or manner analysis.

Under the traditional First Amendment analysis, step one is to determine whether the challenged law implicates the First Amendment and, if so, whether it is content neutral.  As explained in the overbreadth analysis above, the residency provision clearly implicates the First Amendment and burdens expressive activity, like access to expressive forums, that is a necessary antecedent to protected speech, assemblage, and association.  *See Hodgkins ex rel. Hodgkins v. Peterson*, 355 F.3d 1048, 1059 (7th Cir. 2004) ("Being out in public is a necessary precursor to almost all public forums for speech, expression, and political activity.").   The next question is whether the law is content-neutral, which dictates the level of scrutiny to apply.   Here, the court assumes the residency provision is content neutral

because the intended purpose of the law was not to regulate specific viewpoints and, in broad strokes, the law does not reference the content of expression.[39]  Still, the residency provision does regulate expressive conduct that is necessarily integral to speech.  *Id.*  Accordingly, the residency provision is subject to intermediate scrutiny under the content-neutral time, place, or manner framework.  *See Packingham*, 582 U.S. at 105–06; *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 642 (1994).

Under this framework, in order to survive intermediate scrutiny, the residency provision must be "narrowly tailored to serve a significant governmental interest."  *McCullen v. Coakley,* 573 U.S. 464, 486 (2014) (internal quotation marks omitted).  "[T]he essence of narrow tailoring" in the time, place, or manner framework "focus[es] on the source of the evils the [government] seeks to eliminate . . . and eliminat[ing] them without at the same time banning or significantly restricting a substantial quantity of speech that does not create the same evils."  *See Ward,* 491 U.S. at 800 n.7.  In other words, the law must not

---

[39]  The court assumes the residency provision is content neutral but does not definitively decide that question.  There is reason to think that the provision is *not* content neutral because it limits access to expressive forums based on the state-imposed categorization of the would-be speaker and because it creates a carve out for hospital visits but not for churchgoing or other First Amendment conduct, which is indicative of a viewpoint prohibition: Unburdened access to healthcare forums is acceptable, but access to religious forums is not.  *See* Ala. Code § 15-20A-11(f) ("An adult sex offender is exempt from subsections (a) and (b) during the time the adult sex offender is in the facility of a licensed health care provider."); *see also Doe v. Harris*, 772 F.3d 563, 574–576 (9th Cir. 2014) (outlining the debate over whether to apply intermediate or strict scrutiny to a similar law and concluding intermediate scrutiny appropriate because the law did not suggest that its restrictions were a "proxy for content regulation").

"burden substantially more speech than is necessary to further the government's legitimate interests." *McCullen*, 573 U.S. at 486 (internal quotation marks omitted).

Importantly, unlike with the overbreadth analysis where the burden was on Plaintiffs, the tailoring burden is on Defendants. *NetChoice, LLC v. Att'y Gen., Fla.*, 34 F.4th 1196, 1227 (11th Cir. 2022); *McClendon v. Long*, 22 F.4th 1330, 1338 (11th Cir. 2022). "When the Government defends a regulation on speech as a means to redress past harms or prevent anticipated harms, it must do more than simply posit the existence of the disease sought to be cured." *Turner*, 512 U.S. at 664. The government "must demonstrate . . . that the regulation will in fact [prevent the anticipated harm] in a direct and material way." *Id.*; *Los Angeles v. Preferred Comm'ns, Inc.,* 476 U.S. 488, 496 (1986) ("This Court may not simply assume that the ordinance will always advance the asserted state interests sufficiently to justify its abridgment of expressive activity.").

Applying this framework, a content-neutral "time, place, or manner" restriction must, at the outset, at least serve a "legitimate" government interest. *Ward*, 491 U.S. at 798. The residency provision easily satisfies this requirement. As the Supreme Court has repeatedly noted, "[t]he prevention of sexual exploitation and abuse of children constitutes a government objective of surpassing importance." *New York v. Ferber*, 458 U.S. 747, 757 (1982). The Alabama Legislature found that "the residence restrictions, together with monitoring and

tracking" furthers the "primary governmental interest of protecting vulnerable populations, particularly children." Ala. Code § 15-20A-2. There is no doubt that protecting the public, and particularly children, is a significant and legitimate government interest. And there can be no doubt that prohibiting certain dangerous people from living with minors is a legitimate way to protect children.

It is not enough, however, that the law is designed to serve a legitimate state interest; it also must be "narrowly tailored" to serve that interest such that it does not "burden substantially more speech than is necessary to further the government's legitimate interests." *Ward*, 491 U.S., at 798–799; *see also McCullen,* 573 U.S. at 486. "Government may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." *Ward*, 491 U.S. at 799.

For the same reasons provided in the overbreadth analysis above, sections 11(a) and 11(d), both individually and acting collectively, "burden substantially more speech than is necessary" to predictively protect vulnerable populations from sexual abuse. *Packingham*, 582 U.S. at 105. As already explained, the breadth of these provisions is staggering, and no holding from the Supreme Court has approved of a statute as far-ranging in reach—let alone in the "troubling" context of a law that, based solely on a person's criminal history, imposes severe restrictions, under threat of felony, as to where that person may live, with whom that person may live, where that person may go, and around whom they may go in

society after serving their entire criminal sentence.[40]  *Id.* at 107.  Section 11(a) and

section 11(d) fail to pass time, place, or manner intermediate scrutiny on the face

---

[40]   The Supreme Court likely recognized these types of laws as "troubling" for two reasons: (1) they apply beyond criminal sentences without the protections afforded to similar conditions instituted under probation, and (2) they abridge protected conduct on the basis that the protected conduct is predictive of engaging in, or attempting to engage in, conduct that is already proscribed. *Packingham*, 582 U.S. at 107.

First, criminal sex-offender statutes create rules that are functionally similar to the conditions placed on individuals serving probation or a term of supervised release.  But, unlike a term of supervised release, these rules (1) apply to people who have already served their time and completed their supervisory sentences; (2) often apply to people for life, without recourse; (3) often apply not based on consideration of the individuals but to a broad class of convictions; (4) are often not contemplated at the time of sentencing; and (5) are often, like here, far more restrictive than the vast majority of supervised release conditions, even for sex offenders.  *See United States v. Bobal*, 981 F.3d 971, 976 (11th Cir. 2020) (explaining that the greater protections afforded to a special condition of supervised release made that condition constitutional, even though the substantive prohibition of that condition was identical to a sex-offender law the Supreme Court held unconstitutional); *see also Doe v. Harris*, 772 F.3d 563, 570–72 (9th Cir. 2014) (explaining that sex-offender laws, which apply to free-world citizens who are not in prison or on probation, are outside the standard "continuum" of the criminal-justice system).

Second, sex-offender statutes seek to prevent conduct that is already criminalized by further criminalizing protected conduct that is purportedly predictive of criminal conduct.  So, there is already the base criminal offense.  There are also criminal prohibitions for attempting, planning, conspiring, or otherwise inchoately trying to commit the base offense.  Sex-offender statutes like the residency provision take one more unusual step: They criminalize otherwise protected, innocent conduct on the basis that the protected conduct is predictive of an attempt to commit the base offense.  *Cf. Kingsley Int'l Pictures Corp. v. Regents of Univ. of N.Y.*, 360 U.S. 684, 689 (1959) ("Among free men, the deterrents ordinarily to be applied to prevent crime are education and punishment for violations of the law, not abridgment of the rights of free speech.").  This type of predictive criminal law requires the "presag[ing]" of criminal conduct based on typically protected conduct, irrespective of any intent or attempt to commit the base-criminal conduct.  *Packingham*, 582 U.S. at 107.  That is, the typically protected conduct serves as a proxy for intent and the original conviction serves as a proxy for dangerousness.  This is not to say that such predictive criminal laws are not within the state's power.  They can be.  The First Amendment permits specific, narrowly tailored laws that prohibit certain people from engaging in conduct that "presages a sexual crime." *Packingham*, 582 U.S. at 107.  Nonetheless, it is important to understand the unusual and, as the Supreme Court put it, "troubling" nature of predictive criminal laws that severely restrict First Amendment rights, *id.*, especially given that in the sex-offender context such laws have spun into a convoluted web of human-zoning regulations built atop a "permanent system of state surveillance," *State v. Hinman*, 2023 MT 116, ¶ 19, 412 Mont. 434, 444, 530 P.3d 1271, 1278, that burdens the foundational structure of

(continued…)

of their text.  *See id.* (explaining that the over inclusivity of a statute on its face can fail content-neutral time, place, or manner review); *see also United States v. O'Brien*, 391 U.S. 367, 384–85 (1968) ("[T]he purpose of the legislation was irrelevant, because the inevitable effect—the necessary scope and operation," of the "statute on its face [was] unconstitutional" under the First Amendment).  The inexplicably broad definitions of "reside" and "overnight visit" are fatal to the legitimacy of the provisions and the adequacy of their tailoring.  However, unlike under the overbreadth analysis, these aspects of the residency provision fail narrow tailoring for several additional reasons supplementing that conclusion.

Take those reasons in two groups: (1) Several structural features of the residency provision—like who it applies to and for how long—are emblematic of laws that are not narrowly tailored, and (2) evidence that the residency provision does not decrease recidivism and the lack of evidence showing that the residency provision's expansive prohibitions actually serve the government's interest in preventing sex crimes.  To be clear, as explained, sections 11(a) and 11(d) fail to satisfy intermediate scrutiny before consideration of the following for the same reasons provided in the overbreadth analysis.  That said, the structural features of the residency provision and the undisputed evidence in the record confirm that

---

people's lives (where and with whom they can go somewhere, where and with whom they can live, where and with whom they can work) to a significant degree.

sections 11(a) and 11(d) "burden substantially more speech than is necessary to further the government's legitimate interests." *Ward*, 491 U.S., at 798–799.

The base-line structural breadth of the residency provision cannot be overstated. Even without considering the fatally overinclusive definitions of "reside" and "overnight visit," the residency provision's reach is "breathtaking." *Henry*, 2024 WL 115795, at *6 (finding section 11(d)(4) unconstitutional under the due process clause). In nearly every way, Alabama opted for the most expansive approach as to who the residency provisions apply, for how long, and for what reasons.

Unlike other states' sex-offender statutes that categorize sex offenders at different levels based on the predicate crime and other risk-based circumstances, the residency provision generally lumps all sex offenders together, with some exceptions, based on the conviction alone. And there are *hundreds* of convictions that fall under ASORCNA's "adult sex offender" umbrella. *See* Ala. Code § 15-20A-5. Over thirty of the potential convictions are based on Alabama law, ranging from felonies, like sex offenses involving the molestation of children, to misdemeanors, like two convictions for indecent exposure. *Id.* The residency provision treats adult siblings who had consensual sex (incest) the same as someone who violently raped an adult. *See* Ala. Code §§ 15-20A-5(1), (19). Section 11(d) "applies equally to, for example, a 19-year-old male college freshman convicted for downloading sexually explicit content of his 16-year-old

high school girlfriend, to the worst of the worst offenders—like one who trafficked and raped children." *Henry*, 2024 WL 115795, at *6. But ASORCNA is not limited to just Alabama crimes. It also captures:

> *[A]ny* crime committed in *any* jurisdiction which, irrespective of the specific description or statutory elements thereof, is in *any way* characterized or known as rape, carnal knowledge, sodomy, sexual assault, sexual battery, criminal sexual conduct, criminal sexual contact, sexual abuse, continuous sexual abuse, sexual torture, solicitation of a child, enticing or luring a child, child pornography, lewd and lascivious conduct, taking indecent liberties with a child, molestation of a child, criminal sexual misconduct, video voyeurism, or there has been a finding of sexual motivation.

*Id.* § 15-20A-5(39) (emphasis added). The universe of potential convictions that fall under the residency provision has a massive sweep. *See Cornelio v. Connecticut*, 32 F.4th 160, 175 (2d Cir. 2022) ("If [a sex-offender law] applies to a broad class beyond those who are likely to engage in the conduct the government seeks to deter, it would be 'significantly overinclusive' rather than narrowly tailored."); *Doe*, 842 F.3d at 842 (finding overbroad a restriction that inhibited sex offenders' ability "to go to a wide variety of places associated with First Amendment activity," because it applied to a large class of sex offenders, "not just those who pose a danger to minors.").

In addition to covering a sweeping array of convictions, the residency provision creates *lifetime, non-appealable* prohibitions on where an otherwise free person can live and go and with whom they can live and with whom they can be

present.  Ala. Code § 15-20A-3(b) ("Any adult sex offender shall be subject to this chapter for life.").  The lifetime, unappealable nature of the residency provision leaves many registrants "without recourse to protect [their] First Amendment rights." *Bobal*, 981 F.3d at 977.  Indeed, it has been nearly four *decades* since two of the Plaintiffs' convictions in this case.  Neither of those convictions involved a minor.  And yet, those Plaintiffs are subject to ranging prohibitions under section 11(a) and section 11(d) for life, without *any* opportunity for recourse, because of the purported risk they pose to minors.[41]

Taken together, the residency provision burdens fundamental speech and expressive-associational rights.  It does so while (1) applying to people who have already completed their sentences, including supervised release, and been returned to society unencumbered by the criminal-justice system; (2) applying to massive categories of convictions, many of which do not involve minors or children; (3) applying based on the conviction alone, regardless of individual circumstances pre- or post- conviction; and (4) applying for life without any possibility of meaningful recourse.  These are all features that the Eleventh Circuit has explained are indicative of a sex-offender law that is "not sufficiently narrowly tailored" to the

---

[41]  To put this in perspective, Plaintiffs would *not* be subject to the residency provision if they had, without a sexual motivation, kidnapped an eighteen-year-old girl or tortured a minor or murdered a minor or sold fentanyl-laden cocaine to minors. And yet, solely because they have nearly forty-year-old sex offenses where the victim was an adult, McGuire and JEB are deemed by the state to pose a lifelong danger to minors that is beyond rehabilitation such that they cannot go anywhere in public or private that a non-child or non-sibling minor is present for any reason between 10:30 p.m. and 6:00 a.m., or "reside" within 2,000 feet of a school.

First Amendment.[42]  *United States v. Finnell*, 2023 WL 6577444, at *2 (11th Cir. Oct. 10, 2023); *cf. United States v. Widmer,* 785 F.3d 200, 207 (6th Cir. 2015) (explaining that "[s]pecial conditions of supervised release that implicate parental rights are considered more intrusive and require explicit consideration by the sentencing court," but upholding such a condition because it was time-limited to five years, there was a mechanism to petition to modify based on changed circumstances, and because its application took into consideration the defendant's "personal characteristics and proclivities").  Indeed, these structural features are "inconsistent with [the Supreme Court's] general approach to the use of preventative rules in the First Amendment context."  *Edenfield v. Fane*, 507 U.S. at 761, 777 (1993).  "Broad prophylactic rules in the area of free expression are suspect.  Precision of regulation must be the touchstone in an area so closely touching our most precious freedoms."[43]  *Id.*

---

[42] Though not directly relevant to this analysis, the residency provision is also retroactive, meaning that a registrant like McGuire who was convicted of a sex offense in Colorado over 20 years before the creation of modern ASORCNA, and who had no other criminal history, is subject to its prohibitions.  Ala. Code § 15-20A-3(a) (making ASORCNA "applicable to every adult sex offender convicted of a sex offense as defined in Section 15-20A-5, without regard to when his or her crime or crimes were committed or his or her duty to register arose."); *Cf. State v. Hinman*, 2023 MT 116, ¶ 19, 412 Mont. 434, 444, 530 P.3d 1271, 1276 (explaining that a sweeping sex-offender regime that is "akin to being placed on permanent probation" has an "effect like punishment" and is "clearly generally understood to be part of one's punishment for a sexual crime" and therefore should not be applied retroactively).

[43] Though not directly considered here, the absence of structural tailoring in this case is compounded yet further.  As stated, the residency provision has exceptions for healthcare but not for First Amendment conduct.  But it also has no exceptions for registrants who are unable, despite best efforts, to find a compliant residency.  There may be no apartments or houses within

(continued...)

In addition to the over inclusivity of ASORCNA's definitions of "reside" and "overnight visit," and the structural features of the residency provision, the evidence supplements the conclusion that the residency provision is not narrowly tailored in that it burdens substantially more speech than needed to predictively protect society.  No one doubts that Alabama's goal of preventing sexual violence, especially toward children, is significant and legitimate.  But Alabama must nonetheless advance that objective with careful regard to government overreach and through rational means by showing that sections 11(a) and (d) actually prevent future sex offenses in a "direct and material way," *Turner*, 512 U.S. at 664, and that "alternative measures that burden substantially less speech would fail to achieve the government's interests, not simply that the chosen route is easier," *McCullen*, 573 U.S at 495.  *See also Turner*, 512 U.S. at 666 ("[When] trenching on first amendment interests, even incidentally, the government must be able to adduce either empirical support or at least sound reasoning on behalf of its

---

the resident's municipality that are compliant. Or there may be no apartments or houses within the registrant's municipality that the registrant could afford.  Or a registrant may be unable to find a compliant residency based on other circumstances beyond his or her control.  Faced with such scenarios, registrants may have to leave the community, the county, and potentially even the state, or face a felony conviction.  A law that has the potential to deny a person total access to a community likewise denies them access to all First Amendment forums within that community. *See also Murphy v. Raoul*, 380 F. Supp. 3d 731, 738, 766 (N.D. Ill. 2019) (enjoining government from jailing people convicted of sex offenses "indefinitely because they are unable to find a [compliant] residence due to indigence and lack of support"); *State v. Talbert*, 221 N.C. App. 650, 727 S.E.2d 908 (2012) (prohibiting the government from revoking a person's probation simply because he could not find a residence that complied with the state's residency provision).

measures.").  To do so, Alabama cannot rely on stigma, speculation, or conjecture. *Edenfield*, 507 U.S. at 770.

So what is Defendants' evidentiary basis for concluding that sections 11(a) and 11(d) do not burden substantially more expressive activity than necessary to further the government's goal of predictively protecting minors from sexual abuse?[44]   Slim to none.  *See generally* Expert Report of Matt Delisi, Ph.d, (Doc. # 120-27) (outlining Defendants' evidentiary basis for the residency provision).

Defendants' evidence fails to bring into genuine dispute many of Plaintiffs' factual contentions:

- Recidivism rates are not uniform but vary considerably across individuals with a history of sexual crime.  Declaration of R. Karl Hanson (Doc. # 120-33 at 2.)

- The risk for recidivism can be assessed more reliably than a conviction alone by using common risk assessment tools, such as the Static-99R, which are used to classify individuals into various risk levels. *Id.*

- Once convicted, most sex offenders are never convicted of another sexual offense. *Id.*

---

[44]   Here, the analysis for the first time considers the data in the record pertaining to the risks posed by people with sex convictions.  It considers that data in the light most favorable to Defendants.  Though it is not Plaintiffs' burden under a tailoring analysis, Plaintiffs' expert evidence clearly establishes that section 11(a) and section 11(d) burden substantially more expressive activity than necessary to protect the public, particularly minors. *See* (Doc. # 120-33.)  Defendants' expert evidence, viewed in the light most favorable to them, does not bring that finding into dispute.  As already stated, the tailoring analysis stands without considering the data the parties submitted, but that evidence bolsters the court's conclusion that Plaintiffs are entitled to judgment as a matter of law.

- As with general recidivism, the risk for sexual recidivism declines the longer the individual remains offense-free in the community. *Id.*

- No available research has concluded that residency restrictions have the intended effect of reducing recidivism. *Id.* at 48–49.

Even in the light most favorable to Defendants, their evidence only speaks to sex offenders in a broad, general sense. For example, Defendants' expert asserts that sex offenders are "three to five times" more likely to recidivate with a sexual offense than people with non-sex offense convictions. (Doc. # 120-27 at 20.) On the other hand, Defendants' expert concedes, with some caveats, that sex offenders are generally *less* likely to recidivate than other types of criminal offenders. *Id.* at 21. In terms of the efficacy of sex-offender statutes, Defendants' expert generally states that "[r]esearch supports the effectiveness of sex offender restrictions at deterring recidivist activity and thus promoting public safety." (Doc. # 120-27 at 56.) He cites several studies in support. None of these studies deal with *residency* restrictions, but rather with sex-offender laws generally (mainly registration and notification laws, both of which are common and neither of which is challenged here) and they are therefore not directly on point. But even putting that generality aside, the scholarship he cites largely does more harm to Defendants' case than good.

For example, to support his contention that sex offender registration and notification laws reduce recidivism, Defendants' expert cites a study that ultimately found that sex offender *registration* laws somewhat reduce recidivism

but that sex offender *notification* laws "may actually increase recidivism[,]" which is "significant, given that notification's purpose is recidivism reduction."  Prescott, J.J., & Rockoff, J.E., Do Sex Offender Registration and Notification Laws Affect Criminal Behavior?, 54 The Journal of Law and Economics, 161-206 (2011). Another cited study, which conducted a meta-analysis of all empirical studies on the efficacy of sex-offender laws, found "comprehensive evidence that [sex-offender registration and notification] policies have *no effect* on sexual and non-sexual crime commission over their period of existence, thereby failing to deliver on the intention of increasing public safety."  Zgoba, K.M., & Mitchell, M.M., The Effectiveness of Sex Offender Registration and Notification: A Meta-Analysis of 25 years of Findings, Journal of Experimental Criminology, 1, 24–26 (2021) (emphasis added).  "Given the vast support that exists for the laws, their lack of efficacy will likely create a false sense of security for the public and may ultimately create more harm than benefit . . . Due to the dynamic nature of risk across time, offense, and age, recognition that [sex offender registration and notification] policies may prove to be more hurtful than helpful is a necessary conversation that does not automatically signal society has gone soft on crime." *Id.*

Finally, Defendants' expert cites a study that looked at sex offender laws in a specific jurisdiction, from the time of initial implementation through several expansions which increased the number of people on the registry.  That study's

results joined "the growing number of studies that fail to show significant relationships between levels of sexual offending and implementation of [sex-offender laws];" but it also noted that there *are* empirically supported ways to reduce sex-offender recidivism (which do not significantly burden First Amendment activity), like the provision of cognitive-behavioral treatments. Bouffard, J.A., & Askew, L.N., Time-Series Analyses of the Impact of Sex Offender Registration and Notification Law Implementation and Subsequent Modifications on Rates of Sexual Offenses, 65(11) Crime & Delinquency, 1, 24–26 (2019).

Regardless of the fact that Defendants' cited literature largely supports Plaintiffs' position, none of Defendants' evidence shows (1) that most sex offenders are likely to recidivate; (2) that any type of *residency* restriction actually reduces recidivism; (3) that all offenders should be treated as posing the same risk when they are returned to society; (4) that sex offenders' risk levels are the same across their lives; and (5) that there are not more reliable methods of evaluating risk to the public than using a conviction alone.   That is, the evidence does not support the lifetime nature of the provisions in this case, or that they apply to massive categories of offenders, or that qualifying offenders are perpetually withheld any possibility of recourse, regardless of the circumstances pre- or post-conviction.

More fundamental to the analysis, the parties have pointed to nothing in the record that suggests either section 11(a) or (d) has *any* beneficial effect on recidivism rates. Indeed, the court finds that none of Defendants' evidence (or argument) justifies why "reside" and "overnight visit" were defined so broadly or that those definitions "carefully calculated the costs and benefits associated with the burden on speech imposed by [their] prohibition[s]." *Greater New Orleans Broad. Ass'n, Inc. v. United States,* 527 U.S. 173, 188 (1999) (quoting *Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 417 (1993)). The main assertion specific to *residency* restrictions made by Defendants' expert is that "residency restrictions," as a category, need to apply to all sex offenders, regardless of their actual risk level or predicate conviction, because evidence shows that some child pornography offenders also committed contact offenses against children. (Doc. # 120-27 at 45–46.) But that does not address the effect of *Alabama's* residency provision, as it defines "reside" and "overnight visit." Nor does it address that provision's application to people who have zero history of sex crimes involving minors. Nor does it explain how the massive burden placed on First Amendment conduct by Alabama's residency provision is no more than necessary to adequately protect minors or that there are not alternative, less-burdensome measures that could equally effectuate Alabama's goals, as other states have done.

The lack of evidence about the efficacy of residency restrictions generally, and Alabama's residency provision specifically, is unsurprising. "[A] growing

body of research into the effectiveness of sex offender registries has cast significant doubt on their capacity to prevent recidivism," *State v. Hinman*, 2023 MT 116, ¶ 23, 412 Mont. 434, 446, 530 P.3d 1271, 1278, and "[c]ourts, law enforcement agencies, and scholars all have acknowledged that residency restrictions do not reduce recidivism and may actually increase the risk of reoffending," *Ortiz v. Breslin*, 142 S. Ct. 914, 916 (2022) (Sotomayor, J., concurring in denial of certiorari) (surveying residency restriction literature). And, based on the evidence in the record, it is not hard to see why severely restrictive residency provisions have failed to reduce recidivism and may actually increase recidivism. "It is well established that major contributors to desisting from crime are having a place to stay, a job, and stable prosocial peers." (Doc. # 120-33 at 49.)  "[P]olicies and practices that systematically block the attainment of normal, prosocial goals are likely to increase the recidivism risk of individuals who sexually offended in their past." *Id.*; *see also Packingham*, 582 U.S. at 108.

In summary, Defendants' evidence fails to show that the residency provision is narrowly tailored. It does not show that either section 11(a) or 11(d) actually reduce recidivism at all, let alone in a "direct and material way," *Turner*, 512 U.S. at 664, nor does it show that "alternative measures that burden substantially less speech would fail to achieve the government's interests." *McCullen*, 573 U.S. at 495. However, as stated, the residency provision facially fails to comport with the

First Amendment without considering the evidence—the consideration of which only further compels that conclusion.

Undoubtedly, certain sex offenders can be legitimately prevented from sharing a home with minors and from having unfettered, unsupervised access to minors.  But, as explained at length, ASORCNA's residency provision operates far beyond that undisputed, baseline premise.  Under the content-neutral intermediate scrutiny analysis, "[t]he fatal problem" for sections 11(a) and 11(d) is that their wide sweep precludes the access of a massive category of people to a limitless number of expressive places and expressive activity that are, in an overwhelming number of applications, "most unlikely to facilitate the commission of a sex crime against a child."  *Packingham*, 582 U.S. at 114 (Alito, J., concurring).  Sections 11(a) and 11(d), both individually and collectively, therefore are not sufficiently tailored to their preventative-protective purpose.

### 6. *Conclusion and Remedy*

The First Amendment does not disappear for people who have been convicted of a sex offense, have served their time, and are returned back to society.[45]  "Even convicted criminals—and in some instances especially convicted criminals—might receive legitimate benefits" from attending church, engaging in

---

[45] *Packingham*, 582 U.S. at 108; *McClendon v. Long*, 22 F.4th 1330, 1338 (11th Cir. 2022); *Cornelio v. Connecticut*, 32 F.4th 160, 169 (2d Cir. 2022) (assuming free-world sex offenders have full First Amendment protection); *Doe v. Harris*, 772 F.3d 563, 570 (9th Cir. 2014) (explaining why "registered sex offenders enjoy full First Amendment protection").

political speech, spending time with family, and otherwise accessing the world of expression protected by the First Amendment, "in particular if they seek to reform and to pursue lawful and rewarding lives." *Packingham*, 582 U.S. at 108.   In the long struggle to balance individual rights against society's need to defend itself against lawlessness, "it is easy to make light of insistence on scrupulous regard for the safeguards of civil liberties when invoked on behalf of the unworthy." *Davis v. United States*, 328 U.S. 582, 597 (1946) (Frankfurter, J., dissenting)).  It is often all too easy.  But "[h]istory bears testimony that by such disregard are the rights of liberty extinguished, heedlessly at first, then stealthily, and brazenly in the end." *Id.*

"Broad prophylactic rules in the area of free expression are suspect," *Edenfield*, 507 U.S. at 777, but "the First Amendment permits a State to enact specific, narrowly tailored laws that prohibit a sex offender from engaging in conduct that often presages a sexual crime," *Packingham*, 582 U.S. at 106. Relatedly, the First Amendment prohibits a State from enacting a sweepingly broad law that wrongfully punishes a substantial amount of protected activity, even if the law's purpose is to prevent conduct that purportedly presages sexual crimes. Under the proper construction of ASORCNA's definition of "reside" and "overnight visit," Alabama's residency provision is substantially overbroad on its face.   It is also not narrowly tailored to the state's significant interest in predictively preventing sexual abuse, for reasons that are universal to all people the

law applies.  The residency provision is therefore impermissible under two distinct but related First Amendment doctrines.  To be clear, sections 11(a) and 11(d) individually, and when viewed collectively, fail under the overbreadth doctrine. They separately fail under a content-neutral, time-place-manner analysis applying intermediate scrutiny.

This outcome is not reached without importing full credit to the principle that facial invalidation, be it through a universal declaration or universal injunction, is a strong medicine of last-resort proportions.  *See Labrador v. Poe by & through Poe*, 144 S. Ct. 921, 927 (2024) (Gorsuch, J., concurring in grant of stay) (instructing lower courts to take "heed" before entering equitable relief that applies beyond the parties).[46]  But a court is not a legislature.  It cannot rewrite or blind itself to that which was written.   And, despite the serious governmental interest of protecting children from sexual abuse, what was enacted creates criminal prohibitions of alarming breadth that extend well beyond the evils the state seeks to combat in obvious contravention of the First Amendment.  *See Marbury v. Madison*, 5 U.S. 137, 178–180 (1803) ("It is emphatically the province

---

[46] Recently, there has been a flood of criticism targeting universal injunctions. *Labrador v. Poe by & through Poe*, 144 S. Ct. 921, 927 (2024); *see also Griffin* v. *HM Florida-ORL, LLC*, 601 U. S. ——, ——, 144 S.Ct. 1, 2, 217 L.Ed.2d 227 (2023) (statement of Kavanaugh, J.)  Arguments against universal injunctions are largely inapplicable here given that the relief arrives, not as preliminary relief, but as permanent relief, after years of consideration, a developed record, and a judgment on the merits in the unique First Amendment context.  *But see Cartwright*, 32 F.4th at 1128 (holding that a district court "abused its discretion in refusing to preliminarily enjoin [a 'fatally overbroad' ordinance]").

and duty of the judicial department to say what the law is . . . [A] law repugnant to the constitution is void.").  Faced with a facially unconstitutional and overbroad law, the court's duty is to narrowly invalidate the violative portions of ASORCNA.[47]  *See Hansen*, 599 U.S. at 770; *Packingham*, 582 U.S. at 109; *Hicks*, 539 U.S. at 118–119 (collecting cases); *Broadrick*, 413 U.S. at 613.  In so doing, the court recognizes that its ruling will fracture the existing structure of ASORCNA and will necessarily have some harmful effects, in particular preventing the enforcement of section 11(d) against certain dangerous people who constitutionally can be prevented from living under the same roof with minors.[48]  But the statute in its current form addresses that most serious concern by

_____

[47] A law that fails to facially comply with the First Amendment "must be invalidated." *Packingham*, 582 U.S. at 109 (invalid under time, place, or manner); *Hansen*, 599 U.S. at 770 (a facially overbroad law will be held "invalid").  However, "[a] court should refrain from invalidating more of the statute than is necessary. Whenever an act of [the legislature] contains unobjectionable provisions separable from those found to be unconstitutional, it is the duty of this court to so declare, and to maintain the act in so far as it is valid." *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 684 (1987) (alterations adopted) (internal quotation marks omitted).  Every statute codified as part of the 1975 Code of Alabama, including ASORCNA, is subject to a strong severability clause.  *See* Ala. Code § 1-1-16 ("If any provision of this Code or any amendment hereto, or any other statute, or the application thereof to any person, thing or circumstances, is held invalid by a court of competent jurisdiction, such invalidity shall not affect the provisions or application of this Code or such amendment or statute that can be given effect without the invalid provisions or application, and to this end, the provisions of this Code and such amendments and statutes are declared to be severable.").

[48] Section 11(d) is not the only tool the government has to prevent sex offenders from living with minors.  *See* Ala. Code §§ 12-15-301 (termination of parental rights).  And it is not the only tool non-registrant guardians have to prevent sex offenders from living with minors.  *Id.*; *see also* Ala. Code § 30-3-152 (divorce custody, visitation, and supervision); Ala. Code § 30-3-135 (permitting visitation to parents who committed domestic or family violence "only if the court finds that adequate provision for the safety of the child . . . can be made"); Ala. Code § 30-5-2 (providing protection-from-abuse orders for the "purpose of preventing acts of abuse," including child abuse and sexual abuse).

carelessly, unnecessarily, and disproportionately burdening too much innocent conduct protected by the First Amendment without adequately tailoring its prohibitions to the goal of protecting vulnerable populations, particularly minors.

Ultimately, the court hopes that its ruling will ignite efforts to craft a carefully considered sex-offender provision that can survive constitutional review, as has the national model, SORNA.  In light of this hope, and in recognition that facial invalidation of a state law is at the pinnacle of the federal judiciary's power, the court will craft a tailored remedy that is "limited to the inadequacy" that produced the Plaintiffs' injuries—that inadequacy being the facially unconstitutional laws.  *Lewis v. Casey*, 518 U.S. 343, 357 (1996); *see also Missouri v. Jenkins*, 515 U.S. 70, 88, 89 (1995) ("[T]he nature of the . . . remedy is to be determined by the nature and scope of the constitutional violation" (citation and internal quotation marks omitted)).  The strictures of that remedy will be set forth in a separate order and final judgment to follow.

## B.    THE EMPLOYMENT PROVISION (Count 2)

ASORCNA registrants face many obstacles to acquiring gainful, compliant employment.[49]  First, they must overcome the market conditions all Alabamians face.  Second, they lose out on jobs solely based on their status as sex offenders.

---

[49] While not considered here, in a previous case from 2015, evidence reflected that "approximately 85 percent of jobs in [Montgomery, Alabama] are barred to offenders," and that approximately half of registrants in Montgomery County are unemployed.  *McGuire I*, 83 F. Supp. 3d at 1241, n.7.

Many employers do not hire convicted criminals. Even more will not hire sex offenders. Third, governmental and high-earning professional jobs are largely foreclosed based on the difficulty attendant to those jobs' various admissions programs and licensure boards, many of which use subjective character evaluations. Fourth, ASORCNA places a blanket prohibition on registrants working for schools, amusement parks, or "any other business or organization that provides services primarily to children." Ala. Code § 15-20A-13(a). And fifth, ASORCNA creates a bewildering and ever-evolving maze of geographic zones of exclusion surrounding every school and childcare facility in Alabama. Registrants are not allowed to engage in any type of work, for any period of time, within these zones. This last subsection of ASORCNA's employment provision is before the court. *Id.* § 15-20A-13(b). It applies for life, with only limited exceptions and no mechanism for appeal based on individualized circumstances.

In broad terms, ASORCNA's employment provision prohibits ASORCNA registrants from working or volunteering within 2,000 feet of schools and childcare facilities. *See id*. Plaintiffs assert that this employment restriction is unconstitutionally vague. (Doc. # 88 at 60). Specifically, Plaintiffs attack the employment restriction in two ways. First, Plaintiffs argue that the employment restriction is vague in that it is functionally impossible for them to definitively ascertain whether they are within the employment restriction's 2,000-foot boundary. Second, Plaintiffs argue that the employment restriction is vague

because it is unclear whether ASORCNA's definition of "maintain[ing] employment" includes intermittent or fleeting work within a zone of exclusion that is incidental to work typically performed outside the exclusion zone, like a landscaper occasionally mowing a lawn within 2,000 feet of a school.

In response, Defendants raise four arguments: (1) that McGuire and JEB's void-for-vagueness claims are precluded, (Doc. # 122 at 72–76); (2) that the statute of limitations bars all Plaintiffs' claims, (Doc. # 122 at 86–87); (3) that the court must abstain from ruling on KLL's claim, (Doc. # 122 at 62); and (4) that both of Plaintiffs' vagueness arguments fail on the merits. (Doc. # 122 at 103.) For the reasons to follow, McGuire and JEB are not precluded from bringing the claim, the applicable statute of limitations does not bar the challenge, and the court will not abstain from ruling on the merits of the claim. Nonetheless, neither of Plaintiffs' vagueness theories challenging the employment restriction win on the merits and Defendants are entitled to judgment as a matter of law as to them.

That said, the discussion of the employment provision will conclude with a section responding to a serious issue highlighted by the briefing. This issue, as will be explained, calls into doubt the validity of a binding Eleventh Circuit case and is suggestive of potential litigation confusion or worse when it comes to the State's past and present representations about the scope of ASORCNA. *See* Section 4(b), below.

*1.    Claim Preclusion*

Defendants argue that *res judicata* bars McGuire and JEB from challenging ASORCNA's employment provision on vagueness grounds.[50]  (Doc. # 122 at 72–73.)  Unlike the residency provision, which was substantially amended in 2017 resulting in new injuries, the employment provisions have not meaningfully changed since McGuire and JEB brought their previous suits challenging ASORCNA.

At the motion-to-dismiss stage, the court declined to apply claim preclusion to McGuire's vagueness challenge to the employment provisions because it found plausible the allegations that a modification of significant facts had occurred during the five-year passage of time between McGuire's last challenge to ASORCNA (*McGuire I*), and his instigation of this suit.  *See McGuire II*, 512 F. Supp. 3d at 1216 ("*McGuire I* did not involve any allegations related to McGuire's religious practices or his desires to work for a church. Therefore, McGuire can challenge the employment provisions.").  What was plausible then has been sufficiently supported by evidence in the record.  The primary factual change McGuire highlights is that he now wants to join his church's music ministry and work for his church, which is not something he wanted to do when he brought *McGuire I*.  (Doc. # 130 at 45); (Doc. # 120-9 at 23).

_____

[50]  Defendants do not invoke *res judicata* as to KLL because KLL has not challenged ASORCNA before.

Recognizing that "ASORCNA has nearly boundless potential to injure old plaintiffs in new ways," the court finds that McGuire's current desire to join his church's music ministry is a sufficient factual change to create a new vagueness challenge to the employment provision that he could not have brought in *McGuire I*. *McGuire II*, 512 F. Supp. 3d at 1214. Therefore, *res judicata* does not bar McGuire's vagueness challenge to the employment provisions. *See Ragsdale v. Rubbermaid, Inc.*, 193 F.3d 1235, 1238 (11th Cir. 1999) (explaining that res judicata does not bar claims that could not "have been raised in an earlier proceeding").

JEB is similarly not precluded from bringing a vagueness challenge to the employment provisions. In JEB's previous case, *Doe I*, he asserted a nearly identical vagueness challenge to ASORCNA's employment provision. But that claim was dismissed because the court found that JEB lacked standing to challenge the employment provision. Back then he was not injured by the employment provision because he was neither employed nor seeking employment—he drew income from disability. As Defendants successfully argued then, JEB was unable to work. *McGuire II*, 512 F. Supp. 3d at 1219–20 ("JEB's challenge to the employment provisions was not considered on the merits because he lacked standing at that time . . . he was disabled . . . and admitted . . . 'he was physically unable to work.'").

Now, the facts have changed significantly, enabling JEB to establish standing to bring the claim that he previously could not. The record evidence reflects, in contrast to *Doe I*, where he was unemployed and not seeking employment, that JEB is currently periodically employed, he does seek work, and, most importantly, he declines work opportunities because of the employment provisions. Accordingly, JEB is not precluded from bringing a vagueness challenge to the employment provisions because, as a factual matter, he lacked standing to bring that claim in *Doe I*—standing which he has now acquired as a result of a significant factual change in the years since *Doe I*.

### 2.  *Statute of Limitations*

Defendants allege that the statute of limitations bars all Plaintiffs from challenging the employment provisions on vagueness grounds because their injuries accrued at the time each Plaintiff was required to register under ASORCNA. (Doc. # 122 at 86–87.) For JEB and McGuire, the limitations argument is the same as the one raised in the claim preclusion analysis. *See id.* Their claims are not barred by the statute of limitations for the same reason that the claims were not barred by res judicata: New, cognizable injuries caused by the employment provisions triggered new violations and claims that accrued within the applicable two-year statutory window. The statute of limitations argument fails.

### 3.   Abstention

Defendants argue that the court should abstain from ruling on the vagueness challenge to the employment provision as it relates to KLL bringing that challenge. (Doc. # 122 at 68–69.)   For the same reason the court did not walk down the analytical path of Defendants' abstention argument for the residency provision, it will likewise not do so here.   *See supra* Section IV.A.3.   Regardless of whether or not the court should abstain from engaging with KLL's facial vagueness attack to the employment provision, the court must tackle the merits of that exact claim as properly brought by JEB and McGuire, who are not precluded from bringing the claim, who brought it within the applicable statute of limitations, who have a justiciable case in all respects, and against whom Defendants do not argue that abstention applies.

### 4.   Whether the Employment Provision is Vague

Plaintiffs   allege   that   ASORCNA's   employment   provision   is unconstitutionally vague.   The employment provision prohibits sex offenders from "accept[ing] or maintain[ing] employment or a volunteer position within 2,000 feet of the property on which a school or childcare facility is located unless otherwise exempted pursuant to Section 15-20A-24 and 15-20A-25."   Ala. Code § 15-20A-13(b).   ASORCNA further provides that "the 2,000-foot measurement shall be taken in a straight line from nearest property line to nearest property line."   *Id.*

§ 15-20A-13(f).  "Any person who knowingly violates this section shall be guilty of a Class C felony."  *Id.* § 15-20A-13(g).

"School" is defined as a "licensed or accredited public, private, or church school that offers instruction in grades pre-K-12 if it is sufficiently conspicuous that a reasonable person should know or recognize its location or its address has been provided to local law enforcement."  *Id.* § 15-20A-4(24).  "Childcare facility" is defined as a "licensed child daycare center, a licensed childcare facility, or any other childcare service that is exempt from licensing pursuant to Section 38-7-3, if it is sufficiently conspicuous that a reasonable person should know or recognize its location or its address has been provided to local law enforcement."  *Id.* § 15-20A-4(3).

Meanwhile, "employment" is defined as "[c]ompensated work or a volunteer position for any period of time, regardless of whether the work is full-time, part-time, self-employment, or as an independent contractor or day laborer, provided that employment does not include any time spent traveling as a necessary incident to performing the work."  *Id.* § 15-20A-4(5).  Importantly, "volunteer position" is defined as "[a]n arrangement whereby a person works without compensation for any period of time on behalf of a business, school, charity, childcare facility, *or other organization or entity*, provided that a volunteer position does not include any time spent traveling as a necessary incident to performing the uncompensated

work." *Id.* § 15-20A-4(32) (emphasis added).   It is undisputed that "other organization or entity" includes churches and other religious entities.

Together, and at the most general level, the text identifies what areas are prohibited (school or childcare facility); what proximity to those areas is prohibited (2,000 feet); how that distance is calculated (straight line from nearest property line to nearest property line); what constitutes employment or volunteer position (compensated or uncompensated work for any period of time, not including travel incident to that work); and that there is some scienter requirement (knowingly) to be held criminally liable.   Summarizing, ASORCNA prohibits registrants from "knowingly" working with or without compensation for an "organization or entity," including churches, for "any period of time," excluding travel incident to the work, within 2,000 feet (measured "in a straight line from nearest property line to nearest property line") of a school or childcare facility. *Id.* §§ 15-20A-13(g), 15-20A-4(32), 15-20A-4(5), 15-20A-13(b), 15-20A-13(f).

However, ASORCNA does not provide for a preapproval process that enables registrants to request that they be informed of whether a location complies with the employment provision.   Nor does ASORCNA give registrants a land-use database or map of all restricted areas from which registrants can self-determine whether a location is within a restricted zone.   Nor does ASORCNA itself provide registrants with a list of schools and childcare facilities captured by the employment provision.   Nor does ASORCNA provide registrants with guidance as

to how to measure the 2,000-foot boundary from nearest property line to nearest property line.

Plaintiffs argue that ASORCNA's employment provision is vague in two ways. First, Plaintiffs argue the employment provision leaves registrants "with no way to know whether a location is within the employment zone of exclusion." (Doc. # 125 at 100.) Second, Plaintiffs argue that the employment provision does not "make clear whether intermittent working within the zone of exclusion is permitted if it is incidental to work performed outside the zone of exclusion." (Doc. # 125 at 100.) Both arguments are reasonable, and they highlight serious problems with ASORCNA's severely restrictive employment provision. But neither carries the day under vagueness doctrine.

           a)    "No way to know whether a location is within the employment zone of exclusion."

Plaintiffs first argue the employment provision is unconstitutionally vague because it leaves them "with no way to know whether a location is within the employment zone of exclusion." (Doc. # 125 at 100.) This argument is focused on the employment provisions' restricted locations, the boundary-setting text, and the practical realities registrants face when determining whether or not they are in a prohibited location. But the text is not ambiguous or vague as to what constitutes a restricted location (schools and childcare facilities), how far registrants must stay away from those locations (2,000 feet), or how to delineate the boundary line from

120

that location (measured in a straight line from nearest property line to nearest property line).  Plaintiffs generally do not assert that there is any vagueness as to *what* constitutes a restricted area under the employment provision.

Rather, Plaintiffs argue that the employment provision is vague because the statutory text leaves registrants with no way to know if they are in a restricted area. That is, Plaintiffs know what the employment provision proscribes but say that it is impossible for them to discern whether they are inside or outside of that proscription.  Specifically, Plaintiffs assert that the employment provision is vague because the "information by which the 2,000-foot exclusion zone is measured is always and only in the State's possession," which the State is not required to give registrants and which Plaintiffs are unable to acquire without the voluntary assistance of the State.  (Doc. # 130 at 90–91.)

Defendants respond that the core of Plaintiffs' legal argument is that Plaintiffs find it "difficult" and "burdensome" to figure out what areas the employment provision restricts.  (Doc. # 129 at 58–59.)  Ultimately that may be the factual situation, but that is not Plaintiffs' legal argument.  Plaintiffs' legal argument is based on much more than mere difficulty: it is based on impossibility. Plaintiffs contend that the employment provision is unconstitutionally vague because registrants are *always* unable to definitively determine whether they are in a restricted area without voluntary assistance from public officials.  (Doc. # 130 at 91.)

To help understand this argument in the fair-notice vagueness context, Plaintiffs provide this analogy:

The Employment Provision is like playing baseball with bases that only the umpire can see and that can move at any time. Players know that they have to make it to first base, through second and third bases, and back to home plate to score. And they know that they have to tag each base. But they do not know where the bases are. So players never know—until the umpire has called them safe or out—whether they have tagged or missed the invisible bases.

A player in this game will undoubtedly develop some workarounds—ways he can estimate where the bases are so he can try to tag them and not be called out. He might look for clues on the field that indicate where the bases are (or are not). He might watch other players run, see where they were when they were called safe, and try to run to those areas of the field. He might keep track of the places he himself had been called safe and try to run there again. But the bases can move at any time, and the player cannot see them. That means that even if a base was in a specific location during the previous series—or previous game, or previous play—the base might not be there this time when he runs to it.

Maybe the player could ask the umpire to tell him whether there is a base in the location the player plans to run. Maybe the player could even ask the umpire to tell him where *all* the bases are. But the umpire does not have to give the player that information ahead of time—nothing in the rules requires that the player know where the bases are. And answering those questions from players might interfere with the umpire's actual job of calling players safe or out. What's more, nothing in the rules guarantees that if an umpire tells a player he will be safe if he runs to a specific location that the player *will in fact be safe*. That's because the rules don't allow for a call of safe or out until the player either hits or misses the base.

Undoubtedly, there will be times a registrant will guess correctly and tag a base as he runs. That doesn't mean that it was clear where the base was; it means he got lucky. And this isn't horseshoes or hand grenades; close doesn't count. A small error has the same effect as a large one: the registrant is out. But in this game, the consequences of being called out are a felony conviction and the

possibility of years in prison. Players will be understandably afraid of guessing incorrectly. Many of them might choose to forgo the game altogether.

Nobody would say that the rules of that game aren't "vague." Nobody would say that players have "fair notice" of what conduct will get them out just because they know they have to hit the bases and they'll be out if they don't.

(Doc. # 134 at 34–35.)

To be sure, as Plaintiffs admit, this is not the typical vagueness claim wherein it is unclear what facts must be proven to constitute a violation. (Doc. # 130 at 91 ("This sort of challenge might not map cleanly onto vagueness doctrine.").)  It is not the typical vagueness claim because "[w]hat renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is."  *United States v. Williams*, 553 U.S. 285, 306 (2008).  Here, the boundary-line facts that must be proven are clear: registrants cannot work within 2,000 feet—measured from nearest property line to nearest property line—of a school or childcare facility.  Thus, the vagueness doctrine does not cleanly overlay this claim.  *See Klein v. San Diego Cnty.*, 463 F.3d 1029, 1039 (9th Cir. 2006) (finding the same for a claim alleging that is "impossible to determine, from public record or by any other means, where the boundary of [a] 300-foot zone lies").

However, both logic and precedent support Plaintiffs' contention that a type of vagueness-related fair-notice claim can lie against a statute that makes it

impossible for someone to know whether they are violating its clear terms.  The vagueness doctrine is a subset of the due process right to fair warning; fair warning stands for the principle that "no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed." *Bouie v. City of Columbia,* 378 U.S. 347, 351 (1964); *see Colten v. Kentucky*, 407 U.S. 104, 110 (1972) ("The root of the vagueness doctrine is a rough idea of fairness" in that a person must have "fair warning" or fair notice of prohibited conduct).   As Justice Holmes wrote, "fair warning" is "what the law intends to do if a certain line is passed." *United States v. Lanier*, 520 U.S. 259, 265 (1997) (quoting *McBoyle v. United States,* 283 U.S. 25, 27 (1931)).   "To make the warning fair, so far as possible the line should be clear." *Id.*   A clear line is not just a nominally clear line.  To be truly clear, the line must be fairly discernible in reality.   Recognizing this, courts have accepted that a fair-warning vagueness-tinged claim may lie where a statute is clear and concrete in its terms, but those clear terms are impossible to discern or conform to in practice. *See Klein*, 463 F.3d at 1039.

While atypical, this type of fair warning claim often arises in the geographic-exclusion context.   In *Doe v. Snyder*, Michigan's strict-liability sex offender law was found to be unconstitutionally vague because it was unclear "from where to measure the 1,000 feet distance used to determine the exclusion zones," and because, "even if there were a consensus about how [the distance] should be measured," neither registrants "nor law enforcement have the necessary

data to determine the zones." 101 F. Supp. 3d 672, 684 (E.D. Mich. 2015). Meanwhile, in *Klein*, the Ninth Circuit recognized that a 300-foot picketing boundary could be unconstitutionally vague if it were "impossible to determine the 300-foot boundary with any precision" under a strict-liability statute. 463 F.3d at 1039.

In light of this precedent, and the general principle that due process protects against "vague laws [that] trap the innocent by not providing fair warning," the court has no trouble recognizing that a facial vagueness claim may lie against a strict-liability criminal statute that may be concrete on its face, but where it is impossible or functionally impossible in practice to discern whether its prohibitions are being violated, thus forcing regulated persons to "steer far wider of the unlawful zone . . . than if the boundaries of the forbidden areas were clearly marked." *Grayned v. City of Rockford*, 408 U.S. 104, 108–09 (1972) (quoting *Baggett v. Bullitt*, 77 U.S. 360, 372 (1964) (internal quotations omitted)).

Despite recognizing that a potential vagueness claim of the type Plaintiffs' assert is viable, the issue with Plaintiffs' vagueness claim here is twofold. First, despite it being unclear whether registrants are able to *precisely* determine the exclusionary zones, registrants are "able to estimate the boundary with some level of precision." *Klein*, 463 F.3d at 1039. And second, unlike Plaintiffs' cited cases recognizing this type of vagueness claim, ASORCNA's employment provision is *not* a strict-liability statute, and registrants are protected to some extent by the

provision's "knowingly" scienter element.  *Cf. Klein*, 463 F.3d at 1039 (strict liability); *Doe*, 101 F. Supp. 3d at 684 (strict liability).  *See also Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc*., 455 U.S. 489, 499 (1982) ("The [Supreme] Court has recognized that a scienter requirement may mitigate a law's vagueness.").

The statute itself tells registrants the distance: 2,000 feet.  The statute tells registrants how to measure that distance: from nearest property line to nearest property line.  *Cf. Doe*, 101 F. Supp. 3d at 684 (finding Michigan's sex offender law vague in part because it did not explain how to measure the boundary distance).  The statute tells registrants what locations trigger the restricted areas: schools and childcare facilities.  The evidence shows that Plaintiffs know how to definitively determine what schools are captured by ASORCNA.  And while Plaintiffs' deposition testimony (and briefing) indicates that the State has provided them with "no way to know" what childcare facilities are captured by ASORCNA, that testimony is contradicted by undisputed evidence in the record.[51]  (Doc. # 130 at 91.)  The State of Alabama has a public list, but not a geographic map, of all licensed and exempted childcare facilities that are captured by ASORCNA.  *See*

---

[51]  In his deposition, KLL stated that "there's no way for [him] to" determine where are and what are the prohibited daycares.  (Doc. # 123-4 at 14.)  "I mean there's daycares all through neighborhoods, everything. Like the daycare that's two street over from my house, there's no sign that there's a daycare. There's no – if you pull it up in Google Maps, there's nothing there, but [it] is registered through the State."  *Id.*

*Day    Care    Directory*,   Ala.   Dep't   of   Human   Resources, https://apps.dhr.alabama.gov/daycare/daycare_search.

Thus, it is not impossible for registrants to determine what locations are captured by the employment provision.  But, make no mistake, the burden that the employment provision places on registrants seeking lawful employment is immense.  Registrants may have a path to determining with some level of precision whether they are working in an exclusionary zone, but that path is laden with obstacles.  In order to have some measure of certainty, and in the absence of a preapproval provision or geographic map provided by the government, the best-faith and diligent registrants have to run a time-consuming gauntlet of self-help processes to ensure they are not exposed to felonious liability.

For any employment location, registrants can start by calling public officials and asking whether the location is excluded by ASORCNA.  Nothing guarantees the registrants will receive a response.  And the evidence reflects that registrants are routinely unable to get an answer from public officials.  Some public officials refuse to respond absent the registrants having a job offer in hand.  Other times, law enforcement officers refuse to answer and instead detain and frisk Plaintiffs after identifying Plaintiffs as sex offenders who just want to make sure they are complying with the employment provision.  Oftentimes, public officials simply tell registrants, "I don't know" whether a location is prohibited.  (Doc. # 120-7 at 10.) That answer is unsurprising.  After all, unlike other states, Alabama has not

provided registrants *or* law enforcement officials with any type of readily accessible and accurate database or map, like standard zoning maps, of exclusionary zones, despite ASORCNA's employment provision creating an intricate geographic web of exclusion based on evolving land-use practices and shifts in property lines.  In this void, registrants are left to rely on a combination of scattered resources, online tools, and prayers that the information—which requires a non-insignificant amount of money to access in the first place—is up to date and accurate.

For each prospective employment location, registrants have to consult school and childcare directories to determine if any surround the employment location.  For each identified school and childcare facility, registrants can start the measuring process by using Google Maps or some other online mapping tool to receive rough estimates of the distances between the employment location and prohibited location.  (Doc. # 123-4 at 97 (KLL stating he "won't go anywhere near [a school or childcare facility].  I don't know exactly what 2,000 feet is.  But if I can open it on my maps and it's within my finger's touch, I don't go there.").)  Neither Google Maps nor similar online tools provide precise parcel data or clearly mark property lines (let alone "nearest" property lines) as would be necessary to definitely ensure compliance with the bright-line 2,000-foot exclusionary distance.  *See Doe*, 101 F. Supp. 3d at 684 (explaining that Google Maps does not "eliminate many of the sources of vagueness" because such tools do "not provide a registrant

with the necessary detail to determine whether a property that is close to 1,000 feet away from a school property line falls within an exclusion zone").  Alternatively, registrants could go analog and pull out a 2000-foot tape measure to check the distance between property lines from 360 different points on the compass, obviously an impossible task.[52]

But whether approaching the task from online maps or a tape measure, registrants must have access to property lines to be certain they are complying with the employment restriction's 2,000-foot exclusion.[53]  Based on the briefing and the evidence in the record, it is unclear how registrants *or* public officials go about obtaining precise property lines from which to measure.

The evidence does, however, suggest that some public officials rely on Google Maps when trying to locate ASORCNA's exclusionary zones.  (Doc. # 123-4 at 14 (KLL explaining that a public official showed him how to use Google Maps to check locations).)  As discussed, using Google Maps to delineate precise distances between property lines is fraught with uncertainty:  It provides an estimate but not clarity.  Indeed, Plaintiffs have submitted evidence indicating that other registrants have been charged for violating the employment restriction even

---

[52]  Not be overly technical, but any property can be approached from 360 degrees—360 different angles from which to measure.  Only one is usually the "nearest" angle to another property.

[53]  Indeed, it is highly doubtful that most *property owners* know the precise location of the entire boundary line of their property.  Yet, ASORCNA requires registrants to know what most property owners do not.

though the Google Maps measure-distance feature told them they were free and clear of the exclusionary zone.  If public officials are primarily relying on Google Maps to determine excluded areas—as the evidence suggests they do—then uncertainty abounds.  *See Doe*, 101 F. Supp. 3d at 684.  As Defendants' point out, an employment location "either is or is not within" the 2,000-foot exclusionary margin.  (Doc. # 129 at 59.)

Thus, based on the evidence in the record there is a genuine dispute of fact as to whether it is functionally impossible for registrants (or public officials for that matter) to determine *precisely* whether an employment location is within a zone of exclusion.  *Klein*, 463 F.3d at 1039.  Indeed, the evidence suggests that both registrants and public officials are rarely, if ever, *certain* whether an employment location falls within the 2,000-foot boundary, when it is a close call.  In that uncertainty, vagueness shrouds the contours of what the law prohibits.

However, while precise certainty about the exclusionary zones seems realistically unavailable to registrants, online mapping tools, like Google Maps, do allow registrants "to estimate the boundary with some level of precision."  *Id.*  Registrants may have to steer wider than 2,000 feet by using Google Maps and accounting for the uncertainty that tool generates.  But for a law to be unconstitutionally vague, its uncertainty must require registrants to "steer *far* wider of the unlawful zone . . . than if the boundaries of the forbidden areas were clearly marked."  *Grayned*, 408 U.S. at 109 (emphasis added); *see also Klein*, 463 F.3d at

1039.  Because registrants have a path to determining the boundary lines "with some level of precision," and because the statute contains a scienter element that protects registrants from being convicted for "an honest mistake as to whether they were violating [the 2,000-foot requirement]," the uncertainty that admittedly pervades the employment provision is not such that it requires registrants to "steer far wider of the unlawful zone." *Klein*, 463 F.3d at 1039.  It is a close call, but for this reason, Plaintiffs' first vagueness argument against the employment provision fails.

In summary, the court is sympathetic to the extreme difficulty Plaintiffs face in determining whether a given employment location is within a zone of exclusion. In the absence of an official preapproval process or a regularly updated geographic map reflecting zones of exclusion, registrants are left with an expensive, time-consuming process of self-help to determine whether a given employment location is within a zone of exclusion.  That process includes rigorously and routinely checking public databases for schools and childcare facilities.  And then, the only practical way registrants can test distances from schools and childcare facilities (other than by requesting specific parcel data records from government offices, hiring a surveyor, and measuring themselves) is via online mapping tools like Google Maps, which are used by some public officials to estimate the exclusionary zones.  And this process is not just a one-shot event for any employment location: schools can move, childcare facilities can open and close, and what was once a

compliant location may become a noncompliant location moments after a registrant checked. The court has little doubt that even the best-faith registrants often find themselves unknowingly working within exclusionary zones despite diligent effort and expending considerable resources to stay away from excluded areas.

If registrants faced the employment provision under a strict-liability regime, the court would have no issue with finding that law vague, but that is not the case here. *Cf. Doe*, 101 F. Supp. 3d at 684. As stated above, the employment provision has a scienter element that protects registrants from being convicted for good-faith mistakes if their best efforts to "estimate the boundary with some level of precision," ultimately failed to be totally precise. *Klein*, 463 F.3d at 1039. *See also Vill. of Hoffman Ests.*, 455 U.S. at 499 ("The [Supreme] Court has recognized that a scienter requirement may mitigate a law's vagueness.").

Summary judgment will be granted in Defendants' favor as to Plaintiffs' claim that the employment provision, Ala. Code § 15-20A-13, is unconstitutionally vague in that it leaves registrants "with no way to know whether a location is within the employment zone of exclusion." (Doc. # 125 at 100.)

      b)    "Whether intermittent working within the zone of exclusion is permitted."

Plaintiffs secondarily argue that ASORCNA's employment provision is vague "because it leaves registrants uncertain about whether fleeting or

intermittent work performed within the exclusion zone is prohibited." (Doc. # 125 at 112.)   Plaintiffs here are not arguing that it is difficult to conform to the employment restriction, but that the employment restriction's text does not make clear whether fleeting or intermittent work within an exclusionary zone is prohibited.   For example, Plaintiffs assert that it is unclear whether they would violate the employment provision if they took work as a landscaper, roofer, or pizza-delivery person and had to temporarily enter an exclusion zone to perform a work-related task such as mowing a lawn or delivering a pizza to a customer.   This is no small issue.   If fleeting or intermittent work within an exclusionary zone always qualifies as maintaining employment in that zone, then the world of available jobs to registrants shrinks immensely.   Unfortunately for registrants, the statutory text is clear that non-travel-related work—be it fleeting or prolonged— within an exclusion zone is prohibited.   *See* Ala. Code § 15-20A-4(5).

A criminal statute is unconstitutionally vague "if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits." *Hill v. Colorado,* 530 U.S. 703, 732 (2000).   Typically, "[t]o state a void-for-vagueness claim, the language of the ordinance itself must be vague." *See Diversified Numismatics, Inc. v. City of Orlando, FL.*, 949 F.2d 382, 387 (11th Cir. 1991) (explaining that vagueness typically requires plaintiffs to point to "specific aspects of the wording of the [challenged law] that are insufficiently definite").

The employment restriction prohibits sex offenders from "accept[ing] or maintain[ing] employment or a volunteer position within 2,000 feet of the property on which a school or childcare facility is located."  Ala. Code § 15-20A-13(b). ASORCNA does not define "maintain."   However, ASORCNA defines "EMPLOYMENT" as "*[c]ompensated work or a volunteer position for any period of time*, regardless of whether the work is full-time, part-time, self-employment, or as an independent contractor or day laborer, provided that employment does not include any time spent traveling as a necessary incident to performing the work." *Id.* § 15-20A-4(5) (emphasis added).   "Volunteer position" similarly includes uncompensated work "for any period of time." *Id.* § 15-20A-4(32)

As Defendants' point out, the statutory text clearly provides that employment includes compensated work *for any period of time* regardless of if it is as a contractor or day laborer.  *Id.* § 15-20A-4(5).  Thus, Defendants argue that "ASORCNA is [] clear that fleeting or intermittent work performed in [an] exclusion zone is prohibited." (Doc. # 129 at 57.)   Defendants are right.

The language of the employment restriction itself is not vague as it relates to intermittent or fleeting work performed in an exclusion zone.  The employment restriction prohibits work "for any period of time" in an exclusion zone unless that time is "spent traveling as a necessary incident to performing the work." Ala. Code § 15-20A-4(5).  While the prohibition's use of "maintain" somewhat implies that a one-off task inside an exclusion zone would not be considered

"maintain[ing] employment" because the traditional understanding of the word maintain implies more than an isolated incident, that argument is foreclosed by ASORCNA's definition of "employment," which states that employment can be for "any period of time" ("any" necessarily including one-off incidents) and that employment includes "day laborers" and "independent contractors" (positions which routinely deal with single-day, one-off tasks at various worksites). *Id.* Moreover, the exception for travel incident to other work would not make sense if non-travel work-related tasks, even if fleeting or intermittent, were permitted within exclusion zones. *See id.*

The plain language of the statute is supported by both the Attorney General's current interpretation of the employment provision and the interpretation of Alabama's sex-offender resource prosecutor, Trisha Mellberg Cater. As Mellberg Cater stated:

> [I]f you're going to one job that is not within 2,000 feet and you're going to another job that's not within 2,000 feet, driving past a daycare or some prohibited address would not be a violation. However, it says that no adult sex offender can maintain employment within 2,000 foot, so any employment within 2,000 foot of a school or daycare would be a violation.

(Doc. # 123-28 at 15.)

She went on to state, "[t]here's nothing in [ASORCNA] that provides exceptions for [] intermittent employment." *Id.* at 14. Under that principle, according to her, each of the following types of employment would violate ASORCNA:

135

- Cutting the grass at a noncompliant house three times a month.

- Driving a van and picking up supplies from several locations within the exclusion zone.

- Driving a delivery van and delivering packages to locations within the exclusion zone.

*Id.* at 14–15.

But the court need not credit how the Attorney General, or his ASORCNA prosecutors, interpret the law. The employment provision's text itself is clear. That text is disastrous to registrants' already-limited employment options,[54] but it is not unconstitutionally vague: Any non-travel work "for any period of time" within an exclusion zone constitutes accepting or maintaining employment under ASORCNA. *Id.* § 15-20A-4(5). That necessarily includes fleeting or intermittent work within an exclusion zone that is not related to travel. A contrary conclusion would require the court to inject an intermittent-work exception that is nonexistent in the words of the employment provision. Because "the words of the ordinance itself" are unambiguous, this ends the vagueness inquiry. *Grayned*, 408 U.S. at 110. Defendants are entitled to judgment as a matter of law as it concerns

---

[54] Ironically, ASORCNA generally does not prohibit fleeting or intermittent presence within employment zones of exclusion if the registrant is *not* working or volunteering (and is not otherwise present long enough to establish a residency). ASORCNA is not concerned if a registrant briefly gets a meal or visits a friend or plays basketball within 2,000 feet of a school. It just prohibits registrants from being able to volunteer or make money within that zone on a temporary or fleeting basis.

Plaintiffs' challenge that the employment provision is unconstitutionally vague because "it leaves registrants uncertain about whether fleeting or intermittent work performed within the exclusion zone is prohibited." (Doc. # 125 at 112.) Such intermittent work is prohibited.

*

But that does not end discussion of this claim. While ASORCNA's clear definition of employment easily disposes of Plaintiffs' secondary vagueness argument, they cannot be blamed for bringing the argument. Indeed, nobody can blame them for being uncertain about whether ASORCNA's employment provision prohibits fleeting or intermittent work within exclusionary zones. The core of that uncertainty, however, does not stem from the statutory text itself. It stems from the Attorney General's previous statements as recounted and relied upon by the Eleventh Circuit in a binding opinion issued over a year ago in *McGuire*, 50 F.4th 986 (published October 3, 2022).

In that related case, the plaintiffs alleged that ASORCNA's employment and residency provisions violated the *Ex Post Facto* Clause's prohibition against retroactive punishments. The Eleventh Circuit ultimately held that those provisions are not sufficiently punitive to violate that clause. In reaching that decision, the Eleventh Circuit considered the scope of the employment provision. In framing the scope of the provision, the Eleventh Circuit wrote the following:

> [T]he Attorney General concedes that registrants are permitted to
> work in jobs that require them to perform some tasks inside exclusion

137

> zones. For example, the Attorney General says a registrant working as a delivery person may drop off packages at locations inside exclusion zones and a registrant working as a landscaper may tend to yards inside exclusion zones.

*Id.* at 1009.

The Eleventh Circuit—in distinguishing its holding from a contrary Sixth Circuit holding—explained that the employment provision does not "effectively bar[] registrants from working any job that required traveling from jobsite to jobsite" because "registrants may hold jobs that occasionally require them to perform tasks inside . . . an exclusion zone."[55]  *Id.* at 1010, n.27 (quoting *Doe v. Snyder*, 834 F.3d 696, 701–02 (6th Cir. 2016)).   That statement contradicts the plain language of ASORCNA and appears to be solely supported by the Attorney General's concession that "a registrant working as a delivery person may drop off packages at locations inside exclusion zones and a registrant working as a landscaper may tend to yards inside exclusion zones." *Id.* at 1009.  Nowhere in the opinion is ASORCNA's definition of "employment" cited.  *See* Ala. Code § 15-20A-4(5) (excluding "[c]ompensated work . . . for any period of time, regardless of whether the work is . . . as an independent contractor or day laborer").

---

[55]   The Eleventh Circuit also distinguished its ruling in *McGuire* from the Sixth Circuit's ruling in *Doe* because the Sixth Circuit was dealing with a law that had a loitering prohibition, whereas, per the Eleventh Circuit, "ASORCNA imposes no bar on loitering." *McGuire*, 50 F.4th at 1010 n.27.  But ASORCNA does impose a bar on loitering.  *See* Ala. Code § 15-20A-17 ("Loitering in certain areas.").

It has been over a year since that opinion. *McGuire*, 50 F.4th at 986. In that time, any registrant having read it could not be blamed for believing that they were allowed to perform occasional work within employment zones. After all, the Attorney General apparently represented that such work was permitted, and the Eleventh Circuit concluded the employment provision was not sufficiently punitive to violate the *Ex Post Facto* Clause because, in part, registrants are allowed to "hold jobs that occasionally require them to perform tasks inside . . . an exclusion zone." *Id.* at 1010, n.27. If a vagueness claim could rest upon an Attorney General's prior statements or a federal court's embrace of those statements, then the Plaintiffs in this case would have at least a colorable argument that "people of ordinary intelligence" would not know whether ASORCNA's employment provision prohibits intermittent or fleeting work within zones of exclusion. *Hill*, 530 U.S. at 732. But vagueness claims focus on the language of a statute itself.[56] *Diversified Numismatics*, 949 F.2d at 387. And, as explained, that language is clear.

Despite this statutory clarity, the overall situation is troubling. There is a precedential case that rests on a misstatement of law that was arguably invited by a

---

[56] The interpretation of a statute is a question of law, *see United States v. Pistone*, 177 F.3d 957, 958 (11th Cir. 1999), and federal courts are not obliged to accept a party's concession on such questions, *see Roberts v. Galen of Va., Inc.*, 525 U.S. 249, 253 (1999) ("The concession of a point on appeal by respondent is by no means dispositive of a legal issue."); *United States v. Lee*, 586 F.3d 859, 866 (11th Cir. 2009) (refusing to accept the government's concession as to the interpretation of a statutory term). *See also Dana's R.R. Supply v. AG*, 807 F.3d 1235, 1255 (11th Cir. 2015) (Carnes, J., dissenting) (same).

defendant. That misstatement not only undermines the analytical validity of a binding case, but it also creates within registrants an understandable uncertainty about what ASORCNA prohibits—potentially leading registrants to engage in conduct that Alabama would prosecute (and Defendant Marshall now insists he would prosecute).

And the mistake is not about some minor aspect of ASORCNA. It sounds in the overall reach and conceptualization of the employment provision. If occasional work within exclusion zones were allowed under certain circumstances, the available job opportunities for registrants would dramatically increase. If occasional work in exclusionary zones is disallowed, as the statute explicitly says it is, so many more doors close to registrants—greatly amplifying the breadth and effect of the employment provision in a way that may have altered the Eleventh Circuit's previous *Ex Post Facto* Clause ruling in *McGuire*. For example, under *McGuire*'s analysis, employment is anchored to the principal location of the employer and occasional work-related departures from that location into exclusionary zones can be permissible. This view is much less restrictive, and it opens the door to an expanded array of blue collar and working-class jobs that necessitate site-to-site work, like garbage collectors, contractors, food deliverers, landscapers, ride-share drivers, travelling salespeople, caterers, logistics personnel, sanitary personnel, temporary contract employees, *etc*. But those doors are effectively closed by the text of ASORCNA and its definition of "employment."

Therefore, the employment provision conceptualized in *McGuire* is not remotely similar to the provision as it exists in reality and as it exists according to Defendants' representations in this case.

It is equally troubling that the mistake in *McGuire* arose because either (1) Defendant Marshall held a prior, contradictory opinion on the law, as represented to the Eleventh Circuit in *McGuire*, or (2) as Defendants now assert, the Eleventh Circuit was outright mistaken about statements made by Defendant Marshall and relied upon in *McGuire*. *See* (Doc. # 129 at 58 ("[T]his appears to be a mistaken conclusion by the [Eleventh Circuit].")); (Doc. # 122 at 108 n.33) ("[T]he Eleventh Circuit provides no citation to this 'concession.'"). Regardless of which of these articulations is closer to the truth, the State failed to raise the issue in a timely fashion. To the court's knowledge, the State has done nothing to address the Eleventh Circuit's alleged mistake, like filing a notice or moving for re-hearing or correction. Instead, having acquired a favorable ruling in *McGuire* built atop a known legal error that was attributed to the State's representations, the State remained mute until reversing course in this case.

This court is placed in an untenable position. It is not interested in delving into whether misrepresentations were made to, or mistakes were made by, the Eleventh Circuit. The Eleventh Circuit is in a better position to sort that out. For now, the court outlines the issue and leaves it to the parties or the Eleventh Circuit to address at the appropriate time and place.

*

As explained above, both vagueness theories Plaintiffs use to challenge the employment provision are unavailing.  Summary judgment will be granted in Defendants' favor as to this claim.

## C.    THE LOITERING PROVISION (Count 2)

Unlike the previously discussed challenges that were raised by all Plaintiffs, only KLL challenges ASORCNA's loitering provision.  (Doc. # 125 at 144 n.58.) KLL argues that the loitering provision, Section 15-20A-17, is unconstitutionally vague for several reasons.  Defendants respond (1) that the court must abstain from ruling on this claim and/or that the court lacks equitable jurisdiction, (Doc. # 122 at 62); (2) that the statute of limitations bars KLL from bringing this claim, (Doc. # 122 at 88); and (3) that, in any event, the claim fails on the merits, (Doc. # 122 at 113).  For the following reasons, the court will address KLL's vagueness challenge to ASORCNA's loitering provision on the merits.  But the merits' arguments fail.  Summary judgment will be granted in Defendants' favor for this claim.

### 1.    Abstention

The court previously gave short shrift to Defendants' abstention arguments because they were only targeted at KLL and the resolution of the previous claims' neither gained nor lost anything by KLL's nominal inclusion.  Not so with this

142

claim.  Because KLL is the only plaintiff to challenge the loitering provision on vagueness grounds, if abstention is appropriate the claim will be dismissed.

But the court will not abstain from ruling on the merits of KLL's vagueness challenge to ASORCNA's loitering provision.  "The decision whether or not to abstain is one of discretion."  *High Ol' Times, Inc. v. Busbee*, 621 F.2d 135, 138 (5th Cir. 1980).  *Pullman* abstention requires two elements: (1) an unsettled question of state law and (2) that the question be dispositive of the case and would avoid, or substantially modify, the constitutional question.  *Duke v. James*, 713 F.2d 1506, 1510 (11th Cir. 1983).  "If such an issue is present, it is then incumbent on the court to exercise discretion in deciding whether to abstain."  *Id*.  Several factors are at play in determining whether the court should abstain.  "Factors arguing against abstention include delay, cost, doubt as to the adequacy of state procedures for having the state law question resolved, the existence of factual disputes, and the fact that the case has already been in litigation for a long time."  *Id*.  Here, assuming without deciding that the threshold elements for abstention have been met, the court finds that all the above factors are present and counsel against abstaining from KLL's vagueness challenge to the loitering provision.

Relatedly, Defendants argue that this court should decline to hear KLL's suit for declaratory and injunctive relief because KLL may be able to petition in state court for relief from some or all of ASORCNA's provisions.  (Doc. # 122 at 46.) This argument was addressed at the motion-to-dismiss stage.  Then, as now,

Defendants' proposed state remedies are either not adequate in that they do not provide a remedy "as complete or efficient as that which equity could afford," or are not adequate in that it is uncertain if KLL is even eligible for Defendants' proposed remedy. *McGuire II*, 512 F. Supp. 3d at 1224. Accordingly, equity jurisprudence does not divest the court of its authority to issue injunctive or declaratory relief for KLL's vagueness challenge to the loitering provision. *See Levin v. Com. Energy, Inc.,* 560 U.S. 413, 423 n.3 (2010).

2.   *Statute of Limitations*

Defendants argue that the statute of limitations bars KLL's vagueness challenge to the loitering provision because the loitering provision was "not amended in 2017," thus, "the 2017 amendments did not impose any new injuries that create a new cause of action." (Doc. # 122 at 88.) Notwithstanding the fact that the loitering provision was not amended in 2017, the court nevertheless concludes that the statute of limitations does not bar KLL from challenging the loitering provision because the record reflects that KLL has had, and continues to have, the loitering provision enforced against him in freshly injurious ways that constitute new and/or continuing violations.

As previously determined, KLL alleges he is "bound in perpetuity" by the loitering provision. *McGuire II*, 512 F. Supp. 3d at 1221. "Thus, every day dawns a new winter of [his] discontent. To the extent the law is enforced, [he] will suffer new injuries." *Id.* (citing *Maldonado v. Harris*, 370 F.3d 945, 956 (9th Cir. 2004)).

Here, the evidence in the record creates a genuine dispute of fact as to whether KLL continues to have the loitering provision newly enforced against him: At his deposition, he repeatedly stated that he is routinely asked to leave parks and other public spaces under the banner of the loitering provision and that he self-censors from engaging in legitimate conduct out of fear that he will be discriminated against under the banner of the loitering provision. *See* (Doc. # 125 at 115–119.) With the evidence currently in the record, the court is satisfied at this stage that the statute of limitations does not bar KLL's vagueness challenge to the loitering provision—either as a claim based on fresh violations or continued violations. *See Doe as Next Friend of Doe #6 v. Swearingen*, 51 F.4th 1295, 1309 (11th Cir. 2022) ("[O]ngoing threat of enforcement continues to violate their rights each time they forego an opportunity out of fear of enforcement." (citing *Ctr. for Biological Diversity v. Hamilton*, 453 F.3d 1331, 1334 (11th Cir. 2006))).

### 3.   *Whether the Loitering Provision is Vague*

KLL challenges ASORCNA's loitering provision, Ala. Code § 15-20A-17(a), as unconstitutionally vague.  (Doc. # 125 at 114.)  That provision prohibits adult sex offenders whose sex offenses involved a minor from "loiter[ing] on or within 500 feet of the property line of any property on where there is a school, childcare facility, playground, park, athletic field or facility, school bus stop, college or university, or any other business or facility having a principal purpose of caring for, educating, or entertaining minors."  Ala. Code § 15-20A-17(a)(1).

"Loiter" is defined as entering or remaining on or within 500 feet of a property "while having *no legitimate purpose*, or if a legitimate purpose exists, remaining on that property beyond the time necessary to fulfill that purpose." *Id.* § 15-20A-17(a)(2) (emphasis added).   But the prohibition is conditional.   An adult sex offender does not violate the loitering provision "unless he or she has first been asked to leave a prohibited location by a *person authorized to exclude the adult sex offender from the premises*." *Id.*  (emphasis added).

Pursuant to the Due Process Clause of the Fifth Amendment, a statute or regulation is "void for vagueness if its prohibitions are not clearly defined." *Grayned*, 408 U.S. at 108; *see also Keister v. Bell*, 29 F.4th 1239 (11th Cir. 2022). The vagueness doctrine is a safeguard that upholds the continual mandate that "no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed." *Bouie*, 378 U.S. at 351.

"A statute can be impermissibly vague for either of two independent reasons." *Hill*, 530 U.S. at 732 (citing *Chicago v. Morales,* 527 U.S. 41, 56–57 (1999)).  First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits.  *Id.*  Second, if it authorizes or even encourages arbitrary and discriminatory enforcement by giving government officials the sole ability to interpret the scope of the law.  *Id.*  When a legislature fails to provide these minimal guidelines, a criminal statute may permit "a standardless sweep [that] allows policemen, prosecutors, and juries to pursue their

personal predilections." *Smith v. Goguen*, 415 U.S. 566, 575 (1974); *see also Kolender v. Lawson*, 461 U.S. 352, 357–58 (1983).

In engaging in a statutory vagueness analysis, courts must examine the entire text of the statutory framework, its structure, and the logical relationship all of its related provisions in interpreting the language of a statute. *Abramski v. United States*, 573 U.S. 169 (2014); *United States v. McLemore*, 28 F.3d 1160 (11th Cir. 1994). When a statute fails to define a term, courts must give words "their common and ordinary meaning." *High Ol' Times, Inc. v. Busbee*, 673 F.2d 1225, 1229 (11th Cir. 1982); *see also Watson v. United States*, 552 U.S. 74, 79 (2007) ("With no statutory definition or definitive clue, the meaning of [a word] has to turn on the language as we normally speak it . . . . [We] look to 'everyday meaning.'"). Courts also turn to dictionary definitions for guidance when called upon to interpret the meaning of a statute. *United States v. Lopez*, 590 F.3d 1238 (11th Cir. 2009): *United States v. McNab*, 331 F.3d 1228, 1237 (11th Cir. 2003) (citing Black's Law Dictionary and Merriam Webster's Collegiate Dictionary for definitions).

KLL argues that ASORCNA's loitering provision is unconstitutionally vague for four reasons. (Doc. # 125 at 121.) The first reason deals with the provision's "legitimate purpose" language. Ala. Code § 15-20A-17(a)(2) (requiring someone to be somewhere with "no legitimate purpose" to qualify as "loiter[ing]"). The remaining three reasons deal with the "authorized person"

condition.  *Id.*  (stating that there can be no loitering violation unless an authorized person first asks a registrant to leave a certain area).  Each will be addressed in turn, but none prevails.

First, KLL argues that the loitering provision is unconstitutionally vague because it does not define "legitimate purpose," and "legitimate purpose," according to KLL, "lacks a definite standard, which leaves registrants without notice of what conduct is prohibited and allows and encourages discriminatory enforcement."  (Doc. # 125 at 124.)  KLL argues that because "legitimate purpose" is neither defined nor anchored to a standard, registrants are left to only guess at whether their purpose at a certain place is legitimate, and therefore permissible, or illegitimate, and therefore impermissible.

The record reflects that KLL has many times been asked to leave parks and other places when all he was doing was hanging out with his family, playing with the dog, and/or throwing a ball with his brother.  (Doc. # 120-17 at 60–61.)  When asked, KLL always leaves because he is unsure of what is a legitimate purpose.  As KLL stated, "trying to determine what's a legitimate reason to you versus what's a legitimate reason to me is like—it's too open to opinion to really say that, hey, you know, my brother wanted to go to the park today . . . To me that's a legitimate reason. You know, I am here with my brother. We are just trying to have a good time. To you that might not be a legitimate reason."  *Id.* at 59.

"What renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is." *Williams*, 553 U.S. at 306.   Thus, the first question is whether proving the existence or absence of a "legitimate purpose" is a difficult fact to resolve (which would not be vague), or if it is unclear *what* constitutes a legitimate purpose.   It is not unclear what ASORCNA means by "legitimate purpose."

"Legitimate purpose" is not defined by ASORCNA itself.   Nor does the statute contemplate a standard from which to test what is a legitimate purpose.   It provides no examples either.   However, Black's Law Dictionary defines "legitimate" as "[c]omplying with the law; lawful." *Legitimate*, BLACK'S LAW DICTIONARY (11th ed. 2019).   Similarly, Webster's defines the adjective legitimate as "lawfully begotten" or "accordant with law," and provides the following synonyms to legitimate: lawful, legal, licit.   *Legitimate*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/legitimate#h1.   As Defendants assert, "prohibiting loitering with no legitimate purpose is indistinguishable from prohibiting loitering with an unlawful purpose."  (Doc. # 129 at 62); *see also* (Doc. # 133 at 45 ("Considering 'legitimate' to reach only unlawful conduct comports with its ordinary meaning in the context of a criminal statute.")).

While KLL persuasively highlights that several Alabama officials seem to think "legitimate purpose" means any purpose an official subjectively deems to be

149

legitimate, this is not the case.   (Doc. # 123-25 at 11 ("Q: [Is] a legitimate or illegitimate purpose without being defined at all is necessarily an ambiguous term? A: Sure. Q: Changes from person to person, doesn't it? A: Different opinions. Q: It's all based on that individual's perspective. Am I correct? A: Yes, sir.").) Rather, as one official stated, a legitimate purpose is any "purpose that is not to engage in illegal activity."  (Doc. # 129 at 61).

Thus, as Defendants argue, even in the absence of a statutory definition of "legitimate," the plain meaning of legitimate and the above dictionary definitions confirm that "legitimate purpose" as used by ASORCNA's loitering provision is synonymous with "lawful purpose." Because a legitimate purpose is a lawful purpose, registrants do not loiter under ASORCNA unless they are in or remaining in an area with an unlawful purpose.   Accordingly, ASORCNA's loitering provision's use of "legitimate purpose" is not vague.[57]   *See Morales*, 527 U.S. at

---

[57]   While ASORCNA's loitering provision is not vague in its use of "legitimate purpose," the clear meaning of the provision does raise an interesting question: What's the point of the loitering provision?  Because legitimate purpose means lawful purpose, the loitering provision is essentially a law that says registrants should not have an unlawful purpose at certain places. Thus, the loitering provision is akin to standard, universally applicable inchoate crimes. Ultimately, because legitimate purpose means lawful purpose, the loitering provision places no heightened burden on registrants than to that which they are already bound—act and intend to act lawfully.   Based on the clear language of the statute, and Defendants' arguments advancing that language, registrants should have no fear of being prosecuted under the loitering provision unless they have an otherwise illegal or unlawful purpose, or intent to engage in criminal activity.  KLL testified that he is unsure whether playing catch in the park with his brother constitutes a legitimate purpose under ASORCNA.  Because park recreation is not, by itself, unlawful, it is a legitimate purpose and therefore does not meet ASORCNA's definition of loitering.

62 (explaining that a loitering ordinance that "only applied to loitering that had an apparently harmful purpose or effect" would likely not be vague).

With the "legitimate purpose" vagueness argument put to rest, the court will briefly address KLL's alternative "authorized person" arguments.  KLL expresses three concerns about the loitering provision's authorized person language: (1) whether a sex offender *per se* violates the statute by remaining after being asked to leave by an authorized person, (2) whether an authorized person can ask a sex offender who has a legitimate purpose to be on the premises to leave, and (3) not knowing who an authorized person can be.  (Doc. # 125 at 121.)  None of these arguments render the loitering provision vague.

The statute is clear that "[a]n adult sex offender does not violate this subsection unless he or she has first been asked to leave[.]" Ala. Code § 15-20A-17(a)(2).  This element is a necessary condition—not a sufficient one as Plaintiffs say—and thus protects offenders by limiting the circumstances under which a prosecution could be initiated.  *Id.*  The statute is clear that a sex offender does not violate the loitering provision unless he has an illegitimate purpose to be somewhere *and* is asked by an authorized person to leave.  But being asked to leave does not abrogate the first element.  *Id.*  As Defendants explain, "[i]f, a sex offender has a legitimate purpose, he cannot be convicted merely because an authorized person asks him to leave." (Doc. # 129 at 64.)  Therefore, contrary to KLL's first two concerns, a registrant does not

necessarily violate ASORCNA's loitering provision by virtue of remaining somewhere after being asked to leave by an authorized person.

Lastly, KLL argues that the loitering provision is vague because it does not limit who can be an authorized person with exclusionary power over a certain location, nor does it provide a registrant with a way to discern whether someone is actually an authorized person. This argument is a nonstarter. The statute is not vague. Per the statutory text, an authorized person is someone who has the power to "exclude the adult sex offender from the premises." Ala. Code § 15-20A-17(a)(2). Who may have exclusionary authority for a given property is inherently fact specific. But someone either does or does not have such authority for certain premises. It may be a police officer or a park ranger or a director of a sports complex. It is dependent on the property and the authorization of that property's agents. *Id.* ("An authorized person" includes "any person designated with [the] authority" to "exclude the adult sex offender from the premises.").

In summary, KLL argues that the loitering provision is vague (1) because "legitimate purpose" is subjective, (2) because it is unclear who is an authorized person, and (3) because it is unclear whether a registrant with a legitimate purpose to be somewhere can violate ASORCNA simply by not leaving after an authorized person asks them to leave. As explained above, "legitimate purpose" means "lawful purpose" and therefore is not vague or subjective. An authorized person is clearly defined by ASORCNA as a person with the power to exclude someone

152

from the property.  And registrants cannot violate ASORCNA's loitering provision unless they lack a legitimate purpose to be at a certain place, regardless of whether they have been asked to leave an area or not.[58]  Summary judgment will be granted in Defendants' favor as to KLL's vagueness challenge to ASORCNA's loitering provision.

D.    THE ID PROVISION or THE CV606 INDICATOR[59] (Count 3)

The First Amendment "includes both the right to speak freely and the right to refrain from speaking at all."  *Wooley v. Maynard*, 430 U.S. 705, 714 (1977).  All Plaintiffs assert that ASORCNA's "Branded ID Provision" unconstitutionally compels them to speak in violation of the First Amendment.  (Doc. # 125 at 128.)

ASORCNA has long required registrants to carry a state-issued identification card (usually, a driver's license) "bearing a designation that enables law enforcement officers to identify the licensee as a sex offender."  Ala. Code § 15-20A-18(b).  ASORCNA delegates the power to determine what

---

[58]  This is not to say that registrants are able to stay on a given premises after being asked to leave.  Doing so may be unlawful for a variety of other non-ASORCNA laws, like trespass.  *See* ALA. CODE § 13A-7-2 to -4 (describing criminal trespass offenses); *see also id.* § 13A-7-1(3) (defining "enter or remain unlawfully" for purposes of the trespassing offenses as remaining on any premises after being asked to leave by "the owner of such premises or other authorized person").  And, of course, if a registrant is unlawfully on a property for reasons unrelated to ASORCNA, then that registrant at that time would be loitering with an illegitimate purpose in violation of ASORCNA.

[59]  Notably, this claim was not analyzed in the court's prior motion-to-dismiss opinion because the claim was added in a subsequent amended complaint.  *See* (Doc. # 55.)  This is the first time a court has analyzed the CV606 indicator.

that "designation" looks like to the Alabama Law Enforcement Agency (ALEA). *Id.* § 15-20A-18(c).   In years past, ALEA designated registrants' IDs with "CRIMINAL SEX OFFENDER" in bold, red letters across the top of the ID.   In *Doe I*, this court found that the "CRIMINAL SEX OFFENDER" label compelled speech in violation of the First Amendment.   367 F. Supp. 3d at 1323–27.   ALEA has since dispensed of the CRIMINAL SEX OFFENDER designation and now requires registrants' IDs to bear the code "CV606" in small black font.[60]   Plaintiffs allege that the CV606 indicator violates the First Amendment by compelling their speech without sufficiently serving the state's interest for compelling that speech.

The CV606 indicator brand compels speech but it does not violate the First Amendment because it serves a compelling government interest and is sufficiently tailored to that interest.   As an initial matter, the CV606 ID indicator brand is compelled speech.[61]   This is so for the same reasons that the court previously found the "CRIMINAL SEX OFFENDER" ID label compelled speech.   *See Doe 1*, 367 F. Supp. 3d at 1323–27 (explaining why an ID label requirement attached to a

---

[60]   The characters in the "CV606" indicator are the same as the last five characters of the case number, "15-CV-606" of the court's prior opinion that found the "CRIMINAL SEX OFFENDER" designation unconstitutional.   *See Doe 1*, 367 F. Supp. 3d at 1310, Case NO. 2:15-CV-606-WKW.

[61]   To qualify as compelled speech, there must be (1) speech; (2) to which the plaintiff objects; (3) that is compelled; and (4) that is readily associated with the plaintiff.   *Cressman v. Thompson*, 798 F.3d 938, 949–51 (10th Cir. 2015).   All four elements are satisfied here. "CV606" is expressive speech, which plaintiffs object to, which is required, and because it is on Plaintiffs' personal IDs, it is obviously "readily associated" with Plaintiffs.

certain group of people constitutes compelled speech).  Contrary to Defendant's assertions, the challenged provision does not simply require sex offenders to "maintain and possess an ID;" it requires the ID to bear a specific, expressive message.  Indeed, the explicit purpose of the provision is to express a class-based message.  Ala. Code § 15-20A-18(b).  Like a license plate that says, "Live Free or Die," *Wooley*, 403 U.S. at 714, or a yard sign that warns away citizens from a sex offender's home, *McClendon v. Long*, 22 F.4th 1330, 1333 (11th Cir. 2022), a required message classifying someone as a sex offender on their personal ID constitutes compelled speech.[62]

When the government forces certain citizens to advertise an expressive message as a prerequisite for those citizens to participate in society, the government has compelled speech from that citizen.  Defendants do not contest this proposition except insofar as they argue that, unlike a yard sign or license plate, a branded ID is not literally publicly effacing for anybody to view.  But, again, the express purpose of the brand is to advertise a message (that the ID holder is part of a specific class) and the label does communicate that message,

---

[62] Imagine if a state required race, political-affiliation, or religion-based symbols or codes (like a gold star) to be put on an ID.  No one could seriously think those class-based identifiers are not compelled speech.  They would be for the same reasons as here.  *Riley v. Nat'l Fed. of the Blind*, 487 U.S. 781, 797–98 (1988) ("[C]ases cannot be distinguished simply because they involved compelled statements of opinion while here we deal with compelled statements of 'fact': either form of compulsion burdens protected speech.").  They would nonetheless likely fail to pass constitutional muster at the second and third steps of the analysis: whether the state has a compelling interest in race, political-affiliation, or religion-based ID classifications and whether the state's action was sufficiently tailored to achieving that interest.

both to the government and to the broad public that Plaintiffs have to display it to in order to access basic necessities.

And if any distinction between the nature of a personal ID and a license plate lies, it lies in favor of Plaintiffs' arguments. First, unlike a car, a personal ID conveys the challenged expressive message at the same time that it conveys the ID's ownership. Someone can walk by a license plate and not associate the speech on it to anyone in particular simply because he does not know the car or the owner. Not so with an ID. Every time it is displayed, as it must be throughout daily life, the viewer attaches the expressive message to the ID holder. An ID, unlike a car, is anchored to one person and one person alone.

Second, someone can pass thousands of cars without looking at a single license plate, let alone the message on it, and even if they did, the plate itself does not directly communicate who is the speaker. In contrast, an ID may not only be incidentally seen by a passerby in public, but people, both public and private, can require an ID be shown to access something—and they do, routinely: at banks, grocery stores, restaurants, doctor's offices, movie theaters, courthouses, DMVs, apartments, colleges, national parks, libraries, museums, public transportation facilities, political party events, and the list goes on. An ID is unquestionably more necessary than a car to accessing life's necessities. If there is any doubt, try to buy a car without an ID. In short, while an ID may typically be kept in a wallet or purse, its communicative capacity to express or advertise a message is equal to if

not greater than a license plate, and a personal ID is certainly more "readily associated" with its carrier than a license plate. *Wooley*, 430 U.S. at 717 n.15. Thus, the class-based ID indicator in this case compels speech and warrants First Amendment protection.

But "[i]dentifying [Plaintiffs] interests as implicating First Amendment protections does not end [the] inquiry." *Id*. at 715. Those interests must be weighed against the state's interest. When the government "compel[s] speakers to utter or distribute speech bearing a particular message," as the ID provision does here, such a policy imposes a content-based burden on speech and is subject to strict-scrutiny review. *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 641–42 (1994); *see Pacific Gas & Elec. v. Pub. Utils. Comm'n of Cal.*, 475 U.S. 1, 19 (1986). Thus, to be valid under the First Amendment, the CV606 indicator must be a narrowly tailored means of serving a compelling state interest. *Pacific Gas & Elec.*, 475 U.S. at 19; *see Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 454 (2015) (explaining that "narrowly tailored" does not mean "perfectly tailored" (internal quotation marks omitted)).

Here, the state has a compelling interest in enabling law enforcement to readily identify a person as a sex offender.[63]  Ala. Code §§ 15-20A-18(b)-(d); *see*

---

[63] Plaintiffs argue that the state's interest cannot be in identifying people as sex offenders because the state has no interest in categorizing somebody with some other noun, like Methodist, Democrat, or Communist.  Rather, Plaintiffs assert that the state's interest is in public safety and the state has failed to show how that interest is served by the ID indicator.  (Doc. # 125 at 137–

(continued…)

*also Doe 1*, 367 F. Supp. 3d at 1326.  Still, the CV606 indicator must be narrowly tailored to achieving that interest to survive First Amendment scrutiny.  It is.  Unlike, "CRIMINAL SEX OFFENDER" in large red font, the CV606 indicator is coded and in small black font.  It is the functional equivalent of a single letter or number or symbol, which is the standard practice for many states.  While a coded indicator or symbol need not be "perfectly tailored" to the State's interest in identifying sex offenders, it is narrowly tailored to achieving that interest.  *Id.* at 1326–27 & n.4 (explaining that a single letter or code, like many states use, would be a less restrictive, more discrete, and more tailored way of identifying sex offenders to law enforcement than "CRIMINAL SEX OFFENDER").  If it were not so, then the court doubts that the First Amendment would ever permit a state to require a sex-offender indicator of any sort on sex offenders' IDs.

This outcome is not to say that the CV606 indicator comports with all constitutional dimensions; rather, just that compelled speech in the form of a small, ideologically neutral, coded sex-offender indicator on an ID card is sufficiently tailored to the state's purpose of identifying sex-offender registrants so as to be permissible under the First Amendment.  Summary judgment will be granted in

---

39.)  But this frames the state's interest too broadly.  Unlike those other class-based categories, sex offenders are subject to constitutionally valid rules, restrictions, and laws, like SORNA, the enforcement of which may require law enforcement officers to quickly ascertain an individuals' status and sex-offender criminal history.

favor of Defendants on Plaintiffs' claim that the CV606 indicator unconstitutionally compels speech in violation of the First Amendment.

### E.   THE INTERNET DISSEMINATION PROVISION[64] (Count 3)

KLL alleges that ASORCNA's internet dissemination provision, Ala. Code § 15-20A-8, which requires ALEA to publish on a public registry website various information about registrants,[65] violates the First Amendment's protections against compelled speech.  (Doc. # 88 at 64.)  While the provision requires the publication of many types of information, like name, age, and residence, KLL's claim only appears to target the website's labelling of him as a "sex offender," which he says he is not.   KLL asserts that the internet

---

[64]  To the extent that Defendants' assert that the statute of limitations bars this claim, the court finds that it does not.

[65]  ASORCNA requires that ALEA publish "on the public registry website" all of the following information about each registrant:

(1) Name, including any aliases, nicknames, ethnic, or Tribal names.
(2) Address of each residence.
(3) Address of any school the [registrant] attends or will attend. . . .
(4) Address of any employer where the [registrant] works or will work, including any transient or day laborer information.
(5) The license plate number and description of any vehicle used for work or personal use, including land vehicles, aircraft, and watercraft.
(6) A current photograph.
(7) A physical description of the [registrant].
(8) Criminal history of any sex offense for which the [registrant] has been adjudicated or convicted.
(9) The text of the criminal provision of any sex offense of which the [registrant] has been adjudicated or convicted.
(10) Status of the [registrant], including whether the [registrant] has absconded.

Ala. Code § 15-20A-8.

dissemination provision, which requires ALEA to a maintain a public website that labels him as a sex offender, violates the First Amendment because it unconstitutionally compels his speech. *See Wooley v. Maynard*, 430 U.S. 705, 714 (1977) (holding that First Amendment protection "includes both the right to speak freely and the right to refrain from speaking at all").

But the internet dissemination provision itself, Ala. Code § 15-20A-8, requires no speech from KLL or any registrants. It requires ALEA to speak. Granted, it requires ALEA to speak *about* registrants, like KLL. But the public posting of information about KLL does not mean that KLL's speech was compelled by that posting. It is purely government speech. Therefore, KLL's compelled speech attack on the internet dissemination provision must fail. Accordingly, summary judgment will be granted in Defendants' favor as to KLL's First Amendment compelled speech claim challenging Section 15-20A-8.

## F.    CONCEDED CLAIMS (Counts 4 and 5)

In Count 4, Plaintiffs contend that ASORCNA's residency provision and travel provision violate the *Ex Post Facto* Clause of the Constitution. (Doc. # 88 at 64–45.) In their summary-judgment briefing, Plaintiffs conceded these claims. (Doc. # 125 at 156.) *See also McGuire*, 50 F.4th at 1024 (holding that residency and travel provisions do not violate the *Ex Post Facto* Clause's prohibition against retroactive punishments). Similarly, KLL conceded his claim in Count 5, (Doc. # 125 at 156–57), which alleges that Defendant Marshall was selectively enforcing

ASORCNA's provisions against KLL in violation of the Fourteenth Amendment, (Doc. # 88 at 65–66).   Accordingly, judgment will be entered in favor of the Defendants as to all claims in both Count 4 and 5.

## V.   CONCLUSION

In summary, Defendants will be granted summary judgment for all claims brought by Plaintiffs against ASORCNA's employment provision, Ala. Code § 15-20A-13; loitering provision, Ala. Code § 15-20A-17; ID provision, Ala. Code § 15-20A-18; internet dissemination provision, Ala. Code § 15-20A-8; travel provision, Ala. Code § 15-20A-15; and all *Ex Post Facto* Clause and selective enforcement claims.  ASORCNA largely survives the constitutional attacks lodged against it by Plaintiffs in this case.   But it does not survive completely. ASORCNA's residency provision, Ala. Code §§ 15-20A-11(a), 15-20A-11(d), is facially unconstitutional under the First Amendment.   Accordingly, it is ORDERED as follows:

(1) Plaintiffs' motion to exclude expert opinions (Doc. # 107) is DENIED.

(2) Defendants' motion for summary judgment (Doc. # 122) is GRANTED in part and DENIED in part.

(3) Plaintiffs' motion for summary judgment (Doc. # 124) is GRANTED in part and DENIED in part.

(4) Judgment will be entered in Defendants' favor for all claims, except Plaintiffs' facial First Amendment challenges to the residency provision.

(5) Judgment will be entered in Plaintiffs' favor as to their facial First Amendment challenges to the residency provision.

A separate and final judgment will follow.

DONE this 23rd day of May, 2024.

_____/s/   W. Keith Watkins_____
UNITED STATES DISTRICT JUDGE